## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **EAST BATON ROUGE PARISH CLERK OF COURT OFFICE** | **Civil Action No.:** |
| *Plaintiff* | **Section:** |
| v. | **Judge:** |
| **ABBOTT LABORATORIES; ABBVIE INC.; ABBVIE PRODUCTS LLC (f/k/a SOLVAY PHARMACEUTICALS, INC.); ACTAVIS LLC; ACTAVIS PHARMA, INC. (f/k/a WATSON PHARMA, INC.); ACTAVIS, INC. (f/k/a WATSON PHARMACEUTICALS, INC.); ALLERGAN PLC (f/k/a ACTAVIS PLC); AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS INC.; JANSSEN PHARMACEUTICALS, INC.; JOHNSON & JOHNSON; MALLINCKRODT LLC; MALLINCKRODT PLC; MCKESSON CORPORATION; MORRIS AND DICKSON CO., LLC; MYLAN INC.; MYLAN N.V. (f/k/a MYLAN, INC.); ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. (n/k/a JANSSEN PHARMACEUTICALS, INC.); TEVA PHARMACEUTICAL INDUSTRIES LTD.; TEVA PHARMACEUTICALS USA, INC.; and WATSON LABORATORIES, INC.** | |
| *Defendants* | |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................... 1

PARTIES ................................................................................................................................... 8

   A.   Plaintiff ................................................................................................................. 8

   B.   Defendants ............................................................................................................ 9

      i.   Manufacturer Defendants ............................................................................ 9

      ii.   Distributor Defendants ............................................................................... 15

JURISDICTION AND VENUE ................................................................................................ 18

FACTUAL ALLEGATIONS .................................................................................................... 19

   A.   Manufacturer Defendants Misrepresented the Risks and Benefits of Opioid Drugs to Expand the Products' Markets and Increase their Profits ................................................................. 19

      i.   Direct-to-Physician Marketing .................................................................. 22

         1.   Pharmaceutical Sales Representatives ............................................... 25

         2.   Physician-Targeted Advertisements, Websites and Pamphlets ............ 38

            (a)   Print Advertising ................................................................... 38

            (b)   Drug Manufacturer Websites ................................................. 41

         3.   Medical "Key Opinion Leaders" ....................................................... 43

         4.   Front Groups ..................................................................................... 47

            (a)   Examples of Front Groups ..................................................... 48

            (b)   Contributions by Each Manufacturer Defendant to Front Groups ................................. 61

            (c)   Impact of Front Groups ......................................................... 68

         5.   Marketing Disguised as Continuing Medical Education ..................... 70

         6.   Micro-targeting Physicians with Certain Prescribing Patterns ........... 76

         7.   Payments to Physicians ..................................................................... 78

      ii.   Scientific Literature Marketing .................................................................. 80

         1.   Clinical "Proof" ............................................................................... 83

         2.   Treatment Guidelines, Medical Board Policies, and Consensus Statements ......................... 87

         3.   The Manufacturer Defendants' Creation of Clinical Literature Supporting Use of Opioids Drugs to Treat Chronic Pain ......................... 98

         4.   The Manufacturer Defendants' Efforts to Deflect FDA and CDC Concerns ...................... 102

      iii.   Consumer-Directed Marketing ................................................................. 105

         1.   Direct-to-Consumer Marketing ....................................................... 109

         2.   Indirect Marketing to Consumers through Front Groups ................... 109

3.   Media Campaigns and Influencing Media Coverage ............................................ 110

4.   Financial Assistance for Consumer Co-payments and Deductibles ..................... 112

5.   Targeting Vulnerable Patient Populations ........................................................... 112

6.   Marketing Measures Used by Particular Defendants to Promote Unsafe, Unapproved Use of Opioids Drugs ................................................................................................................. 115

(a)   Marketing by Abbott .................................................................................. 115

(b)   Marketing by Teva ...................................................................................... 115

(c)   Marketing by Janssen .................................................................................. 115

(d)   Marketing by Endo ...................................................................................... 117

(e)   Marketing by Actavis .................................................................................. 119

(f)   Marketing by Mallinckrodt ......................................................................... 122

(g)   Marketing by Mylan .................................................................................... 123

iv.   Targeting Insurance Companies to Gain Formulary Access .................................. 123

B.   Defendants Nurtured the Expansion of the Unsafe and Unapproved Market to Use Opioid Drugs to Treat Chronic Pain, Which Created a "Black Market" of Diversion ..................... 129

i.   Defendants' Duty to Monitor, Detect, Investigate, Refuse to Fill, and Report Suspicious Orders of Prescription Opioid Drugs ...................................................................................... 130

ii.   Defendants' Combined Efforts to Expand Opioid Drug Diversion through False and Misleading Acts and Omissions ............................................................................................... 140

iii.   Failure of the Manufacturer Defendants Regarding Diversion of the Opioid Drugs ........... 152

1.   Abbott ......................................................................................................... 154

2.   Teva ............................................................................................................ 155

3.   Janssen ........................................................................................................ 155

4.   Endo ............................................................................................................ 155

5.   Actavis ........................................................................................................ 156

6.   Mallinckrodt ............................................................................................... 157

7.   Mylan .......................................................................................................... 159

iv.   Failure of the Distributor Defendants to Track and Report Suspicious Sales of the Opioid Drugs 159

1.   AmerisourceBergen .................................................................................... 162

2.   Cardinal ...................................................................................................... 163

3.   McKesson ................................................................................................... 166

4.   Morris and Dickson .................................................................................... 168

v.   Defendants' Failures to Track and Report Suspicious Sales of Opioid Drugs Caused Significant Opioid Drug Diversion throughout East Baton Rouge Parish ......................................... 170

C.   Defendants' Fraudulent Marketing and Diversion Concealment Efforts Have Caused Significant Damages to Plaintiff EBRCOC .................................................................................. 173

i.   Health Care Plans ................................................................................................... 174

ii.    Additional Costs Incurred by the EBRCOC ............................................................ 177

D.   Defendants' Fraudulently Concealed the Nature of Plaintiff's Claims........................................ 180

STATUTE OF LIMITATIONS ARE TOLLED AND DEFENDANTS ARE ESTOPPED FROM ASSERTED STATUTE OF LIMITATIONS AS DEFENSES ............................................................ 184

A.   Continuing Conduct ............................................................................................................ 184

B.   Equitable Estoppel ............................................................................................................ 184

C.   Fraudulent Concealment ............................................................................................... 187

CAUSES OF ACTION ............................................................................................................ 189

Count I ............................................................................................................................ 189

Count II ........................................................................................................................... 197

Count III .......................................................................................................................... 205

Count IV .......................................................................................................................... 207

Count V ........................................................................................................................... 211

Count VI .......................................................................................................................... 215

Count VII ......................................................................................................................... 220

Count VIII ........................................................................................................................ 221

Count IV .......................................................................................................................... 227

Count X ........................................................................................................................... 229

Count XI .......................................................................................................................... 230

Count XII ......................................................................................................................... 232

PRAYER FOR RELIEF ........................................................................................................ 233

Plaintiff East Baton Rouge Clerk of Court Office ("EBRCOC" or "Plaintiff") brings this lawsuit against Defendants Teva Pharmaceutical Industries Ltd.; Teva Pharmaceuticals USA, Inc.; Johnson & Johnson; Janssen Pharmaceuticals, Inc.; Ortho-McNeil-Janssen Pharmaceuticals, Inc. (n/k/a Janssen Pharmaceuticals, Inc.); Endo Health Solutions Inc.; Endo Pharmaceuticals Inc.; Allergan PLC (f/k/a Actavis PLC); Watson Pharmaceuticals, Inc. (n/k/a Actavis, Inc.); Watson Laboratories, Inc.; Actavis LLC; Actavis Pharma, Inc. (f/k/a Watson Pharma, Inc.); Mallinckrodt PLC; Mallinckrodt LLC; Mylan Inc.; Mylan N.V. (f/k/a Mylan, Inc.); AbbVie Inc.; Abbott Laboratories; AbbVie Products LLC (f/k/a/ Solvay Pharmaceuticals, Inc.) ("Manufacturer Defendants"); Morris and Dickson Co., LLC; AmerisourceBergen Drug Corporation; Cardinal Health, Inc.; and McKesson Corporation ("Distributor Defendants") (collectively "Defendants"), and alleges as follows:

## PRELIMINARY STATEMENT

1.     The use of highly addictive narcotic drugs known as opioids has become a national addiction epidemic in the United States.  Drug overdoses are one of the leading causes of injury and death in the United States and are currently at their highest level ever recorded.

2.     The opioid epidemic has struck Louisiana and its municipalities particularly hard.

3.     The uptick in opioid prescriptions and resulting addiction is the result of a meticulous, wide-spread, and fraudulent marketing and educational scheme developed by Defendants, pharmaceutical manufacturers and distributors, as part of a concerted effort to expand the market for these highly addictive and dangerous drugs and to subsequently protect that market by obscuring information potentially damaging to their profits.

4.     As described by the United States Food and Drug Administration ("FDA"): "Prescription opioids are powerful pain-reducing medications that include prescription oxycodone,

hydrocode and morphine, among others, and have both benefits as well as potentially serious risks.  These medications can help manage pain when prescribed for the right condition and when used properly.  When misused or abused, they can cause serious harm, including addiction, overdoses and death."

5.      All opioids, semi-synthetic and synthetic, react in the human body in the same way; namely, they are agonists that bind with opioid receptors in the brain, ultimately numbing pain reception and encouraging the release of dopamine, which can result in a euphoric feeling.

6.      Over time, the effects of the opioids are dulled due to overexposure.  This results in a decrease in the release of dopamine and induces cravings for the drugs.

7.      Patients who receive more than a few weeks of opioid therapy frequently experience significant withdrawal symptoms, which can include severe anxiety, nausea, headaches, tremors, delirium, and pain, when that opioid use is delayed or discontinued.

8.      Historically, the risks associated with opioid use were well recognized.  Physicians were aware of the highly addictive nature of opioids and tried to avoid treating patients with them as early as the 1920s.  Manufacturing of heroin, a semi-synthetic opioid based on the structure of morphine, began in 1914.  Due to the dangerous and addictive nature of the opioid, heroin was illegal by 1924.

9.      Prior to the 1990s, physicians were reluctant to prescribe opioids for an extended period of time due to the legitimate fear of causing addiction, and only prescribed opioids to treat short-term, acute, post-surgery, and trauma-related pain or for end-of-life ("palliative") care.  This was a prevailing medical opinion that had a limiting effect on the number of opioid prescriptions written.

10.     Despite this consensus among medical professionals, Defendants set out to change the perception of opioids as addictive and encourage their use for long-term treatment of a variety of unapproved conditions such as back pain, migraines, and arthritis.

11.     Defendants each manufacture, market, sell, and/or distribute prescription opioid pain medications (herein after "Opioid Drugs").[1]  Despite knowing the danger of opioid use and the limited approved uses for these drugs, Defendants set out to reverse medical orthodoxy regarding the highly addictive nature of and inappropriate uses for Opioid Drugs by overstating the efficacy of Opioid Drugs for managing chronic pain and downplaying the high risks of addiction.

12.     Defendants worked with one another, in addition to working with "Front Groups" and physician Key Opinion Leaders (or "KOLs") to carry out a common scheme to deceptively market Opioid Drugs by misrepresenting or otherwise concealing the risks, benefits, and superiority of Opioid Drugs to treat chronic non-cancer pain, as well as to conceal the existence of drug diversion.

13.     Manufacturer Defendants utilized a traditional pharmaceutical marketing approach by targeting practitioners, the scientific literature in the medical field, patients themselves, and third-party payors, including self-funded health insurance plans like EBRCOC, in order to vastly increase prescriber demand, patient demand, and insurance coverage for Opioid Drugs, which increased profits tremendously.

---

[1] "Opioid Drugs," as defined herein, include Dilaudid/Dilaudid HP,  Duragesic, Nucynta, Nucynta ER, Ultracet, Ultram, Ultram ER, Opana, Opana ER, Percocet, Percodan, Zydone, Kadian, Norco, Roxicodone, Exalgo, Xartemis XR, Vicoprofen, Vicodin and generic versions of oxycodone, oxycodone acetaminophen, oxycodone hydrochloride, oxymorphone, hydromorphone, hydromorphone hydrochloride, hydrocodone, hydrocodone bitartrate acetaminophen, hydrocodone bitartrate ibuprofen, morphine sulfate, tramadol, and fentanyl transdermal systems.

14.    Manufacturer Defendants deliberately distributed misleading information, nationwide, including within Louisiana and East Baton Rouge Parish, despite knowing that it was false and misleading.

15.    Manufacturer Defendants each variously employed this fraudulent marketing scheme to promote the use of the prescription Opioid Drugs that Defendants manufacture, distribute, and/or sell to treat conditions well beyond those for which these products were approved.

16.    Manufacturer Defendants overcame decades of medical orthodoxy regarding the highly addictive and dangerous nature of Opioid Drugs within a few years of beginning the operation of their well-funded marketing campaigns, misrepresentations have reverberated along with the proliferation of branded and generic Opioid Drug prescriptions.

17.    The unscrupulous strategies employed by Manufacturer Defendants to obtain insurance coverage for long-term Opioid Drug use, along with their aggressive and misleading marketing to prescribers and consumers, and development of fake scientific substantiation and literature all contributed to a vast increase in Opioid Drug overuse and addiction across the country, including in Louisiana and East Baton Rouge Parish.  Defendants' conduct thus directly caused a public-health crisis that has adversely impacted Louisiana and caused the EBRCOC to incur excessive costs for opioid prescriptions and treatments, as well as other associated costs.

18.    In addition to the Manufacturer Defendants' marketing scheme, both Manufacturer Defendants and Distributor Defendants intentionally concealed evidence of drug diversion in a concerted effort to nurture the expansion of the market for Opioid Drugs and prevent prescribers and third-party payors, including EBRCOC, from reevaluating the appropriateness of the Opioid Drugs and making additional efforts to restrict criminal black-market sales of Opioid Drugs.

19.     Defendants' efforts have led to the overprescribing of Opioid Drugs, which in turn, has driven the opioid epidemic.  The United States and Louisiana and its localities, including East Baton Rouge Parish, are now confronting the widespread misuse of powerful Opioid Drugs and the ensuing devastation and damages.[2]  Defendants have benefitted from their deception as the Opioid Drug market has been substantially expanded, and with it, their profits.

20.     Opioids are now the most prescribed category of drugs; upwards of 90% of those prescriptions are for chronic pain conditions, a treatment that has neither been approved by the FDA nor scientifically confirmed as beneficial.

21.     The Opioid Drug market now touches a significant portion of the population. Approximately 20% of the population between the ages of 30 and 44 and nearly 30% of the population over 45 have used Opioid Drugs.  At least 20% of doctor office visits now include a prescription for an Opioid Drug, typically for treatment of chronic pain.

22.     As stated above, the opioid epidemic has struck Louisiana and its municipalities particularly hard.  According to the Center for Disease Control and Prevention ("CDC"), Louisiana had the fifth highest opioid prescribing rate in the nation in 2016, with 98.1 opioid prescriptions issued for every 100 residents.[3] Likewise, East Baton Rouge Parish has consistently had opioid prescribing rates well above the national average with a rate of 92.1 opioid prescriptions in 2016.[4] In 2014, the Parish rate was 103.8 per 100 people – more opioid prescriptions than residents in the Parish.[5]

---

[2] Robert M. Califf, et al. *A Proactive Response to Prescription Opioid Abuse,* 374 N. ENG. J. MED. 1480 (2016).
[3] Centers for Disease Control and Prevention ("CDC"), CDC Annual Surveillance Report of Drug-Related Risks and Outcomes 2017, *available at:* https://www.cdc.gov/drugoverdose/pdf/pubs/2017-cdc-drug-surveillance-report.pdf.
[4] CDC, U.S. County Prescribing Rates 2016, https://www.cdc.gov/drugoverdose/maps/rxcounty2016.html
[5] CDC, U.S. County Prescribing Rates 2014, https://www.cdc.gov/drugoverdose/maps/rxcounty2014.html

23.     With increases in prescribing rates and availability of opioids, came increases in the rate of overdoses.  According to the East Baton Rouge Parish Coroner, overdoses killed more people than homicides in 2016.[6]  And the Parish has experienced an exponential growth in reported overdose deaths from only 5 in 2012 to 111 in 2017.[7]

24.     Rampant opioid addiction and inevitable overdoses have not only devastated families and communities in Louisiana and East Baton Rouge Parish; they have also inflicted significant strain on the resources of the Plaintiff. The EBRCOC has suffered direct losses as a result of Defendants' conduct, in terms of excessive and unnecessary prescription drug coverage and medical services to its employees and retirees under the various health plans the EBRCOC self-insures, as well as unnecessary prescriptions to combat opioid dependence and withdrawal symptoms—including severe anxiety, nausea, headaches, tremors, and pain—when opioids are delayed or discontinued.  Depending on the length of use, these symptoms may persist for months, or even years, after a complete withdrawal from opioids. Additionally, the EBRCOC has incurred costs for medical and emergency services relating to opioid use and addiction.. Finally, the EBRCOC has incurred enormous costs in providing services to remediate the harmful social effects of the opioid epidemic, including without limitation, employment costs of hiring and training new employees to fill vacancies left by those on leave, in treatment, or let go due to Opioid Drug use;  and increased judicial costs associated in part with increased crime rates and increased children and family welfare social services resulting from the opioid epidemic caused by Defendants.

---

[6] Elizabeth Vowell, *Coroner: Opioid overdoses resulted in more deaths than homicides in 2016,* WAFB (June 26, 2017),  http://www.wafb.com/story/35753747/coroner-opioid-overdoses-resulted-in-more-deaths-than-homicides-in-2016/
[7] Samantha Morgan, *2017 records highest number of opioid-related deaths since spike in EBR Parish began,* WAFB (Jan. 29, 2018), http://www.wafb.com/story/37375297/2017-records-highest-number-of-opioid-related-deaths-since-spike-in-ebr-parish-began/.

25.     Plaintiff has paid for Opioid Drugs and drugs related to opioid use and addiction as part of the prescription drug benefits it provides to employees, retirees and their dependents through its self-insured health care plans.

26.     The cost to remediate the opioid public health crisis has required, and will continue to require, the expenditure of a tremendous amount of Plaintiff's resources.

27.     Defendants' fraudulent and deceptive conduct coupled with a failure to both guard against and report diversion of Opioid Drugs has violated and continues to violate the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") and the Louisiana Racketeering Act ("Louisiana RICO"). Plaintiff's causes of action and Defendants' liability arise from widespread enterprises through which Defendants engaged in a pattern of racketeering activity across state lines, including through Louisiana state lines (and East Baton Rouge Parish), and a conspiracy to engage in racketeering activity involving numerous RICO predicate acts over decades, as described herein.

28.     Defendants' deceitful actions and conduct further violate and continue to violate the Louisiana Unfair Trade Practices Act ("LUTPA"), and also constitute a public nuisance, redhibition, fraud, negligent misrepresentation, and unjust enrichment for which Plaintiff seeks relief.

29.     To redress and enjoin the injuries caused by Defendants' conduct, Plaintiff seeks an order requiring Defendants to cease their unlawful promotion of Opioid Drugs, correct their misrepresentations, guard against and report diversion of Opioid Drugs, and abate the epidemic that their unlawful actions have created. Plaintiff further seeks actual and compensatory damages, restitution, disgorgement of unlawful profits, civil penalties, attorneys' fees and costs, and any and all other relief permitted by law and equity.

## PARTIES

### A.    Plaintiff

30.    Plaintiff EBRCOC is a subdivision of the District Court system, responsible for supporting the judiciary and maintaining court calendars, vital records and documents in civil and criminal matters. The EBRCOC is the official custodian of all records and evidence and performs a wide range of information management duties associated with the District Court system. Plaintiff has three office locations located in East Baton Rouge Parish and employs nearly two hundred people.

31.    The EBRCOC provides services that are designed to foster the safety, health, and well-being of its employees and residents of East Baton Rouge Parish through support of judiciary services indirectly affecting law enforcement, promoting public health and safety, and providing services for families and persons in need.  The EBRCOC self-insures for medical health benefits and prescription drug coverage for hundreds of EBRCOC employees, retirees and their dependents. Additionally, the EBRCOC provides for short-term disability.

32.    The EBRCOC has standing to recover damages incurred as a result of Defendants' actions and omissions as Plaintiff directly and foreseeably sustained all economic damages alleged herein. Defendants' conduct has exacted a financial burden for which the EBRCOC seeks relief. Categories of past and continuing sustained damages include, *inter alia*: increased payments under its self-insured plans for excessive, unnecessary or inappropriate Opioid Drug prescriptions; prescriptions and medical services to combat opioid dependence and withdrawal symptoms; office visits, toxicology screens, hospitalizations, and other medical treatments necessitated by the adverse effects of opioids; increased employment costs due to opioid use and loss of productivity

by employees; and increased judicial costs associated in part with increased crime rates and increased children and family welfare social services stemming from the opioid crisis.

33.    Indeed, clerk of court offices, including Plaintiff EBRCOC, see first-hand the devastating trickle-down effect of opioid use and abuse. As a result of the opioid epidemic caused by Defendants, the EBRCOC has experienced an outstanding increase in the number of cases (and substantial impact on docket activity) involving opioid-addicted persons, not only in the criminal division, with probations and arrests, but also with child welfare, domestic violence and civil cases, along with a corresponding increase in related judicial costs.

**B.    Defendants**

    **i.    Manufacturer Defendants**

34.    Defendant ABBOTT LABORATORIES is a corporation organized and existing under the laws of the State of Illinois and maintains its principal place of business at 100 Abbott Park Road, North Chicago, Lake County, Illinois 60064.

35.    Defendant ABBVIE INC. is a corporation organized and existing under the laws of Delaware with its principal place of business at 1 North Waukegan Road, North Chicago, Lake County, Illinois 60064.

36.    Defendant ABBVIE PRODUCTS LLC (formerly known as Solvay Pharmaceuticals, Inc.) ("AbbVie Products") is incorporated in the State of Georgia and has its principal place of business at 1 North Waukegan Road, North Chicago, Illinois 60064.

37.    AbbVie Products is a wholly-owned subsidiary of Defendant AbbVie Inc. Abbott Laboratories, AbbVie Inc., and AbbVie Products LLC are collectively referred to herein as "Abbott" or the "Abbott Defendants."

38.     The Abbott Defendants previously and/or currently manufacture, promote, sell and distribute generic and branded Opioid Drugs, including Vicoprofen and Vicodin, in Louisiana and throughout the nation.  Abbott also previously manufactured, promoted, sold, and distributed Dilaudid / Dilaudid HP prior to Purdue Pharma L.P. ("Purdue") acquiring the rights to same in or around 2007.

39.     Early on, Abbott and its subsidiaries were actively engaged in the promotion and distribution of Opioid Drugs nationally, propagating the message both in Louisiana and nationwide that chronic pain was under-treated and that Opioid Drugs were a safe, effective, and generally non-addictive treatment for long-term management of chronic pain. Abbott was instrumental in disseminating this falsehood and in promoting the first major blockbuster opioid drug, OxyContin, through a 1996-2002 co-promotional agreement with Purdue. Under the agreement, Abbott received 25% of all net OxyContin sales up to $10 million, for prescriptions written by doctors that its sales representatives called on, and 30% of sales above $10 million.  After 2002, and at least through 2006, Abbott continued to receive a residual payment from Purdue of 6% of net sales.

40.     Working together, Abbott and Purdue increased sales of OxyContin from $49 million in its first full year on the market to $1.6 billion in 2002.  Pursuant to the co-promotional agreement, Purdue has paid Abbott nearly half a billion dollars.

41.     Through this co-promotion agreement, at all relevant times Abbott and Purdue acted in concert with one another in relation to the conduct described herein.  Thus, Abbott Defendants are included within references to Purdue or Purdue Defendants throughout.

42.     Purdue, with Abbott and others promotion support, has generated an estimated $35 billion in sales since it launched OxyContin in 1995.  Since 2009, Purdue's national annual sales

of OxyContin have fluctuated between $2.47 billion and $2.99 billion and are primarily derived from OxyContin.  OxyContin constitutes roughly 30% of the entire market for analgesic drugs (painkillers).

43.    Defendant TEVA PHARMACEUTICAL INDUSTRIES LTD. is an Israeli corporation.  Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation and subsidiary of Teva Pharmaceutical Industries Ltd. and has a primary place of business in North Wales, Pennsylvania.

44.    Defendants Teva USA and Teva Pharmaceutical Industries Ltd. are collectively referred to herein as "Teva" or the "Teva Defendants."

45.    Teva is in the business of manufacturing, selling, and distributing pharmaceutical drugs, including Opioid Drugs and their generic equivalents (including but not limited to hydromorphone hydrochloride and oxycodone hydrochloride), in Louisiana and throughout the nation.

46.    Defendant JOHNSON & JOHNSON is a New Jersey corporation with its principal place of business in New Brunswick, New Jersey.

47.    Defendant JANSSEN PHARMACEUTICALS, INC. (formerly known as Janssen Pharmaceutica Inc.) is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey and is a wholly-owned subsidiary of Defendant Johnson & Johnson.

48.    Defendant ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey.

49.     At all relevant times, Janssen Pharmaceuticals, Inc., and Johnson & Johnson, Ortho-McNeil-Janssen Pharmaceuticals, Inc., acted in concert with one another as agents and/or principals of one another in relation to the conduct described herein.

50.     Defendants Janssen Pharmaceuticals, Inc., Johnson & Johnson, and Ortho-McNeil-Janssen Pharmaceuticals, Inc., are collectively referred to herein as "Janssen" or "Janssen Defendants."

51.     Janssen manufactures, sells, and distributes a range of medical devices and pharmaceutical drugs in Louisiana and throughout the nation, including the Opioid Drugs Duragesic, Nucynta, Nucynta ER, Ultracet, Ultram and Ultram ER.  Sales of Janssen's Opioid Drugs have earned Janssen billions of dollars in revenue.

52.     In addition, Janssen supplies the majority of opiate ingredients utilized by Opioid Drug manufacturers, compounding its profits from the expansion of the Opioid Drug market as alleged herein.

53.     Defendant ENDO HEALTH SOLUTIONS INC. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.

54.     Defendant ENDO PHARMACEUTICALS INC. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania, and is a wholly-owned subsidiary of Endo Health Solutions, Inc.  Defendants Endo Health Solutions Inc., Endo Pharmaceuticals Inc. and subsidiaries are collectively referred to herein as "Endo" or the "Endo Defendants."

55.     Endo develops, markets, and sells prescription drugs, including Opioid Drugs Opana, Opana ER, Percocet, Percodan, and Zydone, in Louisiana and throughout the nation.

56.     Endo also manufactures and sells generic Opioid Drugs (including oxycodone, oxymorphone, hydromorphone, and hydrocodone) in Louisiana and across the United States, both

for itself and through its subsidiary, Qualitest Pharmaceuticals, Inc. ("Qualitest"). Upon information and belief, Endo's generic Opioid Drug market share is substantial.

57.     Defendant ALLERGAN PLC (formerly known as Actavis plc) is an Irish company with its headquarters and principal place of business in Dublin, Ireland.  Actavis PLC acquired Allergan PLC in March 2015, and the combined company changed its name to Allergan PLC in March 2015.  Prior to that, Defendant Watson Pharmaceuticals, Inc. acquired Actavis, Inc. in October 2012; the combined company changed its name to Actavis, Inc. as of January 2013, and then to Actavis PLC in October 2013.

58.     Defendant WATSON LABORATORIES, INC. is a Nevada corporation with its principal place of business in Corona, California, and is a wholly owned subsidiary of Allergan PLC.

59.     Defendant ACTAVIS, LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey.

60.     Defendant ACTAVIS PHARMA, INC. (formerly known as Watson Pharma, Inc.) is a Delaware corporation with its principal place of business in Parsippany, New Jersey.

61.     Each of these defendants is owned by Allergan Plc, which uses them to market and sell its drugs in Louisiana and nationwide. Allergan Plc, Watson Laboratories, Inc., Actavis LLC, and Actavis Pharma, Inc., are collectively referred to herein as "Actavis" or "Actavis Defendants."

62.     Actavis manufactures, promotes, sells, and distributes branded Opioid Drugs, including but not limited to Kadian, Norco, and Opana ER, and generic versions of Duragesic, Opana, and other Opioid Drugs throughout the United States, including Louisiana.  Actavis acquired the rights to Kadian from King Pharmaceuticals, Inc. on December 30, 2008, and began marketing Kadian in 2009.

63.    Defendant MALLINCKRODT PLC is a publicly limited company organized under the laws of the Republic of Ireland with its headquarters and principal place of business in Staines-Upon-Thames, Surrey, United Kingdom.

64.    Defendant MALLINCKRODT LLC is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri, and is a wholly-owned subsidiary of Mallinckrodt PLC.   Mallinckrodt PLC and Mallinckrodt LLC are collectively referred to herein as "Mallinckrodt" or the "Mallinckrodt Defendants."

65.    Mallinckrodt manufactures, promotes, distributes, and sells prescription Opioid Drugs such as Exalgo, Roxicodone, Xartemis XR, along with numerous generic Opioid Drugs, including but not limited to methadone, morphine sulfate extended release, and fentanyl.  These Opioid Drugs are manufactured in the United States and promoted, distributed, and sold across the U.S., including in Louisiana and East Baton Rouge Parish.  Mallinckrodt is the largest U.S. supplier of prescription Opioid Drugs and is among the top ten generic pharmaceutical manufacturers of prescription Opioid Drugs in the United States, based on prescriptions.

66.    Defendant MYLAN N.V. (f/k/a Mylan, Inc.) is a foreign corporation organized under the laws of the Netherlands with its principal place of business located in Hatfield, Hertfordshire, England.

67.    Defendant MYLAN PHARMACEUTICALS INC. is a foreign corporation with its headquarters in Canonsburg, Pennsylvania, and is a wholly owned subsidiary for Mylan N.V.

68.    Defendant MYLAN INC. is a Pennsylvania corporation with its headquarters and principal place of business in Canonsburg, Pennsylvania, and is a wholly owned subsidiary of

Mylan N.V. Mylan Pharmaceuticals Inc., Mylan Inc. and Mylan N.V. are collectively referred to herein as "Mylan" or "Mylan Defendants."

69.     Mylan manufactures, promotes, distributes, and sells prescription Opioid Drugs, including but not limited to, hydrocodone containing products and generic versions of Duragesic, a fentanyl transdermal system. These Opioid Drugs are manufactured in the United States and promoted, distributed, and sold across the nation, including in Louisiana and East Baton Rouge Parish.

**ii.     Distributor Defendants**

70.     Defendant MORRIS AND DICKSON CO., LLC ("Morris and Dickson") is a Louisiana limited liability company that maintains its principal place of business in Shreveport, Louisiana.

71.     Morris and Dickson is the largest privately owned wholesale distributor of pharmaceuticals, including controlled and non-controlled prescription medications, in the United States. During all relevant times, Morris and Dickson distributed pharmaceuticals to retail pharmacies, health systems, pharmaceutical dispensaries and trade partners across 17 different states, including substantial amounts of both branded and generic Opioid Drugs in Louisiana and surrounding areas.

72.     At all relevant times, Morris and Dickson operated as a licensed distributor in Louisiana, licensed by both the Louisiana Board of Drug and Device Distributors and the Louisiana Board of Pharmacy.

73.     On May 2, 2018 the DEA issued an Order to Show Cause and Immediate Suspension of Registration to Morris and Dickson for failure to maintain effective controls against the diversion of oxycodone and hydrocodone in Louisiana. A year later in May of 2019, Morris

and Dickson agreed to pay $22 million dollars in civil penalties to resolve the allegations that it failed to report suspicious orders of Opioid Drugs.[8]

74.    Defendant    AMERISOURCEBERGEN    DRUG    CORPORATION ("AmerisourceBergen") is a Delaware corporation with its principal place of business in Chesterbrook, Pennsylvania.

75.    AmerisourceBergen is a wholesale distributor of pharmaceuticals, including controlled substances and non-controlled prescription medications.  It handles the distribution of approximately 20% of all pharmaceuticals sold and distributed in the U.S., including in Louisiana, through a network of 26 pharmaceutical distribution centers.

76.    At all relevant times, AmerisourceBergen operated as a licensed distributor in Louisiana, licensed by both the Louisiana Board of Drug and Device Distributors and the Louisiana Board of Pharmacy.

77.    AmerisourceBergen is a significant distributor of branded and generic Opioid Drugs in the United States, including in Louisiana.

78.    Defendant CARDINAL HEALTH, INC. ("Cardinal") is an Ohio corporation with its principal place of business in Dublin, Ohio.  Cardinal distributes pharmaceuticals to retail pharmacies and institutional providers to customers in all 50 states, including Louisiana.

79.    Cardinal is a significant distributor of both branded and generic Opioid Drugs in the United States, and has several facilities in Louisiana, including a distribution center located at 2380 O'Neal Drive, Baton Rouge, Louisiana.

---

[8] Press Release, U.S. Dep't of Justice, DEA and U.S. Attorney in the Western District of Louisiana Announce Settlement with Drug Distributor (May 24, 2019), *available at* https://www.dea.gov/press-releases/2019/05/24/dea-and-us-attorney-western-district-louisiana-announce-settlement-drug-0.

80.     At all relevant times, Cardinal operated as a licensed distributor in Louisiana, licensed by both the Louisiana Board of Drug and Device Distributors and the Louisiana Board of Pharmacy.

81.     Defendant MCKESSON CORPORATION ("McKesson") is a Delaware corporation with its principal place of business in San Francisco, California.  McKesson distributes pharmaceuticals to retail pharmacies and institutional providers to customers in all 50 states, including Louisiana.

82.     McKesson is a significant distributor of both branded and generic Opioid Drugs in the United States, including Louisiana. McKesson operates a distribution center in St. Rose, Louisiana.

83.     At all relevant times, McKesson operated as a licensed distributor in Louisiana, licensed by both the Louisiana Board of Drug and Device Distributors and the Louisiana Board of Pharmacy.

84.     In 2008, McKesson paid a $13.25 million civil penalty and entered into an administrative agreement for its failure to detect and report suspicious orders.  Importantly, this fine was the result of the efforts of several district investigations into the company.

85.     Morris and Dickson, AmerisourceBergen, Cardinal, and McKesson are all engaged in the wholesale distribution of branded and generic Opioid Drugs and are collectively referred to herein as the "Distributor Defendants."

86.     The Distributor Defendants' role in facilitating access to Opioid Drugs for long-term use—coupled with their failure to prevent, monitor, identify, and report drug diversion—contributed to a vast increase in opioid overuse and addiction in the United States and in Louisiana.

The Distributor Defendants' conduct thus directly caused a public-health crisis, increasing costs for excessive prescribing and addiction-related treatments for the EBRCOC.

## JURISDICTION AND VENUE

87.    This Honorable Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, based on Defendants' violation of federal law, specifically 18 U.S.C. § 1961, *et seq.* ("Racketeer Influenced and Corrupt Organization Act" or RICO"),  18 U.S.C. § 1965 pertaining to RICO jurisdiction, and supplemental jurisdiction over the state law claims set forth herein pursuant to 28 U.S.C. § 1367, because the state law claims are so related to Plaintiff's federal claims that they form part of the same case or controversy.

88.    This Court has personal jurisdiction over Defendants in this case because Defendants have continuously and systematically transacted business in Louisiana, purposefully direct or directed their actions toward Louisiana, maintained employees and business locations in Louisiana, consented to being sued in Louisiana by registering an agent for service of process in Louisiana when obtaining a manufacturer or distributor license, and have the requisite minimum contacts with Louisiana necessary to constitutionally permit this Court to exercise jurisdiction. This Court also has personal jurisdiction over all Defendants under 18 U.S.C. § 1965(b). This Court may exercise nationwide jurisdiction over the named Defendants where the "ends of justice" require national service, and the Plaintiff demonstrates national contacts. Here, the interests of justice require that Plaintiff be allowed to bring all members of the nationwide RICO enterprises before the court in a single trial. Moreover, Defendants actions and/or inactions described herein were purposefully directed at and/or within the State of Louisiana, the damages sustained by Plaintiff were a result of Defendants' actions and/or inactions (described herein) that were purposefully directed at and/or within the State of Louisiana.

89.    Venue is proper in this Court, as various Defendants herein are registered to do business in the judicial district in which this matter is filed, may be served in this judicial district, conduct the business activities described herein in this judicial district, a substantial part of the events and conduct giving rise to the claims described herein occurred in this judicial district, and the damages were largely sustained in this judicial district. 18 U.S.C. § 1965(a); 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

**A.    Manufacturer Defendants Misrepresented the Risks and Benefits of Opioid Drugs to Expand the Products' Markets and Increase their Profits**

90.    Manufacturer Defendants disregarded and actively sought to destroy the widely accepted medical orthodoxy regarding the extreme risks associated with opioid use in order to increase the number of patients treated with Opioid Drugs thereby bolstering their profits from increased sales of both branded and generic Opioid Drugs.

91.    Beginning in the mid-1990s and continuing through today, Manufacturer Defendants acted to dramatically expand the prescription marketplace for Opioid Drugs by aggressively over-promoting the highly addictive, dangerous Opioid Drugs.  Manufacturer Defendants facilitated this market expansion in a number of ways, as set forth below.

92.    Manufacturer Defendants targeted HCPs and the general public with a coordinated misinformation campaign designed to alter perceptions about the safe, necessary, and effective use of Opioid Drugs.  The Manufacturer Defendants' goal was to create a medical demand that did not currently exist in the market by changing the perception of Opioid Drugs through over-and-above touting of their virtues.

93.    The misrepresentations and omissions key to expanding the prescription market for Opioid Drugs all focused on the necessity, efficacy, and risks (or lack thereof) associated with

long-term use for the treatment of chronic pain. The Manufacturer Defendants and their allies (co-promoters, third-party marketers and promoters, physician thought leaders, KOLs, medical ghost writers, medical marketing firms, digital marketers, and Front Groups) invented an "untreated pain epidemic" requiring urgent attention from not only the medical community but from patients who had decided to live with some chronic pain. Manufacturer Defendants' suggested cure for this "epidemic" was an uninterrupted, life-long regimen of Opioid Drugs.

94.    Further, Manufacturer Defendants promulgated the fraudulent messaging that concerns about addiction to Opioid Drugs were overblown. Instead, simple screening and monitoring tools would prevent addiction, which ironically was unlikely to be successful due to incredible advancements in abuse-deterrent pill technology. According to Manufacturer Defendants, even if a patient exhibited all the classic symptoms of addiction, those were merely signs that his or her pain was undertreated. Defendants' cyclic solution was more Opioid Drugs.

95.    To disseminate this wildly inaccurate message and grow the prescription market for branded and generic Opioid Drugs, the Manufacturer Defendants and their allies employed a comprehensive, coordinated and multi-faceted marketing campaign, utilizing different tools aimed at different targets.

96.    First, Manufacturer Defendants targeted prescribing physicians with these deceptive messages. The messages originated from a variety of sources. Some were recognized as originating from the Defendants, such as sales representative pitches, medical journal advertising, and manufacturer websites. Other deceptive messages, however, came from KOLs, trade organizations, or hosts of medical education programs that appeared independent, but were actually controlled by the Manufacturer Defendants. Prescribing HCPs were also enticed with

financial payments or other compensation (such as free trips) as rewards for prescribing Opioid Drugs.

97.    Second, Manufacturer Defendants set out to corrupt scientific literature in an effort to expand the prescription market for Opioid Drugs.  Manufacturer Defendants employed an endless chain of circular citations in an effort to lend veracity to their unsubstantiated claims.  They helped draft guidelines and disseminate medical board standards, and then utilized their Front Group organizations to create medical consensus around those standards.  Further, they paid physicians, Front Groups, and consultants to draft academic or technical papers lauding the safety and efficacy or opioid drugs in treating chronic pain long-term.  These actors—all paid by the Manufacturer Defendants—often cited and relied on one another's work in an effort to create the illusion of peer review.

98.    Third, the Manufacturer Defendants also targeted vulnerable consumers (those suffering with chronic pain) with false and misleading marketing to increase patient demand for branded and generic Opioid Drugs.  These efforts consisted of, *inter alia*, patient brochures, patient-oriented websites, starter coupons or co-pay assistance, media campaigns and initiatives, and the use of Front Groups masquerading as patient advocacy organizations.

99.    Manufacturer Defendants were thus part of a coordinated scheme to dramatically increase the market for opioid drugs.  These efforts were widely successful.  The total number of opioid drug prescriptions increased sharply in the late 1990s through the early 2000s, reaching nearly 250 million prescriptions in 2013, which amounts to nearly enough for every person in the United States to have their own bottle of painkiller pills.  This represented an increase of 300% since 1999.  The scheme was so successful that by 2014, Manufacturer Defendants had turned

opioid drugs into the most prescribed class of drugs in the entire nation, generating a whopping $11 billion in revenue.

### i. Direct-to-Physician Marketing

100.    Manufacturer Defendants actively targeted physicians with false and misleading statements regarding the safety, necessity, and efficacy of using Opioid Drugs long-term for chronic pain.  Increasing prescriber demand was part of Manufacturer Defendants' greater efforts to expand the prescription market for Opioid Drugs.

101.    The Manufacturer Defendants devised multiple schemes to facilitate direct marketing to physicians.  The marketing was aggressive, with an emphasis on in-person contact. Pharmaceutical sales representatives bombarded HCPs with messages reinforcing the necessity, safety, and efficacy of Opioid Drugs for long-term treatment of chronic pain.  Physician-oriented advertisements appeared in trade and medical journals. Manufacturer websites included sections for prescribers.

102.    Further, in order to successfully execute their scheme, each Manufacturer Defendant had to create parallel marketing structures that appeared independent from the ordinary promotion sources.  To this end, the Manufacturer Defendants surreptitiously employed KOLs— well respected physicians purportedly focused on patient health—to campaign relentlessly on behalf of Opioid Drug manufacturers, pushing beliefs that many later recanted.

103.    The Manufacturer Defendants' synchronized marketing structures also involved the creation, funding, and control of various "Front Groups" that purported to be medical societies, think tanks, and/or patient advocacy groups.  The Manufacturer Defendants funded these groups and were responsible for the content of their messaging, yet carefully concealed their behind-the-scenes role.  Such groups were instrumental in "raising awareness" of a "pain epidemic" afflicting

the United States.  To combat the scourge of untreated pain, HCPs were urged to prescribe Opioid Drugs to their patients, which were disclosed as a legitimate course of treatment that these prestigious organizations backed enthusiastically, all in the name of patient well-being.

104.    The Manufacturer Defendants also funded (either directly or indirectly through their Front Groups and KOLs) marketing presentations that were deceptively presented as unbiased Continuing Medical Education programs ("CMEs"), a learning course required for many physicians to maintain their licenses.

105.    The deceptive marketing to physicians occurred not only on a macro- but a micro-level as well.  Physicians with certain prescribing patterns, or those with a patient base likely composed of many chronic-pain sufferers, were of particular interest to the Manufacturer Defendants.  Their sales representatives made such physicians the targets of even more intense marketing efforts.

106.    The Manufacturer Defendants also developed and put into practice a scheme to financially reward HCPs who prescribed their Opioid Drugs.  This included the development of "speaker bureaus," whereby high prescribers were paid to give presentations that were in large part written by the manufacturers themselves.  Of course, these "speakers" needed to be "trained," which consisted of all-expenses paid trips to lavish resorts.

107.    The Manufacturer Defendants' efforts to deceptively influence HCP prescribing decisions worked.  In an August 2016 open letter to the nation's physicians, the then-U.S. Surgeon General connected the "urgent health crisis" arising from Opioid Drugs to "heavy marketing of opioids to doctors[,] [m]any of whom were taught—incorrectly—that opioids are not addictive when prescribed for legitimate pain."[9]

---

[9] Letter from Vivek H. Murthy, 19th U.S. Surgeon General, to U.S. Doctors (Aug. 2016), *available at* https://turnthetiderx.org/.

108.    Manufacturer Defendants bombarded prescribers with various misrepresentations and omissions aimed at increasing prescriber demand for Opioid Drugs, including: (1) the existence of a "pain epidemic" and urgency with which it must be addressed; (2) the efficacy with which long-term Opioid Drug therapy treats or manages long-term chronic pain; (3) the ability of Opioid Drugs to improve life functions (such as psychological health, health-related quality of life, and quality of life itself); (4) downplaying the serious risk of addiction; (5) creating and promoting the concept of "pseudoaddiction" when signs of actual addiction began appearing and advocated that the signs of addiction should be treated with more Opioid Drugs; (6) exaggerating the effectiveness of screening tools to prevent addiction; (7) claiming that opioid dependence and withdrawal are easily managed; (8) denying the risks of and advocating for the use of higher opioid dosages; (9) exaggerating the effectiveness of "abuse-deterrent" Opioids Drug formulations to prevent abuse and addiction; and (10) actively concealing, and causing others to conceal, information about the safety (including addiction risk), efficacy, and usefulness of Opioid Drugs to treat chronic pain long-term.

109.    Manufacturer Defendants used many tools to spread these misrepresentations and omissions including: (1) pharmaceutical sales representatives who would "detail" prescribers; (2) physician-targeted advertisements (print, video, and online); (3) peer physicians or KOLs; (4) seemingly independent Front Groups; (5) industry sponsored or controlled CME programs; (6) micro-targeting of physicians with certain prescribing patterns or vulnerable patient populations; and (7) financial incentives for physicians to prescribe Opioid Drugs.  Each of these tactics is alleged in greater detail below.

### *1.    Pharmaceutical Sales Representatives*

110.     Each Manufacturer Defendant promoted the use of Opioid Drugs for chronic pain through "detailers," or sales representatives that visited individual physicians and their staff in their offices and small group speaker programs.  By establishing close relationships with HCPs, the Manufacturer Defendants' sales representatives were able to disseminate their misrepresentations in targeted, one-on-one settings that allowed them to differentiate their Opioid Drugs and to address individual prescribers' concerns about prescribing Opioid Drugs for chronic pain.  Representatives were trained to use techniques to build these relationships.

111.     Studies have shown that direct-to-physician visits by drug representatives are highly effective tools for increasing prescriptions for any given drug.[10]  The Manufacturer Defendants used their sales representatives to detail[11] their Opioid Drugs to HCPs throughout Louisiana and the United States.

112.     The Manufacturer Defendants have exerted strict control over the messages their sales force would deliver to prescribers.  They exactingly direct and monitor their sales representatives—through detailed action plans, trainings, tests, verbatims, role-plays, supervisor tag-alongs, and other means—to ensure that individual detailers actually deliver the desired messages and do not veer off-script.  Sales representatives were typically obligated by their

---

[10] *See, e.g.,* Puneet Manchanda & Pradeep K. Chintagunta, *Responsiveness of Physician Prescription Behavior to Salesforce Effort: An Individual Level Analysis,* 15 P.K.MKTG. LETTERS 129 (2004), https://www.researchgate.net/publication/5152944_Responsiveness_of_Physician_Prescription_Behavior_to_Salesforce_Effort_An_Individual_Level_Analysis (detailing has a positive impact on prescriptions written); Ian Larkin, Desmond Ang, Jerry Avorn, & Aaron S. Kesslheim, *Restrictions on Pharmaceutical Detailing Reduced Off-Label Prescribing of Antidepressants and Antipsychotics in Children,* 33:6 HEALTH AFFAIRS 1014 (June 2014), *available at* https://www.healthaffairs.org/doi/pdf/10.1377/hlthaff.2013.0939 (finding academic medical centers that restricted direct promotion by pharmaceutical sales representatives resulted in a 34% decline in on-label use of promoted drugs); *see also* Art Van Zee, *The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy,* 99(2) AM J. PUB. HEALTH 221 (Feb. 2009), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2622774/ (correlating an increase of OxyContin prescriptions from 670,000 annually in 1997 to 6.2 million in 2002 to a doubling of Purdue's sales force and trebling of annual sales calls).
[11] When a sales representative "details" a physician, he or she delivers to the physician (often during a call or in-person) the drug manufacturer's key selling messages for one or more pharmaceutical products. In most cases, the sales pitch is accompanied by written materials and/or other promotional products.

employment contracts to adhere to corporate training and departing from the script could lead to termination of employment.

113.    The Manufacturer Defendants also regularly tested the effectiveness of their messaging through third-party research firms to survey physicians to assess how well their message was received by prescribers.  Further, as alleged below, the Manufacturer Defendants also utilized available market data to identify particularly susceptible prescribers, so as to better focus the efforts of their sales representatives.

114.    In addition to marketing materials, sales representatives were armed with purportedly unbiased "proof" for physicians who may be wary of the sales representatives' advocacy for particular drugs or Opioid Drugs in general.  This "proof" came in the form of the studies, publications, and treatment guidelines.  As noted below, the true sources of this information were the Manufacturer Defendants or their KOLs or Front Groups.

115.    In an effort to maximize their marketing potential, the Manufacturer Defendants did not limit their detailing to in-person sales details.  They sought to reach additional prescribers by expanding beyond traditional sales calls and speaker events to new channels for their messages. These included marketing to prescribers through voice mail, postcards, and email—so-called "e-detailing."  This enabled the Manufacturer Defendants to target hard-to-reach prescribers, such as those at hospitals, academic centers, or other locations that limit or prohibit in-person detailing.

(a)    **Abbott**

116.    OxyContin was released at a time when many in the medical community were being led to believe that it was critical that there be drugs to treat chronic pain.  Abbott's assistance with the OxyContin launch in 1996 highlighted the alleged inadequacy of patient pain treatment and management that had been fabricated by Manufacturer Defendants, resulting in exponential

prescription growth.  By 2001, OxyContin had become a blockbuster drug with sales exceeding $1 billion and over 7 million prescriptions, becoming Purdue's star product and accounting for 90% of the company's total prescription sales.

117.    Purdue doubled its sales force through its 1996 co-promotion agreement with Abbott from approximately 300 to 600 representatives.[12]

118.    Increasing the number of sales representatives, of course, expanded the number of HCPs to whom Abbott and Purdue could make their false and misleading representations.

119.    Through its 1996-2002 co-promotional agreement with Purdue, Abbott was actively engaged in the national promotion and distribution of Opioid Drugs.  Under the agreement, Abbott received 25% of all net sales up to $10 million, for prescriptions written by HCPs its sales representatives called on, and 30% of sales above $10 million.  Abbott thus played an instrumental role in Purdue's marketing scheme.

120.    Purdue sought out general practitioners that had little experience in treating serious pain or recognizing the signs of drug abuse.  By 2003, nearly half of all OxyContin prescribers were primary care physicians who had not been adequately trained in pain management.

121.    Purdue trained Abbott sales representatives to seek out general practitioners with little experience in treating serious pain and to carry the message that risk of addiction was minimal (e.g. "less than one percent").[13] Sales representatives also made numerous misleading statements regarding the efficacy of OxyContin 12-hour dosing while contradictorily promoting the need for additional opioid prescriptions to address end-dose failure, as described below.

---

[12] U.S. Government Accountability Office, GAO-04-110, *OxyContin Abuse and Diversion*, 17 (2003).
[13] Art Van Zee, *The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy*, 99(2) AM. J. PUB. HEALTH 221-27 (Feb. 2009), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2622774/.

122.    According to a 2003 GAO Report, "Purdue's sales representatives promoted OxyContin to physicians as an initial opioid treatment for moderate-to-severe pain lasting more than a few days, to be prescribed instead of other single-entity opioid analgesics or short-acting combination opioid pain relievers."[14]

123.    Purdue also had sales representatives push the false idea that OxyContin provides 12 hours of pain relief, a representation it knew was false.  In reality, OxyContin does not last the full 12 hours, and Purdue only sought the FDA-approved 12-hour dosing label in order to maintain a competitive advantage over more frequently dosed Opioid Drugs.  The dosing label is not equivalent to how long the drug lasts. Purdue knew that, for many patients, the pain relief lasted for as little as eight hours.

124.    Though Purdue promoted OxyContin as a 12-hour extended-release opioid, oxycodone, the active ingredient in OxyContin, does not enter the body at a linear rate.  OxyContin works by releasing a greater proportion of oxycodone into the body upon administration with a gradually tapered release thereafter, as illustrated in the following chart, which was, upon information and belief, adapted from Purdue's own sales materials:[15]

---

[14] U.S. Government Accountability Office, GAO-04-110, *OxyContin Abuse and Diversion,* 17 (2003).

[15] Jim Edwards, *How Purdue Used Misleading Charts to Hide OxyContin's Addictive Power*, CBSNEWS.COM (Sept. 28, 2011), https://www.cbsnews.com/news/how-purdue-used-misleading-charts-to-hide-oxycontins-addictive-power/. Purdue's promotional materials in the past displayed a logarithmic scale, which gave the misleading impression the concentration remained constant.



OxyContin PI Figure, Linear y-axis

Figure 1

125.    The reduced release of the drug over time means that the oxycodone no longer provides the same level of pain relief; as a result, for many patients, OxyContin does not last for the 12 hours for which Purdue promotes it—a fact that Purdue has known at all times relevant to this action.

126.    The initial heightened release rate for OxyContin triggers a powerful psychological response that behaves more like an immediate release opioid, which Purdue itself once claimed was more addicting in its original 1995, FDA-approved drug label.  This initial release means there is less of the active drug at the end of the dosing period, which results in the drug not lasting for the full 12 hours, leading to withdrawal symptoms and "end of dose" failure.  The combination of fast onset and end-of-dose failure makes OxyContin particularly addictive, even compared with other Opioid Drugs, because it often forces a patient to resort to a rescue dose.

127.    Undaunted, Purdue knowingly caused sales representatives to falsely advertise and promote OxyContin as effective for the full 12 hours.  Purdue had knowledge of the occurrence of end-dose failure from FDA's MEDWATCH Adverse Event reports[16] and was also aware that

---

[16] MEDWATCH refers to the FDA's voluntary adverse event reporting system.

physicians would prescribe three pills a day to compensate for the loss of therapeutic effect. Purdue's failure to disclose the prevalence of end-of-dose failure left prescribing physicians in the dark as to the risks relating to addiction, while increasing the dose or prescribing "rescue" Opioid Drugs in attempt to compensate.[17]

128.    Purdue's 12-hour strategy was motivated by profit, not patient health. Purdue insisted on 12-hour rather than 8-hour FDA approval to maintain its edge on the opioid market. In order to receive FDA approval for twice-daily (or "Q2") dosing, Purdue merely had to show that OxyContin lasted for 12 hours for at least half of patients.  Purdue cleared that bar with a single study.  OxyContin was approved for Q2 dosing in 1996.  Since then, Purdue has been using the label to assert that OxyContin provides round-the-clock relief for 12 hours.  Its original press release at launch touted 12-hour dosing as providing "smooth and sustained pain control all day and all night," despite the fact that the FDA had never approved such marketing.  In fact, in 2008, the FDA found that a "substantial number" of chronic pain patients taking OxyContin experienced "end of dose failure," which meant little to no pain relief at the end of the dosing period.

129.    Of course, Purdue anticipated physician feedback that OxyContin did *not* provide 12 hours of relief for their patients.  Purdue's sales representatives were instructed to tell prescribers that the answer to end-of-dose failure was not increasing the interval of dosing, but rather higher doses.

130.    Indeed, "[w]hen many doctors began prescribing OxyContin at shorter intervals in the late 1990s, Purdue executives mobilized hundreds of sales reps to 'refocus' physicians on 12-

---

[17] Purdue's Clinical Issues in Opioid Prescribing, put out in 2005 under Purdue's unbranded Partners Against Pain banner, states that "it is recommended that a supplementary immediate-release medication be provided to treat exacerbations of pain that may occur with stable dosing." References to "rescue" medication also appear in Purdue-sponsored publications such as APF's A Policymaker's Guide (2011) and the 2013 CME Overview of Pain Management Options.

hour dosing.  Anything shorter 'needs to be nipped in the bud. NOW!!' one manager wrote to her staff."[18]

131.    Parlaying the initial success and fraudulent marketing of OxyContin, Abbott and other Manufacturer Defendants engaged in a systematic effort to emphasize the use of Opioid Drugs for the treatment of chronic non-cancer related pain and minimize the risk of addiction. Abbott sales representatives made misleading statements as to the efficacy of Opioid Drugs in treating chronic pain long-term with a deceivingly low risk of addiction and to promote the fabricated concept of "pseudoaddiction." According to Manufacturer Defendants, "pseudoaddiction," which uncannily resembled real addiction, was actually a sign of under-treated pain.

132.    Abbott and Purdue representatives proffered pseudoaddiction as an explanation and incentive to increase the dosage of existing prescriptions.  By emphasizing a new, opioid-specific condition, Manufacturer Defendants convinced physicians to ignore common signs of addiction, including early requests for prescription refills, agitation, etc., and to prescribe a higher dose of the opioid, which feeds the addiction cycle.

133.    Pseudoaddiction is not a real condition.   The CDC rejects the concept of pseudoaddiction.  In its 2016 Guideline for Prescribing Opioids for Chronic Pain, it explains that "[p]atients who do not experience clinically meaningful pain relief early in treatment . . . are unlikely to experience pain relief with longer-term use," and treating physicians should "reassess pain and function within 1 month" which will assist them in determining whether to "minimize

---

[18] Harriet Ryan, Lisa Girion & Scott Glover, *You Want a Description of Hell? Oxycontin's 12-hour Problem*, L.A. TIMES (May 5, 2016) http://www.latimes.com/projects/oxycontin-part1/.

risks of long-term opioid use by discontinuing opioids" since the patient is "not receiving a clear benefit."[19]

134.    Upon information and belief, Abbott sales representatives, employed various marketing techniques to detail OxyContin and also its respective Opioid Drugs, including but not limited to Vicoprofen and Vicodin, to HCPs throughout the United States and Louisiana.  In some instances, sales representatives would visit individual HCPs and their medical staff in their offices, using gifts, meals and trips to get facetime with physicians and/or their staff.  Often sales representatives would discuss Treatment Guidelines with HCPs during individual sales visits in an effort to substantiate their marketing claims.  In other instances, sales representatives would create small group speaker programs to reach more physicians.

135.    Purdue awarded its sales representatives, including Abbott sales representatives, through a lucrative bonus system that had one goal: increase sales of Opioid Drugs (particularly OxyContin).  This resulted in a large number of visits by its sales representatives to physicians with high rates of Opioid Drug prescriptions, as well as a multifaceted "information" campaign aimed at high volume Opioid Drug prescribers.  In 2001, in addition to the average sales representative's annual salary of $55,000, annual bonuses averaged $71,500, with a range of $15,000 to nearly $240,000.  In 2001 alone, Purdue paid approximately $40 million in bonuses to its sales representatives.  According to a 2003 government investigation, "[t]he amount of total bonuses that Purdue estimated were tied to OxyContin sales increased significantly from about $1 million in 1996, when OxyContin was first marketed, to about $40 million in 2001."  The corresponding growth in prescriptions for non-cancer pain outpaced the growth in prescriptions for cancer pain from 1997 to 2002 during the Abbott-Purdue co-promotional agreement.

---

[19]    *CDC    Guidelines    for    Prescribing    Opioids    for    Chronic    Pain,*    CDC.GOV, https://www.cdc.gov/drugoverdose/prescribing/guideline.html (last visited March 26, 2018).

136.    Upon information and belief, Abbott has been fully aware of studies proving that in-person drug detailing was the most effective marketing technique to influence prescribing habits.

137.    Abbott's army of sales representatives was instrumental in expanding prescriber demand (and thus the prescription market) for OxyContin and in turn other Opioid Drugs.  A 2009 study noted that the nearly 10-fold increase in OxyContin prescriptions between 1997 and 2002 correlated with Abbott and Purdue's co-promotional agreement, doubling Purdue's sales force and tripling its sales calls.

138.    Abbott and Purdue, along with other Manufacturer Defendants, recognized that a key to their financial success would be getting physicians to expand the market with an increase in generic immediate-release opioids and further expand the market with a switch from generic immediate-release opioids to extended-release opioids. In furtherance of these goals, sales representatives were trained to highlight a range of patients appropriate for conversion and to promote Opioid Drugs for chronic noncancer pain and off-label indications, such as low back pain, osteoarthritis and migraines.

139.    Not only did Abbott and Purdue sales representatives increase sales of OxyContin, but they also incentivized sales of generic immediate and extended release oxycodone to further expand the Opioid Drug market and potential number of physicians for conversion. Indeed, part of the bonus for sales representatives was calculated in relation to the size of the overall market.

**(b)    Janssen**

140.    Janssen also focused much of its time and resources on detailing its Opioid Drugs to prescribing physicians.  Sales representatives would detail individual HCPs, as well as their

staff, during office visits as well as during small group speaker programs. In 2014 alone, the company spent approximately $34 million in detailing its Opioid Drugs.

141. Janssen's sales representatives often made misleading statements regarding its Opioid Drugs, including misrepresentations as to the safety and efficacy of long-term Opioid Drug therapy for the treatment of chronic pain.

142. On December 9, 1999, the FDA sent Janssen a letter indicating that it had reviewed a number of "homemade" marketing pieces that had been used by Janssen sales representatives for its fentanyl-based synthetic Opioid Drug, Duragesic. The FDA found those marketing pieces to be false or misleading because they contained misrepresentations regarding safety information, broadened Duragesic's indication, contained unsubstantiated claims, and lacked fair balance.

143. The FDA's Warning Letter provided the following examples of statements in the "homemade" marketing material that misrepresented safety information:

- "Significantly LESS constipation!" which suggested Duragesic had been demonstrated to be associated with less constipation than other available Opioid Drugs, thus, minimizing the risk of constipation; and

- "Low abuse potential!" which suggested that Duragesic had less potential for abuse than other available Opioid Drugs and minimized and contradicted fentanyl's status as a Schedule II controlled substance.

144. The FDA's Warning Letter provided the following example of a statement in the homemade marketing material that broadened Duragesic's indication for use: "It's not just for end stage cancer anymore!" That suggested that Duragesic can be used for any type of pain management, and ignored the fact that Duragesic was indicated only for the management of chronic pain in patients who require continuous opioid analgesia for pain that cannot be managed by less powerful means. It also ignored the fact that use in persons other than those for whom Duragesic was indicated by FDA poses a high risk of death.

145. The FDA's Warning Letter provided additional examples of unsubstantiated claims, such as: (a) "Preferred regimen: 2 x per week versus 2 x per day!;" (b) "Easy for Patient compliance;" and (c) "And the #1 reason to convert your patients to the Duragesic patch: QUALITY OF LIFE," and "without pain, patients sleep better[.]"

146. On August 26, 2011, Janssen received another Warning Letter regarding its Opioid Drug, Nucynta. The letter informed Janssen that the FDA had become aware of oral statements made by a Janssen sales representative promoting an unapproved use for its Opioid Drug Nucynta, making unsubstantiated superiority claims about the drug, and minimizing the serious risks associated with Nucynta.

147. The statements were made on December 8, 2010, at the American Society of Health-System Pharmacists Midyear Clinical Meeting and Exhibition in Anaheim, CA. The unsubstantiated claims made by Janssen's sales representatives include, *inter alia*:

- "Nucynta provides 10 mg of opioid/oxycodone pain control, similar to Tramadol, but with less GI, constipation, nausea, and vomiting," which is misleading and implied that Nucynta is clinically superior compared to oxycodone and Tramadol for certain patients; and

- When physicians prescribe Nucynta they "won't have to put patients on docusate or senna [and] patients get out of the hospital a day earlier which saves thousands of dollars because they are going to be able to have a bowel movement," which is misleading and implied that treatment with Nucynta has been shown to reduce the length of a hospital stay in comparison to oxycodone and Tramadol.

**(c)    Endo**

148. Endo also focused much of its time and resources on detailing its Opioid Drugs to prescribing physicians. Sales representatives would detail individual HCPs, as well as their staff, during office visits as well as during small group speaker programs. In 2014 alone, Endo spent approximately $10 million on detailing its Opioid Drugs.

149.    A 2012 Endo business plan sought increased detailing to nurse practitioners and physician assistants, whom Endo viewed as particularly susceptible to detailing.

150.    In an effort to substantiate their marketing claims, Endo sales representatives discussed Treatment Guidelines with HCPs during individual sales visits including visits throughout the United States and Louisiana.  Endo spent approximately $246,620 to buy copies of the Federation of State Medical Boards' ("FSMB") treatment guidelines, which were distributed by Endo's sales force.

151.    Endo also employed its sales representatives to market Opana ER as tamper and crush resistant and therefore less prone to misuse and abuse, despite the fact that the FDA rejected Endo's petition to approve Opana ER as abuse-deterrent in 2012.  The FDA warned in a 2013 letter that there was no evidence to support the claim that Opana ER "would provide a reduction in oral, intranasal or intravenous abuse."

152.    Similarly, the New York Attorney General ("NY AG") found that statements that Opana ER was "designed to be, or is crush resistant" were false and misleading because there was no difference in the ability to extract the narcotic from the drug.

153.    Even Endo's own studies showed that Opana ER could still be ground or chewed, which it failed to disclose. Despite this, and repeated warnings, Endo's sales representatives continued to assert to physicians that Opana ER is harder to abuse. Regional surveys have confirmed that Endo sales representatives marketed the drug as "crush resistant."

**(d)    Actavis**

154.    Actavis also devoted time and resources to detailing its Opioid Drugs.  In 2011 alone, Actavis expended $6.7 million on drug detailing.  In 2014, Actavis spent at least $2 million.

155.    Like the other Defendants, Actavis encouraged its sales representatives to develop close relationships not only with physicians, but with their staff as well.  The company even provided its sales representatives with an "Own the Nurse" kit as a "door opener" to time with HCPs.

156.    The expanded market also included internists and general practitioners who were low-to mid-volume prescribers.  Actavis rolled out a plan in 2008 to move beyond "loyalists" to an "expanded audience" of "low morphine writers."

157.    In an effort to substantiate their marketing claims, Actavis sales representatives discussed Treatment Guidelines with HCPs during individual sales visits including visits throughout the United States and Louisiana.

158.    Actavis sales representatives trained with a uniform, nationally used, education model called "Kadian Learning System," which trained representatives on the marketing messages they were required to pass onto prescribers, including deceptive claims about improved function, the risk of addiction, and withdrawal.

159.    For example, the Kadian Learning System instructed sales representatives to misleadingly inform physicians that "[a]lthough tolerance and dependence do occur with long-term use of opioids, many studies have shown that tolerance is limited in most patients with [chronic pain]" and that Opioid Drug "[d]oses are titrated to pain relief, and so no ceiling dose can be given as to the recommended maximal dose."

160.    The Kadian Learning System further trivialized the harms associated with withdrawal, falsely claiming that "[p]hysical dependence simply requires a tapered withdrawal should the opioid medication no longer be needed."

161.    Like other defendants, Actavis further taught its sales representatives to tell physicians to be on the lookout for "pseudoaddiction," which Actavis defined as "[b]ehaviors (that mimic addictive behaviors) exhibited by patients with inadequately treated pain."

### (e)    Mallinckrodt

162.    Upon information and belief each Defendant, including Mallinckrodt, promoted the use of Opioid Drugs, including but not limited to Exalgo and Xartemis, for chronic pain through "detailers," who were sales representatives who visited individual physicians and their staff in their offices and small group speaker programs.

### 2.    *Physician-Targeted Advertisements, Websites and Pamphlets*

163.    The Manufacturer Defendants also engaged in false and misleading marketing to physicians by way of their physician-targeted advertisements, websites, pamphlets, and other promotional materials.[20]

### (a)    Print Advertising

164.    Manufacturer Defendants placed advertisements in trade journals meant to reach prescribing physicians.

165.    The advertisements were printed in various medical journals, including those aimed at specialists (such as the *Journal of Pain* and *Clinical Journal of Pain*), as well as those targeting a broader array of medical professionals (such as the *Journal of the American Medical Association*).

166.    In 2011 alone, Manufacturer Defendants spent more than $14 million on medical journal advertising of Opioid Drugs, nearly triple what they spent in 2001.

---

[20] Unlike other physician-directed marketing materials, these were official advertisements wherein the Defendants were clearly listed as the sponsor.

167.    These advertisements contained deceptive messages regarding the safety and efficacy of the Opioid Drugs as a long-term treatment for chronic pain.  Such fraudulent marketing falsely implied that Opioid Drugs could provide both effective long-term pain relief and functional improvement, claims that are unsubstantiated and contradicted in the medical literature.

### (1)    *Abbott*

168.    Upon information and belief, Manufacturer Defendants including Abbott engaged in false and misleading marketing to physicians by way of its physician-targeted advertisements, websites, pamphlets, and other promotional materials.

### (2)    *Janssen*

169.    Janssen targeted physicians through medical journal advertising.  In 2011, the company spent approximately $4.9 million on such ads.

170.    Janssen's physician-targeted advertisements were similarly deceptive, as evidenced by a September 2, 2004, FDA Warning Letter.  That letter was in relation to Janssen's Duragesic patch.  FDA found that a file card used by Janssen in connection with that patch contained false and misleading claims regarding the efficacy and abuse potential of Duragesic.  The FDA noted Janssen's representations could encourage the unsafe use of the drug, potentially resulting in serious or life-threatening hypoventilation, or even death.

171.    The marketing materials in question included the following misleading or unsubstantiated claims:

- "low reported rate of mentions in [Drug Abuse Warning Network ("DAWN") data" along with comparisons to other Opioid Drugs, which suggested that Duragesic is less abused than other Opioid Drugs;

- "minimizes the potential for local GI side effects by avoiding GI absorption," which suggested that Duragesic is associated with less constipation, nausea, and vomiting than oral Opioid Drugs;

- "demonstrated effectiveness in chronic back pain with additional patient benefits" which was based on an open-label, single arm trial with no control group which is clearly inadequate to support such a claim;

- "86% of patients experienced overall benefit in a clinical study based on: pain control, disability in ADLs, quality of sleep," "all patients who experienced overall benefit from Duragesic would recommend it to others with chronic low back pain," "significantly reduced nighttime awakenings" and "significant improvement in disability scores as measured by the Oswestry Disability Questionnaire and Pain Disability Index" which were again based on an open-label, single arm trial with no control group—which is inadequate to support such claims;

- "Improved patient outcomes: Open-label, crossover comparison study," "Significant improvement in physical functioning summary score," and "Significant improvement in social functioning," which are based on an open label study lacking sufficient support for the cited claims; and

- "1,360 loaves…and counting," "Work, uninterrupted," "Life, uninterrupted," "Game, uninterrupted," "Chronic pain relief that supports functionality," "Helps patients think less about their pain," and "Improvements in physical and social functioning," which imply that patients will experience improved social or physical functioning, a claim for which Janssen lacked support.

172.    The FDA stated they were not aware of any substantial evidence or clinical experience to support these claims.

173.    On July 15, 2005, the FDA issued a public health advisory warning doctors of deaths resulting from the use of Duragesic and its generic competitor, manufactured by Mylan. The advisory referenced potential adverse events "related to inappropriate use of the patch: and also the possibility "that patients and physicians might be unaware of the risks" of using the fentanyl patch, which is an extremely potent opioid analgesic approved only for the limited indication of chronic pain in opioid-tolerant patients that could not be treated by any other drugs.

### (3)    Endo

174.    Endo also targeted physicians through medical journal advertising.  In 2011, the company spent approximately $1.1 million in such ads.

175.    Upon information and belief, Endo ran print advertisements aimed at prescribers for the 2012 Opana ER reformulation, which made misleading claims that the drug was tamper/crush resistant.

### *(4)     Actavis*

176.    Actavis also targeted physicians through medical journal advertising.    Such advertising hit its peak in 2005, when Actavis spent over $11 million advertising in medical journals.

### *(5)     Mallinckrodt*

177.    Upon information and belief, Manufacturer Defendants including Mallinckrodt engaged in false and misleading marketing to physicians by way of its physician-targeted advertisements, websites, pamphlets, and other promotional materials.

### (b)     Drug Manufacturer Websites

178.    Manufacturer Defendants also utilized "for prescribers" sections on their websites to market Opioid Drugs to prescribers (or otherwise offered information on their websites specifically for HCPs).    These websites, upon information and belief, rehashed many of the long-term efficacy and safety misrepresentations detailed above.

179.    Upon information and belief, every Manufacturer Defendant's website (at least through 2012) contained prescriber information about the fictitious concept of "pseudoaddiction."

180.    The NY AG, in a 2016 settlement agreement with Endo, found that opioid "use disorders appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers meeting the clinical criteria for an opioid use disorder."  Endo had claimed on its www.opana.com website that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged

opioid medicines usually do not become addicted," but the NY AG found that Endo had no evidence for that statement. Consistent with this, Endo agreed not to "make statements that . . . opioids generally are non-addictive" or "that most patients who take opioids do not become addicted" in New York. Upon information and belief, Endo continues to make these false statements elsewhere.

181.    Janssen "owned or controlled"[21] a website called *Prescribe Responsibly*, that propagated numerous false or misleading statements concerning the safety of Opioid Drugs and fails to address the risks associated with taking them. It stated that prescribers' trepidation about prescribing Opioid Drugs is largely due to "questions of addiction" and such concerns "are often overestimated. According to clinical opinion polls, true addiction occurs only in a small percentage of patients with chronic pain who receive chronic opioid analgesic[] . . . therapy."[22] The website also falsely stated that opioid addiction "can usually be managed" with tools like Opioid Agreements between the physician and patient.

182.    Janssen's prescriberesponsibly.com also noted that "pseudoaddiction" is "a syndrome that causes patients to seek additional medications due to inadequate pharmacotherapy being prescribed. Typically, when the pain is treated appropriately, the inappropriate behavior ceases."[23] Essentially spreading the message that pseudoaddiction is a condition that requires the prescription of more or stronger Opioid Drugs.

183.    *Prescribe Responsibly* also misleadingly asserted that Nucynta ER had a low incidence of withdrawal symptoms.

---

[21] Legal Notice, PRESCRIBE RESPONSIBLY, https://www.prescriberesponsibly.com/legal-notice (last visited March 27, 2018).
[22] *Use of Opioid Analgesics in Pain Management*, PRESCRIBE RESPONSIBLY, http://www.prescriberesponsibly.com/articles/opioid-pain-management (last visited Dec. 14, 2017).
[23] *What a Prescriber Should Know Before Writing the First Prescription*, PRESCRIBE RESPONSIBLY, https://www.prescriberesponsibly.com/articles/before-prescribing-opioids (last visited March 27, 2018).

184.    Janssen funded and edited another website, *Let's Talk Pain*, which in 2009 stated that "pseudoaddiction . . . refers to patient behaviors that may occur when pain is undertreated . . . Pseudoaddiction is different from true addiction because such behaviors can be resolved with effective pain management."  This website was accessible nationwide until May of 2012.

185.    Mallinckrodt's website claims, without citing any clinical evidence, that its Opioid Drugs help "enable patients to stay in the workplace, enjoy interactions with family and friends, and remain an active member of society."

186.    Another website founded by Mallinckrodt, pain-topics.org, featured materials from the American Pain Foundation ("APF"), relentlessly overstated the benefits and minimized the risks of opioids, gave extensive coverage to made-up phenomena such as pseudoaddiction and opioid-phobia, and peddled blatantly false statements such as "the clinical benefits of opioid treatment dwarf the clinical risks."

### 3.    Medical "Key Opinion Leaders"

187.    Manufacturer Defendants also employed a small circle of physicians known as KOLs who held themselves out as experts in the pain management field.  These KOLs were selected, cultivated, and elevated to prominence by the Manufacturers.

188.    In order to spread their fraudulent and deceptive science to bolster their marketing schemes, the Manufacturer Defendants enlisted the help of such KOLs to espouse pro-opioid misinformation to practicing doctors, and most importantly, general practitioners.

189.    Pro-opioid HCPs are one of the most important vessels that the Defendants use to spread their false and deceptive statements about the risks and benefits of long-term opioid use. The Manufacturer Defendants know that HCPs rely heavily and less critically on their peers for

guidance, and KOLs provide the false appearance of unbiased and reliable support for chronic opioid therapy.

190.    Further, by maintaining an illusion of independence, KOLs are less subject to FDA oversight and regulations regarding marketing. Without the air of independence, KOLs (and Front Groups) would be subject to the FDA's promotional rules, which state in part:

> FDA's regulation of prescription drug product promotion extends both to promotional activities that are carried out by the firm itself, and to promotion conducted on the firm's behalf.
>
> Therefore, a firm is responsible for the content generated by its employees or any agents acting on behalf of the firm who promote the firm's product. For example, if an employee or agent of a firm, such as a medical science liaison or paid speaker (e.g., a key opinion leader) acting on the firm's behalf, comments on a third-party site about the firm's product, the firm is responsible for the content its employee or agent provides. A firm is also responsible for the content on a blogger's site if the blogger is acting on behalf of the firm.[24]

191.    The laundry list of KOL activities done at the behest of the Manufacturer Defendants was crucial in disseminating their campaign for long-term Opioid Drug use for chronic pain. KOLs have written, consulted on, edited, and supplied their names for books and articles, and given speeches and CMEs in support of long-term Opioid Drug use to treat chronic pain. They have also served on committees that helped develop guidelines for chronic pain Opioid Drug use and on boards of pro-opioid groups and professional societies charged with selecting and preparing CMEs. They have also served as paid consultants to the Manufacturer Defendants.

192.    To garner their support, Manufacturer Defendants provided these KOLs with money, prestige, recognition, research funding, and avenues to publish, all at the expense of the

---

[24] *Draft Guidance for Industry Fulfilling Regulatory Requirements for Postmarketing Submissions of Interactive Promotional Media for Prescription Human and Animal Drugs and Biologics,* FDA, at 4 (Jan. 2014), *available at* https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM381352.pdf.

patients they were obligated to protect. Manufacturer Defendants' manipulative scheme allowed the KOLs to exert an increasing amount of influence on the medical community.

193.    Although some KOLs initially may have advocated for more permissive opioid prescribing with honest intentions, Manufacturer Defendants cultivated and promoted only those KOLs who could be relied on to help broaden the chronic opioid therapy market. Manufacturer Defendants selected, funded, and elevated those HCPs whose public positions were unequivocal and supportive of using Opioid Drugs to treat chronic pain. These HCPs' reputations were then dependent on continuing to promote a pro-opioid message, even in activities that were not directly funded by the drug companies.

194.    Manufacturer Defendants cited and promoted favorable studies or articles by these KOLs. By contrast, Manufacturer Defendants did not support, acknowledge, or disseminate the publications of HCPs critical of long-term opioid therapy for chronic pain. Indeed, one prominent KOL, Russell Portenoy, stated that he was told by a drug company that research critical of Opioid Drugs (and the HCPs who published that research) would never obtain funding. Some KOLs have even gone on to become direct employees and executives of Manufacturer Defendants, like Dr. Bradley Galer, Endo's former Chief Medical Officer.

195.    Manufacturer Defendants kept close tabs on the content of the misleading materials published by these KOLs. In many instances they also scripted what these KOLs said. The KOLs knew or deliberately ignored the misleading way in which they portrayed the use of Opioid Drugs to treat chronic pain to patients and prescribers, and they continued to publish those misstatements to benefit themselves and Defendants, which caused and continues to cause harm to prescribers, patients, and payors, including the EBRCOC.

196.    Manufacturer Defendants often utilized the same KOLs and collaborated on their message.

197.    Manufacturer Defendants collectively, individually, and through Front Groups paid multiple KOLs that reside and practice in Louisiana.  Some of the most prominent and highly paid KOLs in Louisiana include:

a.  Dr. Randall Brewer, Medical Director of River Cities Interventional Pain Specialists in Shreveport, Louisiana has been an instrumental KOL in promoting opioids for long-term non-cancer pain in Louisiana and across the nation. For years, Brewer has been paid handsomely to conduct research on behalf of opioid manufacturers, serving on multiple peer-reviewed pain journals and publications, relaying Defendants' misleading marketing messages. He is part of the Scientific Guidelines Review Committee for the Front Group Academy of Integrative Pain Management ("AIPM"). Brewer also served as editor for an Endo sponsored presentation entitled "Pain Management," which falsely stated that "most specialists in pain medicine and addiction medicine agree that patients treated with prolonged opioid therapy 'usually do not develop addictive disorders'" in an attempt to downplay the stigma and "phobic concerns over opioid use."[25] According to Pro Publica, Brewer is among the top 10 highest Medicare prescribers of Butrans in the nation. He is also among the top highest prescribers of OxyContin, hydrocodone-acetaminophen and oxycodone; in the top 10 highest prescribers of fentanyl and the third highest prescriber of Opana ER in Louisiana.

b.  Dr. Fred Defrancesch is a physical medicine and rehabilitation specialist with several clinics throughout Louisiana. Defrancesch is a former reviewer of Pain Medicine Journal and an active member of Front Group American Academy of Pain Medicine ("AAPM"). Between the second half of 2013 and 2016, Defrancesch received over $121,000 from drug manufacturers, including over $87,000 from Purdue for promotional and speaking engagements relating to its opioid drugs. According to Pro Publica, Defrancesch is among the top 20 highest Medicare prescribers for hydrocodone-acetaminophen, oxycodone, oxycodone-acetaminophen and fentanyl; the third highest prescriber of OxyContin and the top highest prescriber of fentanyl, Opana ER and Nucynta in Louisiana.

### 4.    *Front Groups*

198.    Among the strategies intentionally designed to obscure the actual sources and amounts of funding for promotional activities, the Manufacturer Defendants developed

---

[25] "Pain Management," P&T Digest: A Peer-Reviewed Compendium of Formulary Considerations, Special Supplement to 'Managed Care' Vol. 14, No. 12, Pg. 35 (December 2005).

relationships with various "Front Groups," *i.e.*, industry-funded grassroots, consumer advocacy, research, and educational organizations whose primary goal is to promote marketing, influence regulations, or advance other industry interests.

199.    Manufacturer Defendants utilized non-profit organizations, such as the APF, as Front Groups to further their own self-interest of increasing market share for the Opioid Drugs. Manufacturer Defendants' funding and partnering with the APF and/or other similar organizations was designed to accomplish through a non-profit organization what the Manufacturer Defendants could not do on their own: give the appearance of independent analysis and a grassroots movement encouraging FDA approval and expanding the use, including unapproved uses, for opioids.

200.    As with KOLs, Front Groups—as purportedly independent organizations—helped lend credibility to the Manufacturer Defendants' deceptive marketing.  As one physician adviser to Manufacturer Defendants noted, third-party documents not only had greater credibility, but broader distribution, as HCPs did not "push back" at having materials from, for example, the non-profit APF on display in their offices, as they might with first party, drug company pieces.

201.    Further, Front Groups, like KOLs, evaded FDA oversight and regulations regarding marketing due to their illusory independence from the Manufacturer Defendants.

202.    The large number of these organizations (a recent U.S. Senate Committee Report found fourteen)[26] was no accident.  The groups often had shared board members, reviewed and approved of each other's work, and collaborated on projects.  In this way, the Manufacturer Defendants were able to build an illusion of medical consensus around their false and misleading marketing claims.

---

[26] U.S. Senate Homeland Security & Governmental Affairs Committee, *Fueling an Epidemic: Exposing the Financial Ties Between Opioid Manufacturers and Third Party Advocacy Groups*, 115th Cong., 1 (Feb. 12, 2018), https://www.hsgac.senate.gov/media/minority-media/breaking-millions-in-payments-among-findings-of-mccaskill-opioid-investigation-into-ties-between-manufacturers-and-third-party-advocacy-groups-.

203.    These Front Groups were funded in large part by the Manufacturer Defendants, had "corporate councils" with Manufacturer Defendant representatives, had a "revolving door" between industry employment and Front Group advocacy, and/or were comprised of individuals with financial ties to the Manufacturer Defendants.

204.    The Manufacturer Defendants also cut-out the middleman and made huge payments directly to the board members and other decision-makers at these organizations, thereby creating egregious conflicts of interest aimed at driving those groups' messaging.  For example, Dr. Charles Argoff, current AAPM President, received over $600,000 in payments from Opioid Drug manufacturers between 2013 and 2016.  Between 2013 and 2017, payments by Opioid Drug manufacturers to Front Group affiliated individuals exceeded $10 million.

## (a)    Examples of Front Groups

205.    Manufacturer Defendants were involved with numerous Front Groups that were used to further Defendants' fraudulent marketing scheme.  Some of the most prominent Front Groups were the APF, AAPM, and American Pain Society ("APS").  In an effort to create an impression of medical consensus, these groups often "collaborated" on various initiatives and publications, such as the Pain Care Forum ("PCF").

### (1)    American Pain Foundation

206.    The most prominent nonparty advocate for Opioid Drugs, funded by Defendants was the APF, which falsely held itself out to be an independent patient advocacy organization.  In reality, APF advocated for Opioid Drug manufacturers, even accepting grants from manufacturers meant to "strategically align [the manufacturer's] investment in nonprofit organization that share [its] business interests."

207.    APF received more than $10 million in funding from Opioid Drug manufacturers from 2007 until it closed its doors in May 2012.  In 2009 and 2010, more than 80% of APF's operating budget came from pharmaceutical industry sources.  Including industry grants for specific projects, APF received about $2.3 million from industry sources out of total income of about $2.85 million in 2009; its budget for 2010, projected receipts of roughly $2.9 million from drug companies, out of total income of about $3.5 million.

208.    By 2011, APF was entirely dependent on incoming grants from manufacturers, including Endo, and others to avoid using its line of credit.  Even notorious KOL Dr. Portenoy admitted that the lack of funding diversity was a big problem for APF.

209.    APF's board, which developed it's messaging and reviewed its publications, was comprised in large part of KOLs sponsored by the Defendants.  Its board also included one or more individuals who also worked for public relations firms that represented certain Defendants.

210.    APF issued "education guides" for physicians, patients, reporters, and policymakers that touted the benefits of Opioid Drugs for chronic pain and trivialized their risks, particularly the risk of addiction.  It even provided "patient representatives" to participate in industry marketing campaigns.

211.    APF also developed the National Initiative on Pain Control ("NIPC"), which ran a facially unaffiliated website called www.painknowledge.org and put on CME programs.  NIPC was substantially controlled by Endo through funding of NIPC projects; development, directing specifics of and review of content; and distribution of NIPC materials.

212.    NIPC held itself out to be an education initiative and promoted its expert leadership team that included purported experts in the pain management field.  Its website painknowledge.org informed readers that while using Opioid Drugs "your level of function should improve; you may

find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse." It also included improved quality of life and functions as benefits of Opioid Drug uses throughout the website. It falsely stated that "people that have no history of drug abuse, including tobacco, and use their opioid medication as directed will probably not become addicted" and did not rule out the possibility of those with a history of opioid addiction continuing to use the drugs.

213. APF also engaged in a significant multimedia campaign—through radio, television, and the internet—to educate patients about their "right" to pain treatment, namely Opioid Drugs. All of the programs and materials were available nationally and were intended to reach Louisiana physicians, patients, and payors, including the EBRCOC.

214. Its media campaign led it in some instances to merely re-stamp its name on opioid manufacturer materials. For example, APF put out media packet—APF Reporter's Guide: Covering Pain and its Management (2009)—that simply recycled text previously used by a (non-defendant) drug manufacturer in its media relations. The Reporter's Guide also graciously offered to "connect reporters with a wide array of leading pain experts," who (upon information and belief) consisted of the Defendants' KOLs.

215. APF also launched a campaign to promote Opioid Drugs for returning veterans, which has contributed to high rates of addiction and other adverse outcomes—including death—among returning soldiers.

216. It also engaged in purported grassroots lobbying against various legislative initiatives that might limit opioid prescribing, and thus the profitability of its sponsors.

217.    APF took audacious stances in an effort to convince HCPs that the country was suffering from an epidemic of untreated pain, and that Opioid Drugs were the solution.  It even urged tracking of this so-called pain epidemic.

218.    APF's activities were guided or controlled by various Manufacturer Defendants.  In many instances, Opioid Drug manufacturer representatives—usually at informal meetings—"suggested" activities and publications for APF to pursue.  APF would then submit a grant proposal seeking funding for these "suggested" activities, knowing that the drug companies would provide financial support.

219.    APF caught the attention of the United States Senate Finance Committee in May 2012, as the Committee sought to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers.  The investigation raised red flags as to APF's credibility as an objective and neutral third party; the Manufacturer Defendants stopped funding it.  Within days of being targeted by the Senate's investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances."  APF "cease[d] to exist, effective immediately."

*(2)    The American Academy of Pain Medicine*

220.    AAPM, which falsely held itself out to be a professional society, was another one of the Defendants' Front Groups.  Between 2012 and 2017, opioid manufacturers collectively submitted over $2.7 million dollars in payments to AAPM.[27]

221.    AAPM's past presidents included numerous KOLs sponsored by the Defendant Manufacturers.

---

[27] U.S. Senate Homeland Security & Governmental Affairs Committee, *Fueling an Epidemic: Exposing the Financial Ties Between Opioid Manufacturers and Third Party Advocacy Groups*, 115th Cong., 1 (Feb. 12, 2018), https://www.hsgac.senate.gov/media/minority-media/breaking-millions-in-payments-among-findings-of-mccaskill-opioid-investigation-into-ties-between-manufacturers-and-third-party-advocacy-groups-.

222.    With the assistance, prompting, and involvement of the Defendant Manufacturers (as well as other Front Groups), AAPM served the Defendant Manufacturers' financial interests. Through treatment guidelines, policies, and similar messaging, AAPM deceptively promoted Opioid Drugs for the long-term treatment of chronic pain.  AAPM issues guidelines and policies minimizing the risk of addiction.

223.    Additionally, AAPM lobbied to change laws directed at curbing Opioid Drug use, strongly criticized landmark CDC guidelines on opioid prescribing, and challenged legal efforts to hold physicians and industry executives responsible for over-prescribing and misbranding.

224.    AAPM also sponsored and hosted medical education programs essential to Defendant Manufacturers' deceptive marketing of chronic opioid therapy.

225.    AAPM was laser focused on promoting the use of Opioid Drugs for long-term treatment of chronic pain and downplaying the risk of addiction.  At one conference alone, 37 out of 40 of the conference sessions were opioid-focused.  Dr. Fishman, a past AAPM president, stated that he would place the organization "at the forefront" of teaching that "the risks of addiction are . . . small and can be managed."[28]  AAPM even issued a statement in 1997 that endorsed opioid drugs and claimed that the risk of opioid addiction in people taking prescription opioids was low.

226.    The Manufacturer Defendants were able to use AAPM and other Front Groups to overestimate the prevalence of pain suffering and need for Opioid Drug therapy.  Eleven AAPM members were on the roster for the Institute of Medicine ("IOM") Committee working on the 2011 report finding chronic pain affects over 100 million people.  As AAPM member Dr. Sean Mackey deceptively notes, this influential report "clearly reinforce[s] that the overall burden of pain is just

---

[28] Interview with Scott M. Fishman, M.D., Professor of Anesthesiology and Pain Medicine, Chief of the Division of Pain Medicine, Univ. of Cal., Davis (2005), https://www.medscape.org/viewarticle/500829.

astronomically high."[29]    Mackey also commented on the "clear overlap between the recommendations outlined in the [IOM] report and much of the vision of the [AAPM]."[30]

227.    As noted in greater detail below, AAPM also sought to undermine both the FDA and CDC's efforts to limit opioid prescribing as they were contrary to the Manufacturer Defendants' marketing plan.

228.    In 2012, KOLs Dr. Perry Fine and Dr. Lynn Webster co-authored the AAPM's response to the FDA's efforts to limit opioid medications to severe and cancer pain indications. The response circularly references the AAPM/APS 2009 Guidelines, written by KOLs and sponsored/funded by the Manufacturer Defendants, admitting the Guidelines "are based on lower quality evidence" but maintaining that "[a]t best, the literature has shown inconsistent effectiveness of opioids for chronic pain."  Parroting the opioid drug industry's message, the response further misleadingly states that mental health and substance-abuse comorbidities are "not a reason to deny people with pain an opioid."

### (3)    *Academy of Integrative Pain Management*

229.    The AIPM was yet another Front Group that received significant funding from the Defendants.  Formerly the American Academy of Pain Management, AIPM is a "diverse community of healthcare providers representing more than 30 distinct disciplines who are dedicated to *using all appropriate therapeutic approaches* to reduce pain and achieve optimal health and healing."  Despite the name change and this ostensibly holistic goal, the former American Academy of Pain Management received approximately $1.2 million in funding from the Defendants between 2012 and 2017.

---

[29] The American Academy of Pain Medicine, *Shared Vision on Future of Pain Care,* 26 PAIN MEDICINE NETWORK 2, 4 (Fall 2011/Winter 2012) *available at* http://www.painmed.org/files/network-newsletter-2011-fall-2012-winter.pdf.
[30] *Id.* at 1.

230.    According to AIPM's website, they "greatly value. . .relationships with. . . commercial sponsors."[31]   Corporate council benefits, which paying Defendant Manufacturers received, are said to "increase in value as the level of corporate support increases."[32]  In exchange for funds, corporate council Defendants received access to leadership and data the organization collects, including: "Executive Reports of Member and Patient Surveys," "Advised Input Into Planned Surveys," and "Monthly Email to Members Listing Sponsors Open Clinical Trials."[33] The benefits also included allowing members to present educational programs at off-site dinner symposia in connection with AAPM's marquee event – its annual meeting.  Defendants Endo Abbott and Actavis were members of the council and presented deceptive programs to HCPs who attended this annual event.  Finally, corporate council members allowed drug company executives and marketing staff to meet in an intimate setting, allowing an opportunity to align their fraudulent messages.[34]

### (4)    American Pain Society

231.    APS was another of the Manufacturer Defendants' Front Groups.  According to a 2018 Senate Committee investigation, various Manufacturer Defendants combined to pay APS more than $1 million between 2012 and 2017.[35]

---

[31]    Corporate Council Members, ACADEMY OF INTEGRATIVE PAIN MANAGEMENT, https://integrativepainmanagement.site-ym.com/page/CorporateCouncil, (last visited March 5, 2018).
[32] *Id.*
[33]    Corporate Council Program, ACADEMY OF INTEGRATIVE PAIN MANAGEMENT, https://integrativepainmanagement.site-ym.com/page/CorpCouncilProgram (last visited March 5, 2018).
[34] *Id.*
[35] U.S. Senate Homeland Security & Governmental Affairs Committee,. *Fueling an Epidemic: Exposing the Financial Ties Between Opioid Manufacturers and Third Party Advocacy Groups*, 115th Cong., 7 (Feb. 12, 2018), https://www.hsgac.senate.gov/media/minority-media/breaking-millions-in-payments-among-findings-of-mccaskill-opioid-investigation-into-ties-between-manufacturers-and-third-party-advocacy-groups-.

232.    The APS website specifies that its "Corporate Council" contributors donated between $7,500 and $25,000.    Various Manufacturer Defendants "served" on the Corporate Council during the relevant time period.

233.    In 1996, the APS first introduced the concept of "pain as the 5th vital sign" to exaggerate and misinform the medical community that "pain assessment is as important assessment of the standard four vital signs and that clinicians need to take action when patients report pain."[36]  As a result of equating subjective pain as a vital sign, physicians are forced to come up with a reliable and effective treatment if and when a patient gives a subjectively high pain rating on the scale.[37]

234.    APS also publishes the *Journal of Pain*, which according to APS's website "aims to improve the care of patients in pain by providing a platform in which clinical researchers, basic scientists, clinicians, and other health professionals can publish original research.  The *Journal of Pain* is the second ranked pain journal in the world and has a current impact factor of 4,519© on 2013 Journal Citation Reports®, which rises every year."[38]  Upon information and belief, the Manufacturer Defendants utilized the *Journal of Pain* to disseminate their false and misleading statements regarding the safety and efficacy of Opioid Drugs for the long-term treatment of chronic pain.

235.    In addition to its journal, APS has also generated and disseminated an electronic newsletter which, upon information and belief, also misleadingly marketed Opioid Drugs to prescribers.

---

[36]    National Pharmaceutical Council, *Section II: Assessment of Pain, available at* http://americanpainsociety.org/uploads/education/section_2.pdf (last visited March 26, 2018).
[37]    Myles Gart, M.D., *Pain is not the fifth vital sign,* MEDICAL ECONOMICS (May 20, 2017), http://medicaleconomics.modernmedicine.com/medical-economics/news/pain-not-fifth-vital-sign.
[38]    *The Journal of Pain*, AMERICAN PAIN SOCIETY, http://americanpainsociety.org/education/the-journal-of-pain/overview (last accessed Mar. 20, 2018).

236.    APS also hosted a number of CMEs or other "educational" courses for physicians which were used by the Manufacturer Defendants to misleadingly market their Opioid Drugs to physicians.  These include, *inter alia*, the APS Resident's Course sponsored by Endo.

237.    APS has several connections to other Front Groups through which the Manufacturer Defendants have funneled money and influence.  For example, APS along with AAPM discussed herein was largely responsible for the misleading 1997 and 2009 treatment Guidelines and "Consensus Statements."

### (5)    *Federation of State Medical Boards*

238.    Even where the Defendants did not completely control an organization, they were able to hijack that organization's messaging on pain treatment through the use of grants and lobbying.  One example is the FSMB, an organization representing the various state medical boards in the United States, including the Louisiana State Board of Medical Examiners, which in turn have the power to license, investigate, and discipline physicians.

239.    The FSMB received funding from numerous Manufacturer Defendants, both to its general fund and to bankroll opioid promotion campaigns.  FSMB in turn utilized these grants from the Manufacturer Defendants to finance various opioid- and pain-specific programs.

240.    For example, the FSMB reportedly asked for financial assistance to help pay for printing and distribution of its 2007 physician's guide titled "Responsible Opioid Prescribing" by Dr. Fishman.  The guide, which dramatically overstating the safety and efficacy of opioids and understated the risk of opioid addiction, was ultimately disseminated by FSMP to 700,000 practicing doctors, including those in Louisiana, and became the seminal authority on opioid prescribing for the medical profession.

241.    A June 8, 2012 letter submitted by the FSMB to the U.S. Senate Finance Committee disclosed payments the FSMB received from organizations that develop, manufacture, produce, market or promote the use of opioid-based drugs, including Defendants Endo and Mallinckrodt.

242.    FSMB received the following payments from Defendants:

| Company | Fiscal Year | Amount |
|---|---|---|
| **Endo** | 2007 | $40,000.00 |
| | 2008 | $100,000.00 |
| | 2009 | $100,000.00 |
| | 2011 | $125,000.00 |
| | 2012 | $46,620.00 |
| | **Total Endo Payments** | **$411,620.00** |

| Company | Fiscal Year | Amount |
|---|---|---|
| **Mallinckrodt** | 2011 | $100,000.00 |
| | **Total Mallinckrodt Payments** | **$100,000.00** |

243.    The letter disclosed payments of $40,000 by Endo to directly fund the production of "Responsible Opioid Prescribing." Upon information and belief, Abbott was also a sponsor of the publication.

244.    The FSMB is most well-known for its adoption of Treatment Guidelines and Model Policies, which were in turn adopted by many state medical boards.  These policies are not only distributed to prescribing physicians (which certain Defendants funded), but form the standards against which state medical boards might discipline prescribing HCPs.

245.    As explained below, the FSMB's Treatment Guidelines and Model Policies were funded by industry and had a significant impact on prescribing behavior.  The standards, not surprisingly, advocated for the use of Opioid Drugs in the long-term treatment of chronic pain, minimized the risk of addiction, and promoted false concepts such as pseudoaddiction.

### (6)    *Pain Care Forum*

246.    In 2004, the Front Groups combined with the Defendants to form the PCF, which began as an APF project with the stated goals of offering "a setting where multiple organizations can share information" and to "promote and support taking collaborative action regarding federal pain policy issues."  APF President Will Rowe allegedly described the forum as "a deliberate effort to positively merge the capacities of industry, professional associations, and patient organizations."

247.    PCF is comprised of representatives from Opioid Drug manufacturers and distributors (including, *inter alia*, Defendants Janssen, Abbott and Endo); HCPs and nurses in the field of pain care; professional organizations (including AAPM, APS, and American Society of Pain Educators ("ASPE")); patient advocacy groups (including APF and American Chronic Pain Association ("ACPA")); and other like-minded organizations, almost all of which received substantial funding from Manufacturer Defendants.

248.    The PCF was yet another attempt by Manufacturer Defendants to push false and misleading messages about the existence of a pain epidemic in America, the safety and efficacy of long-term Opioid Drug therapy in treating said epidemic, and other typical claims. In addition to utilizing the tools used by other Front Groups, PCF aggressively used lobbying to achieve these ends.

249.    PCF held monthly meetings which included dozens of lobbyists and executives of opioid pharmaceutical manufacturers. The PCF group met regularly in-person and via teleconference, and shared information through an email listserv.[39]

---

[39] *Id.*

250.    PCF also sought to influence and undermine the FDA's 2009 Risk Evaluation and Mitigation Strategies ("REMS") for long-acting Opioid Drugs.  For example, in response to the FDA requiring drug companies to fund CMEs related to Opioid Drug risks in accordance with its REMS, PCF lobbied to ensure that it would not be mandatory for prescribers to attend the CMEs. A survey was circulated among Endo, Janssen, and others which predicted that the rates of doctors who prescribe Opioid Drugs for chronic pain would fall by 13% if more than four hours of mandatory patient education were required.

251.    According to a report by the Associated Press and the Center for Public Integrity, the pharmaceutical companies and allied groups that comprise the PCF "spent more than $880 million from 2006 to 2015 on campaign contributions and lobbying expenses at the state and federal levels" to preserve the status quo of aggressive opioid prescribing.[40]  Front Groups like PCF, the report noted, served as "advocates spreading opioid-friendly narratives – with their links to drug companies going unmentioned – or by persuading pharma-friendly lawmakers to introduce legislation drafted by the industry."[41]

252.    For example, the PCF organized a Capitol Hill briefing entitled "The Epidemic of Pain in America" in June of 2006, which briefing materials included misleading statements, such as: "[a]ppropriate use of opioid medications like oxycodone is safe and effective and unlikely to cause addiction in people who are under the care of a doctor and who have no history of substance abuse."[42]

---

[40] *Politics of Pain: A Decade of Opioid Lobbying,* ASSOCIATED PRESS & THE CENTER FOR PUBLIC INTEGRITY (Sept. 19, 2016), http://data.ap.org/projects/2016/cpi_ap_opioids/indexcpiap.html.
[41] *Id.*
[42] Matthew Perrone & Ben Wieder, *Pro-painkiller Echo Chamber Shaped Policy Amid Drug Epidemic*, THE CENTER FOR PUBLIC INTEGRITY (Sept. 19, 2016), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic.

253.     In or around 2007, the PCF specifically "agreed to pay a public relations consultant $85,000 to prep speakers, draft patient testimonials and coordinate an educational initiative focused on elected officials and the state medical board."[43]   At the same time, the PCF Education Subgroup, which included Front Group APF, developed a plan to address perceived "lack of coordination" among the industry and pro-opioid organizations.  PCF members agreed to develop simplified "key" messages for public education purposes.  These messages are reflected in NIPC's Let's Talk Pain (put together by Endo and APF and discussed below).  As early as 2008, the PCF was developing lobbying strategies to influence and "inform the process" at the FDA.[44]

254.     PCF engaged in efforts to defeat proposed opioid prescribing guidelines, meeting with health advisers to discuss the "unintended consequences" of Washington State's stricter opioid prescribing guidelines discouraging high doses.[45]

255.     PCF participants spent nearly $19 million on lobbying efforts that included the legislation requiring federal research on pain and the IOM report that first highlighted the figure that more than 100 million Americans suffer from debilitating pain.[46]   Nearly half the experts assembled by the IOM to write the 364-page report had served as leaders in PCF-affiliated groups, such as the APF, the APS and the AAPM — all supported by industry funding.[47]   Essentially the

---

[43] Geoff Mulvihill & Liz Essley Whyte, *Drugmakers Fought Domino Effect of Washington Opioid Limits,* THE CENTER FOR PUBLIC INTEGRITY (Sept. 21, 2016), https://www.publicintegrity.org/2016/09/18/20202/drugmakers-fought-domino-effect-washington-opioid-limits.

[44] Matthew Perrone & Ben Wieder, *Pro-painkiller Echo Chamber Shaped Policy Amid Drug Epidemic*, THE CENTER FOR PUBLIC INTEGRITY (Sept. 19, 2016), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic.

[45] Geoff Mulvihill & Liz Essley Whyte, *Drugmakers fought domino effect of Washington opioid limits,* THE CENTER FOR PUBLIC INTEGRITY (Sept. 21, 2016), https://www.publicintegrity.org/2016/09/18/20202/drugmakers-fought-domino-effect-washington-opioid-limits.

[46] Institute of Medicine (US) Committee on Advancing Pain Research, Care, and Education, *Relieving Pain in America: A Blueprint for Transforming Prevention, Care, Education and Research,* NATIONAL ACADEMIES PRESS (2011), https://www.ncbi.nlm.nih.gov/books/NBK92516/#ch2.s1.

[47] Matthew Perrone & Ben Wieder, *Pro-painkiller Echo Chamber Shaped Policy Amid Drug Epidemic*, THE CENTER FOR PUBLIC INTEGRITY (Sept. 19, 2016), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic.

IOM report was derived from legislation drafted and pushed by PCF members that their experts had helped author. To further highlight the manipulated information and perpetuate the myth that chronic pain in America was a "crisis of epidemic proportions," PCF sent a letter to U.S. senators in 2012, to promote a hearing on the influential IOM report.

256.    PCF was also instrumental in lobbying for state bills mandating coverage for abuse-deterrent formulations.[48]  Upon information and belief, PCF influenced the passage of more than 100 state bills (at least 81 in the 2015-2016 timeframe) with at least 21 containing nearly identical language.

### (b)    Contributions by Each Manufacturer Defendant to Front Groups

#### (1)    *Abbott's Front Group Contributions*

257.    Abbott was a paying member of AAPM and used its membership to make false and misleading presentations to prescribing physicians at AAPM's annual meetings.

258.    Abbott was also an elite member of APS, donating annually over numerous years to a common APS Guidelines Program Fund.

259.    Abbott also utilized APS's *Journal of Pain* to disseminate marketing materials directed at physicians. For example, Abbott[49] conducted a survey entitled "Unmet needs: among patients experiencing acute and chronic pain: Results from a survey of 606 pain patients and 491 physicians," published in APS's *Journal of Pain* in April 2008.[50]  The authors claimed the survey showed that "end-of-dose pain" occurred in over 90% of the paint patients and further "highlights some unmet needs experienced by pain patients taking IR medications."[51]

---

[48] *Id.*
[49] The survey was conducted and funded by Abbott Laboratories, Abbott Park, IL.
[50] P. Vo, et al., *Unmet needs among patients experiencing acute and chronic pain; Results from a survey of 606 pain patients and 491 physicians,* 9 THE JOURNAL OF PAIN 4 (2008).
[51] *Id.*

260.    Abbott helped initiate and/or fund several Front Groups and "collaborative" projects aimed at creating an illusion of medical consensus around the Manufacturer Defendants' marketing themes, including but not limited to the promotion of extended-release Opioid Drugs for long-term treatment of chronic non-cancer pain.

261.    Upon information and belief, Abbott affiliated entities were members and contributors to the Healthcare Distribution Alliance ("HDA"), an association of pharmaceutical manufacturers and distributors, that worked tirelessly to protect the market for Opioid Drugs by fighting regulatory efforts to crack down on drug diversion.  HDA is discussed in greater detail below.

### (2)    Teva's Front Group Contributions

262.    Teva provided funding to several persons sitting on the American Chronic Pain Association Advisory Board (who also reviewed and approved several Defendants' publications).

263.    Teva was a paying member of AAPM and used its membership to make false and misleading presentations to prescribing physicians at AAPM's annual meetings.

264.    Teva was also an elite member of APS, donating between $7,500 and $25,000 to APS annually.  Upon information and belief, this was true for numerous years.   The 2018 Senate investigation revealed that between 2012 and 2017 various Manufacturer Defendants (including Teva) paid approximately $1 million to APS.

265.    Teva helped initiate and/or fund several Front Groups and "collaborative" projects aimed at creating an illusion of medical consensus around the Manufacturer Defendants' marketing themes.

266.    Teva was also a member (and upon information and belief, a contributor) to the HDA.

### (3)    *Janssen's Front Group Contributions*

267.    Between 2012 and 2017, Janssen made payments to many Front Groups including AIPM ($128,000), APS ($88,500), AAPM ($83,975), ASPMN ($55,177), ACPA ($50,000), USPF ($41,500), and others.  During those years, Janssen's payments to Front Groups were nearly $500,000.

268.    Between 2012 and 2017, Janssen (combined with Purdue and others) also made payments to individuals affiliated with Front Groups, including: NPF ($839,848), AAPM ($330,636), ASPE ($280,765), APS ($95,474), ACPA ($31,265), and AIPM ($30,223).

269.    Janssen also made payments to persons on APF's board (who also reviewed and approved its publications).  Janssen utilized APF "patient representatives" in its promotional activities, including its Let's Talk Pain campaign.  Janssen funded and controlled the content of the Let's Talk Pain website, while orchestrating (through financing) the "involvement" of APF, AAPM, and ASPMN.

270.    Janssen sat on AAPM's Corporate Council board, at an annual cost of $25,000.  It used this position to make false and misleading presentations to prescribing physicians at AAPM's annual meetings.  Janssen also made payments to Dr. Portenoy, who served at one time as AAPM's President.  Dr. Portenoy was the sole consultant to AAPM's 1997 Consensus Statement.

271.    Janssen also worked with various Front Groups to create and disseminate brochures and guides.  Ostensibly aimed at "educating" HCPs and patients, these materials were nothing more than a medium by which Janssen made misleading statements regarding the safety and efficacy of long-term Opioid Drug use.

272.    For example, Janssen worked with AAPM and the American Geriatric Society ("AGS") to create a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009).

273.    Janssen also worked with AAPM to purchase and distribute copies of Finding Relief.  The money behind these and many other "educational" efforts, led to significantly decreased rates of skepticism on the part of leading physicians about the use of Opioid Drugs.  It also led these physicians to accept without adequate scrutiny published studies that, while being cited to support the safety of Opioid Drugs, were, in fact, of such poor methodological quality that they would not normally be accepted as adequate scientific evidence.

274.    Janssen also sat on APS's Corporate Council, donating between $7,500 and $25,000 to APS annually.  This was true for 2012 and, upon information and belief, in numerous other years as well.  A 2018, investigation by a U.S. Senate Committee revealed that between 2012 and 2017, various Manufacturer Defendants (including Janssen) paid approximately $1 million to APS.  Upon information and belief, approximately $88,500 of these contributions came from Janssen.

275.    Janssen also utilized APS's *Journal of Pain* to disseminate marketing materials directed at physicians.  For example, Janssen[52] conducted a survey entitled "Clinicians' Attitudes and Beliefs about Opioids Surveys ("CAOS"): Instrument Development and Results of National Physician Survey" which was published in APS's *Journal of Pain* in June 2013.[53]  The authors concluded that the survey results showed "that negative physician attitudes about opioids are closely associated with lower rates of prescribing and more favorable attitudes are linked with

---

[52] The survey was conducted through Janssen Scientific Affairs, LLC.
[53] Hilary D. Wilson, et al., *Clinicians' Attitudes and Beliefs About Opioids Survey (CAOS): Instrument Development and Result of a National Physician Survey,* 6 THE JOURNAL OF PAIN 613 (2013); *see also* AMERICAN PAIN SOCIETY, APS E-NEWS, (June 2013), http://www.americanpainsociety.org/enews/2013/june.html.

higher prescribing levels."[54]  This study shows how the Manufacturer Defendants recognized the importance of changing HCPs' attitudes.

276.    Janssen helped initiate and/or fund PCF, the "collaborative" project aimed at creating an illusion of medical consensus around the Manufacturer Defendants' marketing themes.

277.    Janssen and/or its subsidiaries was also a member (and upon information and belief, a contributor) to the HDA.

### (4)    Endo's Front Group Contributions

278.    Between 2007 and 2012, APF received more than $5 million from Endo.  Endo also made payments to persons on APF's board (who also reviewed and approved its publications), including Dr. Fine and Dr. Portenoy.

279.    Endo also funded and substantially controlled APF's NIPC.

280.    Endo representatives sat on AAPM's Corporate Council, whose membership cost Endo $25,000 per year.  Endo used its AAPM Corporate Council membership to make false and misleading presentations to prescribing physicians at AAPM's annual meetings.

281.    In 2008, Endo spent $1 million to attend conventions of these pro-opioid medical societies, including meetings of AAPM.  Endo also worked with AAPM, which it viewed internally as "Industry Friendly," with Endo advisors and speakers among its active members. Endo attended AAPM conferences, funded its CMEs, and distributed its publications.

282.    Endo also made payments to Dr. Portenoy, who served as AAPM's President.  Dr. Portenoy was the sole consultant to AAPM's 1997 Consensus Statement.

---

[54] AMERICAN PAIN SOCIETY, APS E-NEWS, (June 2013), http://www.americanpainsociety.org/enews/2013/june.html.

283.    Endo also sat on APS's Corporate Council, donating between $7,500 and $25,000 to APS annually.  This was true for 2012 and, upon information and belief, in numerous other years as well.

284.    Between 1997 and 2012, Endo has contributed at least $350,000 to FSMB.  Endo helped fund (paying approximately $50,000) FSMB's project to convert the organization's opioid friendly Model Guidelines into a book by Dr. Fishman, *Responsible Opioid Prescribing: A Physician's Guide*. Endo also funded CMEs based on the book and Model Guidelines, including CMEs offered by the University of Wisconsin's Pain & Policy Group.

285.    Endo helped initiate and/or fund PCF, the "collaborative" project aimed at creating an illusion of medical consensus around the Manufacturer Defendants' marketing themes.

286.    Endo also provided grants for the production and distribution of the AGS 2009 treatment guidelines, Pharmacological Management of Persistent Pain in Older Persons.  Endo went to fund AGS efforts to develop and conduct CME(s) based on these guidelines.

287.    Endo, combined with five other Opioid Drug manufacturers, made payments exceeding $140,000 to ten members of the ACPA Advisory Board.

288.    Endo was also a member (and upon information and belief, a contributor) to the HDA.

### (5)    *Actavis's Front Group Contributions*

289.    Actavis representatives sat on AAPM's corporate council, whose membership cost Actavis $25,000 per year. Actavis used its AAPM corporate council membership to make false and misleading presentations to prescribing physicians at AAPM's annual meetings.

290.    Actavis also sat on APS's Corporate Council, donating between $7,500 and $25,000 to APS annually.  This was true for 2012 and, upon information and belief, in numerous other years as well.

291.    Actavis, combined with five other Opioid Drug manufacturers, made payments exceeding $140,000 to ten members of the ACPA Advisory Board.

292.    Actavis also presented at various Front Group meetings.  For example, Actavis presented papers concerning Kadian at an annual meeting of AGS because AGS's guidelines, according to Actavis documents, "support the use of opioids."

293.    Upon information and belief, Actavis was also a member (and upon information and belief, a contributor) to the HDA.

### *(6)    Mallinckrodt's Front Group Contributions*

294.    Mallinckrodt built on other Defendants' marketing techniques by creating new Front Groups – themselves composed of Front Groups – to amplify Defendants' fraudulent messaging. In 2010, Mallinckrodt created C.A.R.E.S. (Collaborating and Acting Responsibly to Ensure Safety) Alliance to disseminate pro-opioid marketing materials via meetings, dinners, reprints, direct mail and the web. C.A.R.E.S. Alliance was also involved in efforts to distribute APS/AAPM Guidelines and KOL authored *Responsible Opioid Prescribing* to physicians.

295.    Since 2013, Mallinckrodt has funded and/or contributed over one million dollars to APF, AAPM and AIPM.

296.    Over the years, Mallinckrodt has also paid at least $100,000 to FSMB.

297.    Additionally Mallinckrodt, combined with five other Opioid Drug manufacturers, made payments exceeding $140,000 to ten members of the ACPA Advisory Board.

298.    Mallinckrodt was also a member (and upon information and belief, a contributor) to the HDA.

### (7)    *Mylan's Front Group Contributions*

299.    In March 2015, in or around the time Mylan launched intermediate dosage strengths for its fentanyl transdermal system, Mylan made a single payment to APS of $15,000. Collectively between 2015 and 2017, Mylan made payments to APS of at least $20,250.

300.    Mylan was also a member (and upon information and belief, a contributor and frequent sponsor) of the HDA and its initiatives to curb regulatory efforts to fight drug diversion.

### (c)    Impact of Front Groups

301.    A lack of funding transparency was key to the success of these groups in marketing Opioid Drugs.  Due to their classification under the U.S. tax code, the Front Groups had no legal obligation to disclose their donors publicly in their I.R.S. Form 990 filings.  Whereas other professional groups feel an ethical obligation to disclose any potential conflicts of interest, the Front Groups did not.

302.    As noted in the Senate Report, of the 14 Front Groups profiled, "no organization . . . provides an online list linking donors, their specific donations, and the projects or events benefiting from each donation for each of the years between 2012 and 2017."[55]

303.    Funding from Defendants in large part shaped the message of these groups.  "The necessary conditions for [the opioid] crisis," the Senate Report noted, "may have arisen, in part,

---

[55] U.S. Senate Homeland Security & Governmental Affairs Committee, *Fueling an Epidemic: Exposing the Financial Ties Between Opioid Manufacturers and Third Party Advocacy Groups*, 115th Cong., 11-12 (Feb. 12, 2018), https://www.hsgac.senate.gov/media/minority-media/breaking-millions-in-payments-among-findings-of-mccaskill-opioid-investigation-into-ties-between-manufacturers-and-third-party-advocacy-groups-.

due to the financial relationships between opioid manufacturers and patient advocacy groups and medical professional societies[.]"[56]

304.    The Manufacturer Defendants' payments to these organizations coincided with their financial interest in the Opioid Drug market, destroying any notion that their contributions were for any reasons other than their own financial gains.  Payments from Janssen dropped sharply to $0 in 2015, coinciding with its sale of its U.S. licensing rights for its blockbuster opioid Nucynta to Depomed for $1.05 billion.

305.    The Front Groups were involved in numerous activities aimed at increasing the medical market for Opioid Drugs, including guidelines and policies minimizing the risk of addiction and promoting Opioid Drugs for chronic pain.  Much of this work was comprised of CMEs, Treatment Guidelines, pamphlets for patients, and Consensus Statements.

306.    APS, for example, campaigned to make pain the "fifth vital sign" that HCPs should monitor, alongside blood pressure, temperature, heartbeat, and breathing.  The addition of "pain" as a vital sign was simply part of Manufacturer Defendants' greater efforts to create an "epidemic of pain" in the United States.  Shortly after APS's campaign, the U.S. Department of Veterans Affairs adopted such a standard into their national pain management strategy.  On June 16, 2016, at its annual meeting in Chicago, the American Medical Association ("AMA")—a legitimate medical organization—urged physicians to eliminate pain as the fifth vital sign.

307.    Some Front Groups also lobbied to change laws directed at curbing Opioid Drug use and challenged legal efforts to hold physicians and industry executives accountable for overprescribing and misbranding.

---

[56] *Id.* at 2.

308.    The impact of these groups as part of Defendants' marketing scheme was significant.  The U.S. Senate Committee investigation found that "[i]nitiatives from the groups … often echoed and amplified messages favorable to increased opioid use—and ultimately, the financial interests of opioid manufacturers.  These groups have issued guidelines and policies minimizing the risk of opioid addiction and promoting opioid for chronic pain, lobbied to change laws directed at curbing opioid use, and argued against accountability for physicians and industry executives responsible for over prescription and misbranding."

### 5.    *Marketing Disguised as Continuing Medical Education*

309.    Manufacturer Defendants also funded a number of CME Programs that were little more than face-to-face marketing sessions between their agents and prescribing physicians.  The aim of these CMEs was to ensure that Defendants' long-term opioid use agenda was spread effectively.

310.    Because industry-sponsored CMEs are typically delivered by KOLs, whose presentations are expected to reflect their medical expertise and "cutting edge" practices, HCPs who attend these CMEs are particularly susceptible to Defendants' messaging.

311.    The Manufacturer Defendants would also hide their involvement in the CMEs with Front Groups.  By sponsoring CME programs put on by Front Groups like APF, AAPM, and others, the Manufacturer Defendants could expect messages to be favorable to them, as these organizations were otherwise dependent on the Defendants for other projects.  The sponsoring organizations honored this arrangement by hiring pro-opioid KOLs to give talks that supported long-term opioid therapy for chronic pain.

312.    Defendant-driven content in these CMEs had a direct and immediate effect on prescribers' views on Opioid Drugs.  Producers of CMEs and the Manufacturer Defendants

measured the effects of CMEs on prescribers' views on Opioid Drugs and their absorption of specific messages, confirming that the strategic marketing practices were successful.

313.    Further, in addition to using CMEs to propagate the false messages, the Manufacturer Defendants took effective steps to suppress other CMEs which (accurately) contradicted their marketing message.  In 2009, the FDA sought to convince state medical boards to require all physicians take a vetted CME accurately representing the efficacies and risks.  The Manufacturer Defendants undertook a study and found that such a requirement would result in at least a 13% reduction in Opioid Drug prescription rates.  To protect their market, these manufacturers (through the PCF which they controlled) lobbied and successfully had the measure killed.

314.    The reputable AMA has recognized that support from drug companies with a financial interest in the content being promoted "creates conditions in which external interests could influence the availability and/or content" of the programs and urges that "[w]hen possible, CME[s] should be provided without such support or the participation of individuals who have financial interests in the educational subject matter."[57]  The Manufacturer Defendants-sponsored CMEs fell short of these standards.

315.    The influence of Manufacturer Defendants' funding on the content of these CMEs is clear.  One study by a Georgetown University Medical Center professor compared the messages retained by medical students who reviewed an industry-funded CME article on Opioid Drugs versus another group who reviewed a non-industry-funded CME article.  The industry-funded CME did not mention opioid-related death once; the non-industry-funded CME mentioned opioid-related death 26 times.  Students who read the industry-funded article more frequently noted the

---

[57] *Financial Relationships with Industry in Continuing Medical Education,* AM. MED. ASS'N (Nov. 2011), *available at* https://www.ama-assn.org/delivering-care/financial-relationships-industry-continuing-medical-education.

impression that Opioid Drugs were underused in treating chronic pain. The "take-aways" of those reading the non-industry-funded CME mentioned the risks of death and addiction much more frequently than the other group. Neither group could accurately identify whether the article they read was industry-funded, making clear the difficulty health care providers have in screening and accounting for source bias.[58]

(a)    **Abbott Sponsored CMEs**

316.    In 2007, Abbott funded a medical writer to assist authors with a manuscript preparation for a CME entitled *Opioids May be Useful for Chronic Noncancer Pain Management in Primary Care*. It taught that controlled-release formulations of long-acting opioids "will offer sustained pain relief, as well as better sleep quality, compliance, and sometimes quality of life. . . with decreased potential for end-of-dose failure."[59] The CME downplayed the risks of addiction claiming screening tools would allow primary physicians to effectively minimize addiction and abuse and further claiming that opioid drug hoarding, requesting specific opioid drugs, and obtaining similar opioid drugs from other medical sources were "aberrant drug-taking behaviors, which are probably less predictive of addiction-related outcomes."[60] The CME was available for credit through the end of 2009 and its content is still currently accessible on MedScape.

317.    Abbott also utilized KOLs to author CMEs targeting primary care physicians to promote the use of Opioid Drugs as a treatment for chronic non-cancer pain. These CMEs frequently stressed the underdiagnosis and undertreatment of chronic pain and fraudulently taught

---

[58] Adriane Fugh-Berman, *Marketing Messages in Industry-Funded CME,* PHARMEDOUT (June 25, 2010), *available at* pharmedout.galacticrealms.com/Fugh-BermanPrescriptionforConflict6-25-10.pdf (archived).
[59] L. Barclay & P. Murata, *Opioids May Be Useful for Chronic Noncancer Pain Management in Primary Care,* MEDSCAPE (Oct. 12, 2007), *available at* https://www.medscape.org/viewarticle/564197.
[60] *Id.*

primary care physicians and other prescribers that the use of opioid screening tools could effectively minimize addiction, misuse and abuse.

### (b)    Janssen Sponsored CMEs

318.    Janssen also utilized various CMEs (often featuring KOLs) as a means to spread false and deceptive marketing to prescriber physicians.

319.    AGS contracted with Janssen, along with Endo and others, to sponsor a number of CMEs based on the 2009 AGS Treatment Guidelines.

320.    Similar to CMEs, Janssen also offered "training materials" on its PrescribeResponsibly.com website, which made various false and/or misleading statements regarding the safety and efficacy of its Opioid Drugs.

321.    Janssen was also one of four Manufacturer Defendants responsible for the PCF's successful thwarting of the FDA's 2009 efforts to convince state medical boards to require corrective CME training for all physicians relating to opioid prescribing.

### (c)    Endo Sponsored CMEs

322.    Endo also utilized various CMEs (often featuring KOLs) as a means to spread false and deceptive marketing to prescribing HCPs.

323.    Through its substantive control over NIPC, Endo sponsored, developed, and/or distributed CME programs (ostensibly hosted by NIPC) aimed at marketing false and misleading claims to prescribing physicians.

324.    For example, Endo sponsored and NIPC distributed a number of eNewsletter CMEs that focused on "key topic[s] surrounding the use of opioid therapy" and were intended to quell physician fears in prescribing Opioid Drugs.  Dr. Webster authored a number of these, while Dr. Fine served as editor.  Such CMEs were available to prescribers and Endo estimated that roughly

60,000 prescribers viewed each one. Before-and-after surveys, summarized in the chart below, showed that prescriber comfort with prescribing Opioid Drugs ranged from 27% to 62% before exposure to the CME, and from 76% to 92% after exposure:

| Topic | Comfort level *prior to reading the article* | Comfort level *after reading the article* |
|---|---|---|
| Patient Selection and Initiation of Opioid Therapy as a Component of Pain Treatment | 47% | 87% |
| Informed Consent and Management Plans to Optimize Opioid Therapy for Chronic Pain | 48% | 81% |
| Risk Stratification and Evaluation of High-Risk Behaviors for Chronic Opioid Therapy | 28% | 76% |
| Integration of Nonpharmacologic and Multidisciplinary Therapies Into the Opioid Treatment Plan | 42% | 85% |
| Addressing Patients' Concerns Associated With Chronic Pain Treatment and Opioid Use | 62% | 92% |
| Opioid Therapy in Patients With a History of Substance Use Disorders | 35% | 85% |
| Urine Drug Testing: An Underused Tool | 54% | 86% |
| Appropriate Documentation of Opioid Therapy: The Emergence of the 4As and Trust and Verify as the Paradigm | 44% | 86% |
| Opioid Rotation | 27% | 92% |
| Discontinuing Opioid Therapy: Developing and Implementing an "Exit Strategy" | 37% | 90% |

325. AGS contracted with Endo, along with Janssen and others, to sponsor a number of CMEs based on the 2009 AGS Treatment Guidelines. One such 2009 CME, *The Role of Opana ER in the Management of Chronic Pain*, includes a slide titled "Use of Opioids is Recommended for Moderate to Severe Chronic Non-Cancer Pain." That slide cites the Guidelines, which contain a number of misstatements as noted elsewhere herein, while omitting their disclaimer regarding the lack of supporting evidence. This dangerously misrepresented to HCPs the force and utility of the 2009 Guidelines. The CME was approved by Endo's Medical Affairs Review Committee.

326. Endo also funded CMEs, such as those put on by the University of Wisconsin's Pain & Policy Group that were based on Dr. Fishman's book, Responsible Opioid Prescribing.

327. Additionally, Endo sponsored CMEs based on the AGS Treatment Guidelines. AGS panel member Dr. Bruce Ferrell authored an Endo funded CME in 2007, on treating pain in

the elderly and spoke favorably about opioid use.  A year after the AGS Guidelines came out, Dr. Ferrell was listed as a paid speaker for Endo.

328.    Upon information and belief, Endo sponsored a CME titled *Persistent Pain in the Older Adult*.  Therein, physicians were "taught" that withdrawal can be avoided if they taper the dosage by 10-20% for ten days.  This statement is false and misleading.

329.    Endo also utilized CMEs to push the concept of pseudoaddiction onto prescribers. For example, Endo sponsored an NIPC CME in 2009, titled *Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia*.  The program, upon information and belief, promoted pseudoaddiction by teaching that a patient's aberrant behavior was the result of untreated pain.

330.    Endo also sponsored the APS Residence's Course through the efforts of Dr. Galer, who at the time had left the University of Washington and was working for Endo Pharmaceuticals Inc. and others.[61]  Endo "graciously agreed to support this program, which initially included approximately 30 residents" and continued to sponsor the course until at least 2011.[62]   The reasoning for the course as stated in APS publication:

> [T]hat we could develop a . . . pain management course that, even if the participating resident did not pursue a career in pain medicine, nevertheless that resident would feel comfortable in the assessment and initial treatment of a person with acute or chronic pain and be able to make appropriate and timely referrals as needed.  Given how prevalent acute and chronic pain are and how prevalent the underassessment and under treatment of acute and chronic pain are, we felt this was an extremely needed education priority for residents.

---

[61]   *APS Bulletin,* AMERICAN PAIN SOCIETY, Vol. 18, Issue 3 (2008), *available at* http://americanpainsociety.org/uploads/APS08_NwsWinter.pdf.
[62]   American Pain Society, APS E-NEWS (Jan. 2011), *available at* http://www.americanpainsociety.org/enews/2011/jan/.

331.    Endo was also one of four Defendants responsible for the PCF's successful thwarting of the FDA's 2009 efforts to convince state medical boards to require corrective CME training for all physicians relating to opioid prescribing.

332.    Endo also funded a CME promoting the use of opioid rotation claiming "[t]his view has been advocated by expert groups, e.g., in the 2009 evidence-based guidelines developed by [APS and AAPM], as well as by the [AGS]."[63]

### (d)    Actavis Sponsored CMEs

333.    Upon information and belief, Actavis also utilized various CMEs (often featuring KOLs) as a means to spread false and deceptive marketing to prescribing physicians.

### (e)    Mallinckrodt Sponsored CMEs

334.    Upon information and belief, Mallinckrodt also utilized various CMEs (often featuring KOLs) as a means to spread false and deceptive marketing to prescribing physicians.

### 6.    *Micro-targeting Physicians with Certain Prescribing Patterns*

335.    Upon information and belief, all Manufacturer Defendants utilized prescription and marketing data to micro-target certain physicians with prescribing patterns and/or patient populations likely suffering from chronic pain.  Purdue was the industry pioneer in developing these tactics, which (upon information and belief) the other Defendants adopted, and which Abbott assisted in implementing through its co-promotional agreement.

336.    Purdue compiled (or purchased from other Defendants or specialized companies) detailed prescription data for the Opioid Drug market, including (upon information and belief) Louisiana.  Purdue's data collection allowed it to build prescriber profiles tied to individual HCPs

---

[63] Perry Fine & Robert Portenoy, *Strategies for Opioid Rotation: Decision Support in Chronic Pain Management,* MEDSCAPE (March 30, 2010), *available at* https://www.medscape.org/viewarticle/717832. The CME was available from March 30, 2010 through March 30, 2011.

and identify the highest and lowest prescribers by drug class in a particular zip code, county, state, or nationwide.  It also enabled Purdue to identify HCPs with a large number of chronic pain patients.

337.    Armed with this data, Purdue's sales representatives set out to target the highest prescribers of Opioid Drugs in the country, HCPs with liberal prescription records, and HCPs with the most vulnerable patient populations.

338.    These practices became the common practices of all the Manufacturer Defendants. The Manufacturer Defendants would purchase and closely analyze prescription sales data from IMS Health, which buys such data from pharmacies for resale purposes that allows manufacturers to precisely track the rates of initial prescribing and renewal by individual HCP, which in turn allows manufacturers to target, tailor, and monitor the impact of their detailing.

339.    The Manufacturers Defendant in particular relied upon "influence mapping," i.e., using decile rankings or similar breakdowns to identify the high-volume prescribers as to whom detailing would have the greatest sales impact.  Endo, for example, identified prescribers representing 30% of its nationwide sales volume (decile Nos. 8 through 10) and planned to visit these physicians three times per month.  Manufacturer Defendants also closely monitored HCPs' prescribing after a sales representative's visit to allow them to refine their planning and messaging and to evaluate and compensate their detailers.

### *7.    Payments to Physicians*

340.    Manufacturer Defendants' marketing efforts to physicians also included financial incentives for physicians to prescribe Opioid Drugs.  Such payments are typically disguised as speaking or consulting fees.

341.    A recent (March 2018) Harvard University and CNN study looked at Opioid Drug manufacturer payments to prescribing physicians in 2014-2015 and found startling results.  Not only did "opioid manufacturers [pay] hundreds of HCPs sums in the six figures, while thousands more were paid over $25,000," but "the more opioids a doctor prescribes, the more money he or she gets paid by those same manufacturers,"[64] as the following chart illustrates:



342.    As noted by one industry watchdog, "[t]his is the first time we've seen this, and it's really important."[65]  The Executive Director of Physicians for Responsible Opioid Prescribing noted that it "smells like doctors being bribed to sell narcotics."[66]

---

[64] *The More Opioids Doctors Prescribe, the More They Get Paid,* HARVARD SCHOOL OF PUBLIC HEALTH (Mar. 2018), https://www.hsph.harvard.edu/news/hsph-in-the-news/opioids-doctors-prescriptions-payments/.
[65] Aaron Kessler & Elizabeth Cohen, *The More Opioids Doctors Prescribe, the More Money They Make*, CNN (Mar. 12, 2018), https://www.cnn.com/2018/03/11/health/prescription-opioid-payments-eprise/index.html.
[66] *Id.*

343.    In all, between 2014 and 2015, more than 200,000 doctors who wrote Opioid Drug prescriptions received payments from manufacturers, including (upon information and belief) the Manufacturer Defendants.[67]

344.    Mallinckrodt paid physicians $1.2 million between 2014 and 2015, for its drug Xartemis XR.  In 2014, the top paid physician received $54,505 for promotional speaking or other support of the drug.  Between 2013 and 2015, the company paid out $376,000 to physicians for speaking or other support of its drug Exalgo.

345.    Predictably, the Manufacturer Defendants counted on their Front Groups to handle spin control.  In a recent CNN interview, AAPM President Dr. Steven Stanos downplayed the study's link between high prescribers and high payments, because high prescribers "know those medicines, and so they're going to be more likely to prescribe those because they have a better understanding."  He then went on to hit another Front Group talking point, that the payments may have been to HCPs to educate other HCPs about "abuse-deterrent" Opioid Drugs.[68]

346.    One common way such payments are made is through the Manufacturer Defendants' selection of a high prescriber to serve on paid "speakers' bureaus" and/or to attend programs with free meals and other amenities.  Although these meal-based speaker events are more expensive to host and typically have lower attendance than CMEs, they are subject to less professional scrutiny and thus afford Manufacturer Defendants greater freedom in the messages they present.  Indeed, the two were combined in many cases, such that the paid members of the "speakers' bureau" would receive an all-expenses-paid "training" at lavish resorts.

347.    During the time of its co-promotional agreement with Abbott, Purdue conducted more than 40 national pain-management and speaker-training conferences at resorts across the

---

[67] *Id.*
[68] *Id.*

country.    Thousands of physicians, pharmacists, and nurses attended these all-expenses-paid symposia, where they were recruited and trained for Purdue's national speaker bureau.

348.    Endo also sought to use specialists in pain medicine—including high prescribers of its drugs—as local thought leaders to market its drug Opana ER to primary care doctors.    Such invitations are lucrative to the physicians selected for these bureaus; honorarium rates range from $800 to $2,000 per program, depending on the type of event, and even speaker training typically is compensated at $500 per hour.

349.    Speakers were not selected to share their expertise, but rather were paid to follow the slide decks provided to them by the Manufacturer Defendants.    This is important because the FDA regards promotional talks as part of product labeling and requires their submission for review. Speakers thus give the appearance of providing independent, unbiased presentations on Opioid Drugs, when in fact they are presenting a script prepared by Manufacturer Defendants' marketing departments.    Endo's speaker rules, for example, provide that "all slides must be presented in their entirety and without alterations . . . and in sequence."

**ii.    Scientific Literature Marketing**

350.    Manufacturer Defendants understood that scientific substantiation (or the illusion thereof) was key to bolstering the effectiveness of their marketing messages.    They therefore set out to manufacture a body of scientific literature, again concealing its source.    This scheme was part of Manufacturer Defendants' greater efforts to expand the prescription market for branded and generic Opioid Drugs.

351.    Regarding clinical proof, the Manufacturer Defendants and their KOL and front-group agents often pointed to scientific "evidence" backing their claims of efficacy and safety.

However, such "evidence" consisted of nothing but a letter-to-the-editor and a widely-debunked observational study.  Both authors of this "scientific evidence" were industry-paid KOLs.

352.    Manufacturer Defendants, through their financial influence and control over Front Groups, played a major role in the development of Consensus Statements, FSMB Guidelines and Model Policies, and "Treatment Guidelines."

353.    Manufacturer Defendants paid KOLs to churn out academic and research papers pointing to a "pain epidemic" that could be successfully treated through a long-term regimen of Opioid Drugs.  In some instances, a manufacturer would instruct the KOL as to the "outcome" of study and paper before the KOL started the project.

354.    Consultants were even hired by some manufacturers to help engineer an academic publication strategy.  This strategy advocated the use of circular sourcing, whereby the same unsubstantiated materials would all cite to one another and then be "adopted" by Front Groups who would issue Consensus Statements, demonstrating the medical community's consensus around the false representations.

355.    For example, KOL Dr. Fine authored an article suggesting urine testing could prevent opioid drug diversion in patients on long-term Opioid Drug therapy for the treatment of chronic pain.[69]  In that 2012 article, titled *Recommendations for Urine Drug Monitoring as a Component of Opioid Therapy in the Treatment of Chronic Pain*, Dr. Fine relies heavily on the 2009 APS/AAPM Treatment Guidelines, which were written in part by Dr. Fine himself.

356.    These consensus recommendations were meant to influence state medical board policies or undercut various FDA REMS. They were in some instances reprinted in medical journals relied on by prescribers.

---

[69] Perry Fine *et al.*, *Recommendations for Urine Drug Monitoring as a Component of Opioid Therapy in the Treatment of Chronic Pain*, 13 PAIN MED. 886 (2012).

357.    Front Groups also "peer-reviewed" industry-sponsored articles and papers authored by KOLs, thereby bolstering those works' legitimacy.

358.    Front Groups also brought attention to and lent credence to one another's works. When one Front Group issued consensus recommendations, other Front Groups would promote them, in some instances lauding them as breakthroughs in the medical community.

359.    Upon information and belief, it was actually the Manufacturer Defendants who were coordinating this "peer-reviewed" process. The Manufacturer Defendants—who drafted (or directed the drafting) of various groups' publications—essentially "peer reviewed" themselves. This was nothing but a sham aimed at creating an air of legitimacy and scientific consensus around their absurd marketing claims. The Manufacturer Defendants' sales representatives, for example, would point to consensus recommendations to back up their claims.

360.    In addition to promoting opioid products, the literature was also used to combat messaging (most originating from government agencies) that contradicted the Manufacturer Defendants' claims regarding the safety and efficacy of long-term Opioid Drug therapy to treat chronic pain.

361.    Manufacturer Defendants also undertook a concerted effort to undermine the 2016 CDC Guidelines, which reject many of the Manufacturer Defendants' false and misleading marketing claims.

362.    Manufacturer Defendants' scientific literature marketing scheme was comprised of four main categories: (1) clinical "proof;" (2) Treatment Guidelines and Consensus Statements; (3) "academic" publications; and (4) attempts to undermine the FDA and CDC. The overall effectiveness of these actions were and are amplified by the Defendants' use of circular sourcing to create a façade of real peer review.

### 1.    Clinical "Proof"

363.    Manufacturer Defendants' campaign of deception regarding the safety and efficacy of long-term opioid treatment for chronic pain was rooted in two pieces of purportedly "scientific" evidence.  The first piece of evidence was a five-sentence letter to the editor published in 1980 in the *New England Journal of Medicine* ("*NEJM*").

364.    The letter was drafted by Hershel Jick, a doctor at Boston University Medical Center, with the help of a graduate student, Jane Porter.  It noted, anecdotally, that a review of "current files" did not indicate high levels of addiction among hospitalized medical patients who received narcotic preparation treatment.  In full, the letter reads:

> Recently, we examined our current files to determine the incidence of narcotic addiction in 39,946 hospitalized medical patients who were monitored consecutively.  Although there were 11,882 patients who received at least one narcotic preparation, there were only four cases of reasonably well-documented addiction in patients who had no history of addiction.  The addiction was considered major in only one instance.  The drugs implicated were meperidine in two patients, Percodan in one, and hydromorphone in one.  We conclude that despite widespread use of narcotic drugs in hospitals, the development of addiction is rare in medical patients with no history of addiction.

*Addiction Rate in Patients Treated With Narcotics,* 302(2) NEW ENG. J. MED. 123 (Jan. 10, 1980).

365.    Notably, since the letter was written in 1980, then-current Opioid Drug prescribing practices likely meant that the "medical patients" regularly receiving Opioid Drugs were likely sufferers of acute, cancerous, or end-of-life pain and importantly were hospitalized and therefore under medical supervision.  The Manufacturer Defendants were aware of or should have been aware that this "study" was completely inapplicable to the safety and efficacy of long-term Opioid Drug treatment of chronic pain.

366.    Further, while the letter says that patient records were reviewed (resulting in few references to signs of addiction), there is no indication that the caregivers generating those records

were instructed to assess or document signs of addiction. Though the Manufacturer Defendants were aware or should have been aware of the serious limitations of this "study," those limitations, upon information and belief, were not communicated to prescribers.

367.    During the time of the Abbott and Purdue co-promotional agreement, the letter's data, based on a highly unrepresentative cohort, was being used "to say that less than 1% of patients treated with opioids became addicted"[70] in promotional videos. One video entitled "I Got My Life Back" featured people suffering from chronic pain and deceptively taught that OxyContin has a very minimal risk of addiction and could give them their lives back. The video was distributed to 15,000 HCPs in 1998. Ad campaigns distributed to physicians in 2000 included similar unsubstantiated claims that Opioid Drugs are virtually non-addicting.[71]

368.    Currently on *NEJM's* website, the Porter & Jick letter is qualified by an editor's note stating: "For reasons of public health, readers should be aware that this letter has been 'heavily and uncritically' cited as evidence that addiction is rare with opioid therapy."

369.    Defendants—often working through their KOLs or Front Groups—saw that the "study" was cited throughout the academic literature. It is cited 856 times in Google Scholar, including 86 citations since 2010. Upon information and belief, it was cited by the Manufacturer Defendants in various industry-sponsored CMEs. It appears as a reference in two CME programs in 2012 sponsored by Endo and Purdue.[72]

370.    The second major piece of "evidence" used by the Defendants was a 1986 study by soon-to-be-KOL Dr. Portenoy in the medical journal *Pain*. The study, which had a patient cohort

---

[70] *Id. See also,* Purdue Pharma L.P., "I got my life back," *available at* https://www.youtube.com/watch?v=Er78Dj5hyeI (last visited March 26, 2018).

[71] Jerry Mitchell and Clarion Ledger, *How the FDA helped pave the way for an opioid epidemic,* USA TODAY NETWORK (Jan. 26, 2018), https://www.clarionledger.com/story/news/2018/01/26/opioid-epidemic-how-fda-helped-pave-way/950561001/.

[72] AAPM, *Safe Opioid Prescribing Course*, February 25-26, 2012, sponsored by Purdue and Endo; *Chronic Pain Management and Opioid Use*, October 11, 2012, sponsored by Purdue.

of merely 38 patients, claimed that Opioid Drugs could be used for long periods of time to treat non-cancer related chronic pain without any risk of addiction. The rationale behind the study was that patients in pain would not become addicted to Opioid Drugs because their pain drowned out the euphoria associated with Opioid Drugs. As such, the study concluded that Opioid Drugs should be freely administered to patients with fibromyalgia, headaches, finicky backs, and a host of other issues. According to Portenoy and his co-author, Dr. Kathleen Foley, "opioid maintenance therapy can be a safe, salutary and more humane alternative . . . in those patients with intractable non-malignant pain and no history of drug abuse."[73] Portenoy's study also cited Jick's one-paragraph letter to the *NEJM* and Portenoy himself admitted that he gave innumerable lectures citing the statistic that less than 1% of opioid users became addicted.[74]

371. In the years that have followed, both the *NEJM* letter and Portenoy's 1986 study have been expressly disavowed. Neither actually demonstrates that Opioid Drugs can be safely prescribed for long-term, chronic pain.

372. In a taped interview in 2011, Portenoy admitted:

> I gave so many lectures to primary care audiences in which the Porter and Jick article was just one piece of data that I would then cite. I would cite 6 to 7 maybe 10 different avenues of thought or evidence, *none of which represents real evidence.* And yet what I was trying to do was to create a narrative so that the primary care audience would look at this information in toto and feel more comfortable about opioids in a way they hadn't before ... Because the primary goal was to de-stigmatize, *we often left evidence behind."*
>
> *It was clearly the wrong thing to do* and to the extent that some of the adverse outcomes now are as bad as they have become in terms of endemic occurrences of addiction and unintentional overdose

---

[73] Robert Portenoy and K.M. Foley, *Chronic use of opioid analgesics in non-malignant pain: report of 38 cases*, 25 PAIN 171 (1986).

[74] Thomas Catan and Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, WALL ST. J., (Dec. 17, 2012), https://www.wsj.com/articles/SB10001424127887324478304578173342657044604.

death, it's quite scary to think about how the growth in that prescribing driven by people like me led, in part, to that occurring.[75]

373.    As to the *NEJM* letter, Dr. Jick, in an interview with Sam Quinones decades after the letter was published, stated: "[t]hat particular letter, for me, is very near the bottom of a long list of studies that I've done.  It's useful as it stands because there's nothing else like it on hospitalized patients.  If you read it carefully, it does not speak to the level of addiction in outpatients who take these drugs for chronic pain."

374.    The *NEJM* itself has since disavowed the letter, stating "[the letter] was heavily and uncritically cited as evidence that addiction was rare with long-term opioid therapy." 376 New Eng. J. Med. 2194, 2194-95 (2017). "We believe," the journal provided, "that this citation pattern contributed to the North American opioid crisis by helping to shape a narrative that allayed prescribers' concerns about the risk of addiction associated with long-term opioid therapy." *Id.*

375.    Indeed, the letter—because it was just a letter—did not describe how the data was gathered, the duration of the patients' treatment, or the purpose behind their treatment in the first place.  The *NEJM* is one of the premier medical journals in the country.  Given the journal's prestige, the five-sentence letter, combined with Portenoy's later study, was exactly what opioid manufacturers needed to push their products.

376.    Manufacturer Defendants (or their Front Groups) cited these pieces of "evidence" time and time again, even after they had come to be rejected by their source. Some Manufacturer Defendants conducted rigged studies related to their Opioid Drugs.

377.    By way of example, Janssen on its Prescribe Responsibly website claimed that Nucynta ER had a low incidence of withdrawal symptoms.  The basis for this false and misleading

---

[75] Physicians for Responsible Opioid Prescribing, *Opioids for Chronic Pain: Addiction is NOT Rare*, *available at* https://www.youtube.com/watch?v=DgyuBWN9D4w (last visited March 26, 2018).

claim was a purported study of withdrawal symptoms occurring two to four days after discontinuing use. In reality withdrawal symptoms peak earlier than that.

### 2. *Treatment Guidelines, Medical Board Policies, and Consensus Statements*

378.    Manufacturer Defendants also used Front Group Consensus Statements, Treatment Guidelines, and FSMB Model Policies to further the narrative that its marketing themes were actually the result of sound science and peer review. All of these "scientific" or "academic" publications, however, were heavily influenced if not drafted by persons with financial ties to the Defendants. This scheme targeted not only physicians, but policymakers, regulators, and the academic community.

379.    The scheme aimed at building "consensus" around the Manufacturer Defendants' deceptive marketing claims was multi-tiered. First, Front Groups would issue landmark consensus statements. Next, the FSMB, relying on the consensus in the medical and scientific community, would develop its Treatment Guidelines and Model Policies. The Model Policies would in turn be adopted by state medical boards, to which the Front Groups and Manufacturer Defendants would point when drafting additional Treatment Guidelines.

380.    Through their Front Groups, the Manufacturer Defendants also worked to build an illusion of medical consensus around the Guidelines and Policies. Front Groups would put out Consensus Statements endorsing the practices in the FSMB Treatment Guidelines and Model Policy. Often, these statements involved the collaboration between multiple Front Groups, further underscoring the theme of medical consensus. Upon information and belief, this illusion of medical consensus influenced the state medical boards' decision to adopt the FSMB Model Policy.

381.    As alleged above, AAPM and APS were two Front Groups which received substantial funding from the Manufacturer Defendants. In 1997, the two organizations came

together and issued a joint landmark Consensus Statement, The Use of Opioids for the Treatment of Chronic Pain, that endorsed Opioid Drugs to treat chronic pain and claimed that the there was little risk of addiction or overdose in pain patients.[76]   The 1997 statement misleadingly recommended the use of Opioid Drugs to treat chronic pain, despite limited evidence, and concluded that the risk of addiction is manageable for patients regardless of past abuse histories.

382.    The publication, sub-titled "A consensus statement from the American Academy of Pain Medicine and American Pain Society," was approved by AAPM's Board of Directors on June 29, 1996, followed by APS's Executive Committee on August 20, 1996.

383.    The Chair of the Committee was none other than Dr. David Haddox, a KOL who at that time was a paid speaker for Purdue.  The sole consultant to the Committee (and fellow author of the "landmark" Consensus Statement) was Dr. Portenoy, whose paid work on behalf of the Manufacturer Defendants is well documented.

384.    The FSMB authored a Treatment Guidelines in 1998, which it conceded was produced "in collaboration with pharmaceutical companies."  It was based in large part on the APM/AAPS Consensus Statement.

385.    It proclaimed that Opioid Drugs were "essential" for the effective treatment of chronic pain but failed to mention risks relating to respiratory depression and overdose, and discussed addiction only in the sense that "inadequate understanding" of addiction can lead to "inadequate pain control," insinuating that the risk of addiction should not hinder higher dose prescriptions.

386.    FSMB then adopted those guidelines as a Model Policy in 2004, which the majority of state medical boards adopted.  Thus, this Model Policy, which was developed by FSMB with

---

[76] *The Use of Opioids for the Treatment of Chronic Pain*, APS & AAPM (1997), *available at* http://www.jpain.org/article/S1082-3174(97)80022-0/pdf (last accessed Mar. 14, 2018).

industry grants, was especially impactful on prescriber behavior.  Since medical boards were the agencies responsible for disciplining HCPs, the Model Policies came to be seen as "rules of the road" for opioid prescribing.

387.    Following the publication of FSMB's Model Policy, Defendants helped to facilitate the printing and distribution of that policy to 700,000 practicing doctors.  FSMB estimated it would cost $3.1 million for its campaign to get out the word about "safe" use of opioid analgesics in treatment of chronic pain.

388.    Instead of protecting patients from over-prescribing HCPs, many of those medical boards were duped by FSMB's pharma-funded campaign into encouraging aggressive prescribing.  This in turn made it more difficult for medical boards to discipline pill mill operators and reckless HCPs.

389.    FSMB then turned to Scott Fishman, a notorious industry KOL, to translate their model policy into a guidebook: *Responsible Opioid Prescribing: A Physician's Guide*. The project was underwritten by various Manufacturer Defendants, including Endo.  The Manufacturer Defendants then sponsored CMEs based on these guidelines (as further filtered through Dr. Fishman's book).

390.    The Responsible Opioid Prescribing guide promoted the use of Opioid Drug pain relievers for both acute and chronic pain and severely minimized the risk of addiction, even claiming that Opioid Drugs could be used safely (just with additional care) in patients assessed to have a risk of substance abuse.  The guide promoted the widespread use of Opioid Drugs, stating that "[p]atients should not be denied opioid medications except in light of clear evidence that such medications are harmful to the patient."  The Guideline advised physicians that denying high doses of Opioid Drugs to patients is a "bad medical decision."

391.    Additionally, the guide presented symptoms of genuine addiction as "pseudoaddiction" and taught HCPs that the symptoms of addiction—such as demanding or manipulative behavior and obtaining Opioid Drug prescriptions from more than one physician— are actually pseudoaddiction, rather than addictive behavior that would necessitate the cessation of opioid treatment.  Instead, HCPs faced with "pseudoaddiction" in patients should prescribe higher doses of Opioid Drugs.

392.    The publication of Responsible Opioid Prescribing was backed largely by drug manufacturers.  Its author, Dr. Fishman, now acknowledges that the list of adverse effects from chronic Opioid Drug use in publications he authored were "ridiculous" and "prime examples" of leaving out facts that the pharmaceutical company sponsors and KOLs knew at the time were true. His writings repeatedly alleged that the risk of addiction as low.  Dr. Fishman stated that he understood that the goal was to promote Opioid Drugs and, as a result, discussing addiction would be "counterproductive."

393.    In all, 163,131 copies of Responsible Opioid Prescribing were distributed by state medical boards (and through the boards, to practicing doctors).  The FSMB website describes the book as the "leading CME activity for prescribers of opioid medications."

394.    The most disturbing effect of Defendants' manipulation of the FSMB was the instilled fear of discipline.  The FSMB Guidelines, by favoring higher dose prescriptions, conveyed the message that "under treatment of pain" would result in official discipline, but no discipline would result if Opioid Drugs were prescribed as part of an ongoing patient relationship and such prescription decisions were documented.  Since the Model Policy had been adopted by state medical boards, many physicians viewed them as standards of care regulating their prescribing conduct.

395.    In other words, Manufacturer Defendants created an environment where over-prescription of Opioid Drugs, even in instances leading to death, created less liability risk than untreated pain.   The Guidelines and Model Policy not only offered physicians a carrot but threatened them with a stick.

396.    Indeed, Manufacturer Defendants' Front Groups even filed at least one amicus brief in support of HCPs who had been criminally convicted of illegally prescribing Opioid Drugs.  In 2005, one such brief was filed by APF and NPF in the United States Court of Appeals for the Fourth Circuit.  Therein, the Front Groups argued that "there is no 'ceiling dose' for opioids."[77]

397.    As noted above, the Manufacturer Defendants not only played a key role in the development of the FSMB Treatment Guidelines and Model Policy, but also their dissemination (through physician mailings, physician-oriented advertising, sales representatives, books authored by KOLs, and CME programs).

398.    AAPM and APS put out their own Treatment Guidelines in 2009 ("2009 AAPM/APS Guidelines") and continued to recommend the use of Opioid Drugs to treat chronic pain.  Fourteen of the 21 panel members who drafted the 2009 AAPM/APS Guidelines, including Dr. Portenoy and Dr. Fine, received support from Janssen, Abbott and Endo.

399.    The 2009 AAPM/APS Guidelines promote Opioid Drugs as "safe and effective" for treating chronic pain, despite acknowledging limited evidence, and conclude that the risk of addiction is manageable for patients regardless of past abuse histories.  One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache and Neurological Institute, resigned from the panel because of his concerns

---

[77] Brief of the American Pain Foundation (APF), the National Pain Foundation, and the National Foundation for the Treatment of Pain in Support of Appellant and Reversal of the Conviction, *United States v. Hurowitz,* No. 05-4474, 9 (4th Cir. Sept. 8, 2005).

that the 2009 Guidelines were influenced by contributions that drug companies, including Manufacturer Defendants made to the sponsoring organizations and committee members.

400.    The 2009 AAPM/APS Guidelines contain only four recommendations "viewed as supported by even moderate quality evidence,"[78] with nearly all recommendations based on "low-quality" evidence.[79] While admitting that "well-conducted studies have not examined these benefits," the Guidelines misleadingly suggest that the: "[p]roposed benefits of transitioning to long-acting opioids....include[s]...a lower risk of addiction or abuse."[80] Another "strong recommendation" based on "low-quality evidence" is consideration of long-term Opioid Drug therapy for patients with chronic non-cancer pain and a history of drug abuse if monitored.[81]

401.    The Guidelines similarly suggest that screening tools are capable of assessing potential addiction risks for patients despite having no evidence to support the veracity of this assertion.[82]  The claimed ability to pre-sort patients likely to become addicted is an important tool in giving HCPs confidence to prescribe Opioid Drugs long-term, and for this reason, references to screening appear in various industry supported guidelines.  Versions of KOL Dr. Webster's Opioid Risk Tool appear on or are linked to websites run by Endo and Janssen, and also coincidentally appear in the 2009 Manufacturer Defendant influenced Guidelines.

402.    The Manufacturer Defendants widely cited and promoted the 2009 Guidelines without disclosing the lack of evidence to support their conclusions.

---

[78] Roger Chou, *et al*., *Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Noncancer Pain,* 10 JOURNAL OF PAIN, 113,124 (Feb. 2009), *available at* http://www.jpain.org/article/S1526-5900(08)00831-6/pdf.

[79] *Id.* at p. 124. *See* Appendix 2: *Grading Evidence and Recommendations.* Low-quality evidence is defined as "insufficient to assess effects on health outcomes because of the limited number or power of studies, large and unexplained inconsistency between higher quality studies, important flaws in study design or conduct, gaps in the chain of evidence, or lack of information on important health outcomes."

[80] *Id.* at 117.

[81] *Id.* at 112.

[82] *Id.* at 116.

403.    The AAPM/APS Consensus Statement (1997) and Treatment Guidelines (2009) have been a particularly effective channel of deception and have influenced not only treating physicians, but also the body of scientific evidence on Opioid Drugs; the Guidelines have been cited over 700 times in academic literature and are still available online and were reprinted in the *Journal of Pain*.

404.    Meanwhile, the AGS put out its own guidelines in 2009 titled Pharmacological Management of Persistent Pain in Older Persons ("AGS Treatment Guidelines"). Similar to AAPM/APS Guidelines, the AGS Treatment Guidelines doled out strong recommendations favorable to Opioid Drug use based on low-quality evidence, with known KOLs serving on its expert panel.  Additionally, AAPM provided peer review of a preliminary draft of the guideline.[83]

405.    AGS is yet another organization that was provided funding to push the Manufacturer Defendants' unsubstantiated claims regarding Opioid Drugs.

406.    At the time of publication of the AGS Treatment Guidelines, the preferred treatment of chronic pain in older adults was acetaminophen.  The AGS Treatment Guidelines strongly recommended Opioid Drugs—as opposed to aspirin or ibuprofen—for those unable to gain relief from Tylenol or similar non-steroidal anti-inflammatory drugs ("NSAID") products.

407.    The AGS Treatment Guidelines also included the following recommendations: "All patients with moderate to severe pain…should be considered for opioid therapy (low quality of evidence, strong recommendation)," and "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse."[84]  These recommendations, which

---

[83] *Id.* at 1343

[84] *Pharmacological Management of Persistent Pain in Older Persons*, 57 J. AM. GERIATRICS SOC'Y 1331, 1339, 1342 (2009),                                  *available*                                  *at* https://geriatricpain.org/sites/geriatricpain.org/files/wysiwyg_uploads/ags_pharmacological_management_of_persistent_pain_in_olders_persons_2009_2.pdf.

continue to appear on AGS's website, are not supported by any study or other reliable scientific evidence. Nevertheless, they have been cited 278 times in Google Scholar since their 2009 publication.

408.    Known KOL and AGS panel member Dr. Fine was receiving payments as a consultant or speaker "for at least six opioid companies at the time the guidelines came out," including Defendants Janssen and Endo.[85]   Indeed, half of the experts on the ten-member AGS Treatment Guidelines panel disclosed financial ties to Manufacturer Defendants, including serving as paid speakers and consultants, presenting CMEs sponsored by Manufacturer Defendants, receiving grants from Manufacturer Defendants, and investing in Manufacturer Defendants' stock. The Institute of Medicine recommends that, to ensure an unbiased result, fewer than 50% of the members of a guidelines committee should have financial relationships with drug companies.

409.    AGS sought and obtained grants from Endo and others to distribute and promote the AGS Treatment Guidelines beginning July 15, 2009.  Internal AGS discussions in August 2009 revealed that it did not want to receive up-front funding from drug companies, which would suggest drug company influence, but would instead accept commercial support to disseminate the publication.  However, by drafting the guidelines knowing that pharmaceutical company funding would be needed and allowing these companies to determine whether to provide support only after they have approved the message, AGS ceded significant control to these companies.  According to one news report, AGS has received $344,000 in funding from Opioid Drug manufacturers since 2009.[86]

---

[85] John Fauber & Ellen Gabler, *Narcotic Painkiller Use Booming Among Elderly*, MILWAUKEE J.SENTINEL, (May 30, 2012), https://www.medpagetoday.com/geriatrics/painmanagement/32967.

[86] John Fauber and Ellen Gabler, *Narcotic Painkiller Use Booming Among Elderly,* MILWAUKEE J. SENTINEL, (May 30, 2012).

410. Following their publication, Endo funded AGS efforts in December 2009 to create a CME based on the AGS Treatment Guidelines. After having sponsored it, Endo's internal documents indicate that Endo's sales representatives discussed the AGS Guidelines with HCPs during individual sales visits.

411. Upon information and belief, most if not all of the Manufacturer Defendants trained their sales representatives to invoke various Treatment Guidelines when detailing their respective Opioid Drugs to prescribers.

412. The extent of Manufacturer Defendants' influence on treatment guidelines is demonstrated by the fact that independent guidelines — the authors of which did not accept drug company funding — reached very different conclusions.

413. The American Society of Interventional Pain Physicians' ("ASIPP") 2012 Guidelines for Responsible Opioid Prescribing in Chronic Non-Cancer Pain warned that "[t]he recent revelation that the pharmaceutical industry was involved in the development of opioid guidelines as well as the bias observed in the development of many of these guidelines illustrate that the model guidelines are not a model for curtailing controlled substance abuse and may, in fact, be facilitating it." ASIPP's Guidelines further advise that "therapeutic opioid use, specifically in high doses over long periods of time in chronic non-cancer pain starting with acute pain, not only lacks scientific evidence, but is in fact associated with serious health risks including multiple fatalities, and is based on emotional and political propaganda under the guise of improving the treatment of chronic pain." ASIPP recommends long-acting Opioid Drugs in high doses only "in specific circumstances with severe intractable pain" and only when coupled with "continuous adherence monitoring, in well-selected populations, in conjunction with or after failure of other

modalities of treatments with improvements in physical and functional status and minimal adverse effects."[87]

414.    Similarly, the American College of Occupational and Environmental Medicine's 2011 Guidelines for the Chronic Use of Opioids recommend against the "routine use of opioids in the management of patients with chronic pain," finding "at least moderate evidence that harms and costs exceed benefits based on limited evidence."[88]

415.    The United States Department of Veterans Affairs ("VA") and Department of Defense's ("DOD") 2010 Clinical Guidelines on Management of Opioid Therapy for Chronic Pain notes that their review revealed a lack of solid evidence-based research on the efficacy of long-term opioid therapy.[89]

416.    It was not until June 2017, under pressure from legitimate advocacy groups, that FSMB updated its Model Policy regarding Opioid Drugs.  The current policy, based off the CDC's March 2016 Guidelines for Prescribing Opioids for Chronic Pain, is a complete reversal of FSMB's previous Model Policy which promoted the long-term use of Opioid Drugs while downplaying the risk of addiction.

417.    Manufacturer Defendants' Treatment Guidelines, along with the previous FSMB Model Policy, were instrumental in securing coverage of Opioid Drugs.  Treatment Guidelines directly inform HCPs' prescribing practices, are especially important because they are relied upon more by general practitioners and family doctors, who—as Manufacturer Defendants' marketing research concluded—were typically less informed about Opioid Drugs and thus more susceptible

---

[87] Laxmaiah Manchikanti, *et al*., American Society of Interventional Pain Physicians (ASIPP), *Guidelines for Responsible Opioid Prescribing in Chronic Non-Cancer Pain: Part 1, Evidence Assessment,* 15 PAIN PHYSICIAN (Special Issue) S1-S66; *Part 2 — Guidance,* 15 PAIN PHYSICIAN (Special Issue) S67-S116 (2012).
[88] AMERICAN COLLEGE OF OCCUPATIONAL AND ENVIRONMENTAL MEDICINE'S GUIDELINES FOR THE CHRONIC USE OF OPIOIDS (2011).
[89] MANAGEMENT OF OPIOID THERAPY FOR CHRONIC PAIN WORKING GROUP, VA/DoD CLINICAL PRACTICE GUIDELINE FOR MANAGEMENT OF OPIOID THERAPY FOR CHRONIC PAIN (MAY 2010).

to marketing messages.  These prescribers included nurse practitioners and physician assistants, who, a 2012 Endo business plan noted, were "share acquisition" opportunities because they were "3x times more responsive than MDs to details" and wrote "96% of [their] prescription…without physician consult."

418.    Certain manufacturers went so far as to include references to the FSMB Policy and the APS Guidelines in their early prescribing labels, encouraging would be prescribers to consult both when selecting patients to prescribe the drugs. Such an inclusion lends even more credibility to the Front Group materials and enforces fears of discipline.

419.    Such guidelines were crucial for giving legitimacy to the explosion of opioid prescriptions and providing HCPs with a framework within which to work and to allay their fears that such prescriptions were inappropriate.

420.    Payors also utilized the various guidelines to determine whether or not they should cover treatments (including opioid prescriptions for management) for specific conditions.  The more HCPs that were prescribing a given opioid medication within the recommended framework, the more likely it was that the insurance companies would cover the drug for that purpose.

### 3.    The Manufacturer Defendants' Creation of Clinical Literature Supporting Use of Opioids Drugs to Treat Chronic Pain

421.    The Manufacturer Defendants aimed to create a body of academic literature that its sales force, KOLs, and Front Groups could rely on as "evidence" of their false and misleading claims relating to the Opioid Drugs.

422.    The Manufacturer Defendants' Front Groups also published a number of seemingly academic peer-reviewed articles in medical journals, which were utilized by the Manufacturer Defendants to misleadingly market their Opioid Drugs to physicians.

423.    The proliferation of academic articles promoting the long-term use of Opioid Drugs in treating chronic pain was the result of orchestrated publication campaigns developed by the Manufacturer Defendants as part of their overall marketing strategy.

424.    To accomplish this, Manufacturer Defendants—sometimes through third-party consultants and/or advocacy organizations—commissioned, edited, and arranged for the placement of favorable articles in academic journals.  The Manufacturer Defendants' internal documents reveal plans to submit research papers and "studies" to long lists of journals, including back-up options and last resort, "fast-track" application journals that they could use if the pending paper was rejected everywhere else.

425.    Manufacturer Defendants coordinated the timing and publication of manuscripts, abstracts, posters/oral presentations, and educational materials in peer-reviewed journals and other publications to support the launch and sales of their drugs.  The plans for these materials did not originate in the departments within the manufacturers' organizations that were responsible for research, development, or any other area that would have specialized knowledge about the drugs and their effects on patients, but in their marketing departments (and from their marketing and public relations consultants).

426.    Manufacturer Defendant-sponsored studies and marketing materials were widely distributed and tainted the scientific literature.

427.    Additionally, the 2009 AAPM/APS Guidelines, which promoted opioids as "safe and effective" for treating chronic pain and concluded that the risk of addiction was manageable for all patients, even those with a prior history of drug abuse, were cited nearly 1,700 times in academic literature according to Google Scholar.

428.    Janssen used APS's *Journal of Pain* to publish its Clinicians' Attitudes and Beliefs survey, discussed supra.

429.    Endo likewise sponsored a paper that falsely and misleadingly emphasized or exaggerated the risks of competing products like NSAIDs, so that HCPs and patients nationwide, and in Louisiana and East Baton Rouge Parish would look to Opioid Drugs first for the treatment of chronic pain.  The paper deceptively describes the risks from NSAIDs while failing to disclose the risks from Opioid Drugs.[90]

430.    Endo distributed copies of a book by KOL Dr. Webster entitled *Avoiding Opioid Abuse While Managing Pain* (2007).  Endo's internal planning documents describe the purpose of distributing this book as to "[i]ncrease the breadth and depth of the Opana ER prescriber base." The book claims that when faced with signs of aberrant behavior, the doctor should regard it as pseudoaddiction and thus, increasing the dose in most cases . . . should be the clinician's first response." (emphasis added).

431.    A slide from an Opana ER business plan contemplated distribution of the book as part of Endo's efforts to "[i]ncrease the breadth and depth of the OPANA ER prescriber base via targeted promotion and educational programs."  The slide indicates that the book would be particularly effective "for [the] PCP audience" and instructed "[s]ales representatives [to] deliver [the book] to participating health care professionals."  The slide, shown below, demonstrates Endo's express incorporation of this book by a KOL into its marketing strategy:

---

[90] *See, e.g., Case Challenges in Pain Management: Opioid Therapy for Chronic Pain*, PAIN MED. NEWS (Apr. 2007), *available at* http://www.painmedicinenews.com/download/BtoB_Opana_WM.pdf (describing massive gastrointestinal bleeds from long-term use of NSAIDs and recommending opioids, and supported by Endo).



432.    Endo documents indicate that, around 2007, the company purchased at least 50,000 copies of the book for distribution.  Internal Endo documents demonstrate that the book had been approved for distribution by Endo's sales force, and Endo had fewer than 8,000 copies on hand in March of 2013.  Based on the nationwide and uniform character of Endo's marketing, and the book's approval for distribution, this book was available to and was intended to reach prescribers, including those in Louisiana.

433.    KOL Dr. Lynn Webster later conceded this information was deceiving: "[Pseudoaddiction] obviously became too much of an excuse to give patients more medication. . . . It led us down a path that caused harm.  It is already something we are debunking as a concept."

434.    In 2005, Actavis commissioned a report from one of its consultants regarding the barriers to market entry for its branded drug Kadian.  The report concluded that the major barriers to opioid manufacturers were (i) overcoming "concerns regarding the safety and tolerability" of Opioid Drugs, and (ii) the fact that "physicians have been trained to evaluate the supporting data before changing their respective practice behavior."

435.    In order to change physicians' practice behavior, the report recommended a "[p]ublication strategy based on placing in the literature key data that influence members of the target audience," with an "emphasis…on ensuring that the message is believable and relevant to the needs of the target audience."  Such a strategy requires the creation of "effective copy points . . . backed by published references" and "developing and placing publications that demonstrate [the] efficacy [of opioids] and [their] safety/positive side effect profile."  In this way physicians would be able to "reach[] a mental agreement" and change their behavior without having first evaluated supporting data, which of course did not exist.  Such manufactured literature would "provide greater support for the promotional message and add credibility to the brand's advocates" based on "either actual or perceived 'scientific exchange'" in relevant medical literature, which essentially admits Actavis knew their messaging was false and deceptive.

436.    Actavis also exemplifies the Manufacturer Defendants' practice of commissioning a KOL research article with a pre-determined conclusion.  For example, Actavis ordered three manuscripts to be written in 2005, all three of which had planned outcomes.  The contents were to be written as follows: "[t]he neuropathic pain manuscript will provide evidence demonstrating KADIAN is as effective in patients with presumptive neuropathic pain as it is in those with other pain types;" "[t]he elderly subanalysis…will provide clinicians with evidence that KADIAN is efficacious and well tolerated in appropriately selected elderly patients" and will "be targeted to readers in the geriatrics specialty;" and "[t]he QDF/BID manuscript will…call attention to the fact that KADIAN is the only-sustained release opioid to be labeled for [once or twice daily] use." Articles matching these descriptions later appeared in the *Journal of Pain* and the *Journal of the American Geriatrics Society*, which as discussed herein received significant funding from the Manufacturer Defendants.

### 4. The Manufacturer Defendants' Efforts to Deflect FDA and CDC Concerns

437.    As part of their coordinated efforts to deflect concerns about the Opioid Drugs' contribution to the epidemic, the Manufacturer Defendants, through their Front Groups, issued official statements and critical reviews of positions taken by both the FDA and CDC aimed at reigning in the long-term prescribing of Opioid Drugs for chronic pain.

438.    In 2009 the FDA mandated REMS for Opioid Drugs to be distributed to prescribers and patients.  PCF developed and disseminated "consensus recommendations" in order to ensure that the REMS did not go too far in narrowing the uses or benefits or highlighting the risks of opioid therapy for chronic pain, which would significantly undermine the Defendants' marketing efforts.  On information and belief, the recommendations claimed that Opioid Drugs were "essential" to the management of pain and that it would behoove the REMS to "acknowledge the importance of opioids in the management of pain and…not introduce new barriers."  Defendants worked with PCF members to limit the reach and manage the message of the REMS, which enabled them to maintain their deceptive marketing of Opioid Drugs for chronic pain.

439.    As noted above, one successful effort by the Manufacturer Defendants (through PCF) was to thwart the FDA's efforts to require physicians take a CME, which accurately informs them of the efficacy and risks of long-term Opioid Drug treatment for chronic pain.  PCF was controlled in large part by Defendants including Janssen, Endo, Teva and Abbott.

440.    In 2012, KOLs Dr. Fine and Dr. Webster co-authored the AAPM's response to the FDA's efforts to limit opioid medications to severe and cancer pain indications, relying on the AAPM's own 2009 Guidelines (that they assisted in drafting) as evidence.  Therein they made the unsubstantiated statements that "[a]t best, the literature has shown inconsistent effectiveness of

opioids for chronic pain" and a predisposition to substance abuse is "not a reason to deny people with pain an opioid."

441.    AAPM subsequently spearheaded a campaign criticizing the CDC's drafted prescribing guidelines in 2015, claiming "[b]y only addressing how to limit or avoid opioids, the new guidelines will inevitably result in fewer prescriptions overall – including those needed by patients with legitimate medical needs."[91]    In its letter, the AAPM questions the CDC's methodology of evidence review claiming the proposed CDC guidelines restricting opioid use "are not an evidence-based practice guideline in the conventional sense."[92]    Not surprisingly, AAPM champions for the continued use of industry funded misrepresentations in its 2009 Guidelines which they now characterize as an approach "relying on the 'best available evidence.'"    AAPM stressed the Manufacturer Defendants' favorite message - that chronic pain is "a national healthcare crisis." —while downplaying the public health risk associated with opioid prescriptions. In 2016, past president of the AAPM, Daniel Carr, also criticized the prescribing guidelines, stating "that the CDC guideline makes disproportionately strong recommendations based upon a narrowly selected portion of the available clinical evidence."[93]

442.    On March 15, 2016, the CDC issued the guidelines, "explaining that non-opioid therapies are preferred for chronic pain and recommended that physicians prescribe immediate-release opioids at the lowest effective dosage and evaluate the benefits and harms of continued

---

[91] Mary Rechtoris, *Pain Groups Critique CDC's Prescribing Guidelines—6 Points*, BECKER'S SPINE REVIEW (Sept. 13, 2915), https://www.beckersspine.com/spine/item/27319-http-www-painnewsnetwork-org-stories-2015-9-22-chronic-pain-groups-blast-cdc-for-opioid-guidelines.html.

[92] Letter to Thomas Frieden, MD, MPH, Nat't Ctr. for Injury Prevention & Control, Ctrs. for Disease Control & Prevention, from the American Academy of Pain Medicine (Jan. 12, 2016), at 2, *available at* http://www.painmed.org/files/aapm-letter-to-cdc-proposed-2016-guidelines-for-presciding.pdf.

[93] *Responses and Criticisms Over New CDC Opioid Prescribing Guidelines*, PRACTICAL PAIN MGMT., https://www.practicalpainmanagement.com/resources/news-and-research/responses-criticisms-over-new-cdc-opioid-prescribing-guidelines.  (last visited Sept. 28, 2017).

opioid use within one to four weeks of starting opioid therapy."[94]    As Dr. Andrew Kolodny, executive director of Physicians for Responsible Opioid Prescribing, has explained, "[t]he opioid lobby has very actively blocked interventions that might result in more cautious prescribing or reduced prescribing.  They've very clearly defended their financial stake in the status quo."

443.    Likewise, the 2018, Senate report notes: "[t]he fact that these groups registered their opposition while receiving funding from the opioids industry raises the appearance—at the very least—of a direct link between corporate donations and the advancement of opioids-friendly messaging."[95]

444.    Relatedly, in a March 2017 article published in *JAMA Internal Medicine*, researchers from Johns Hopkins University and Brandeis University examined industry payments to over 150 organizations that had submitted comments on the draft CDC guidelines.[96]    After coding guideline comments by supporting and reviewing financial disclosures, including annual reports, tax returns, and self-reported information, researchers found "opposition to the guidelines was significantly more common among organizations with funding from opioid manufacturers than those without funding from the life sciences industry."[97]

445.    Accordingly, a "major concern is that opposition to regulatory, payment, or clinical policies to reduce opioid use may originate from groups that stand to lose financially if opioids

---

[94] Department of Health and Human Services, Centers for Disease Control and Prevention, *CDC Guideline for Prescribing Opioids for Chronic Pain – United States, 2016* (Mar. 15, 2016), www.cdc.gov/mmwr/volumes/65/rr/pdfs/rr6501e1er.pdf.
[95] U.S. Senate Homeland Security & Governmental Affairs Committee, *Fueling an Epidemic: Exposing the Financial Ties Between Opioid Manufacturers and Third Party Advocacy Groups*, 115th Cong., 14 (Sept. 6, 2017) https://www.hsgac.senate.gov/imo/media/doc/REPORT-Fueling%20an%20Epidemic-Exposing%20the%20Financial%20Ties%20Between%20Opioid%20Manufacturers%20and%20Third%20Party%20Advocacy%20Groups.pdf.
[96] Dora H. Lin *et al.*, *Financial Conflicts of Interest and the Centers for Disease Control and Prevention's 2016 Guideline for Prescribing Opioids for Chronic Pain*, JAMA INTERNAL MEDICINE (Mar. 2017).
[97] *Id.* (emphasis added).

sales decline."[98]    In an extended version of their findings, the researchers are more explicit: "[O]pposition to more conservative opioid use may, at least in part, be financially motivated."[99]

### iii.    Consumer-Directed Marketing

446.    Beginning in the early 1990s, there was a significant philosophical shift in the way prescription drugs were marketed.  Twenty years ago, direct appeals to consumers by prescription drug manufacturers via print and broadcast media was a new phenomenon in the health sector. This approach, known as direct-to-consumer ("DTC") marketing, has earned an increasingly important position in terms of public awareness of prescription drug products.  Surveys have shown that over 90% of the public reports seeing prescription drug advertisements.

447.    In 1989, the drug industry collectively spent only $12 million on DTC marketing, compared to $2.38 billion in 2001, an increase of almost 200-fold in only twelve years.  A total of 105 prescription drugs were advertised directly to consumers in 2001.

448.    As a result of this change in marketing, the Institute for Safe Medication Practices reports 78% of primary care physicians have been asked for drugs that their patients saw advertised on television and 67% concede that they sometimes grant patients' requests for medications that are not clinically indicated.  Therefore, many patients may be using medications unnecessarily and/or are overmedicated.

449.    Direct marketing of controlled prescription drugs to patients is designed to increase the demand for a particular medication among those seeking it for legitimate (i.e., medical) purposes.  Unfortunately, it may increase demand among those seeking drugs for abusive (i.e. diversion) purposes as well.

---

[98] *Id.*
[99] DORA H. LIN ET AL., POTENTIAL FINANCIAL CONFLICTS OF INTEREST AND FEDERAL OPIOID GUIDELINES: A CROSS-SECTIONAL STUDY (2017).

450.    Manufacturer Defendants knew they could not create a new market for a drug by convincing HCPs alone.  Manufacturer Defendants therefore unleashed a torrent of deceptive marketing on consumers as well, promising sufferers of chronic pain that greener pastures were on the horizon.  Increasing consumer demand was thus part of the Manufacturer Defendants' greater efforts to expand the prescription market for branded and generic Opioid Drugs.

451.    The emphasis on patient marketing was based on the Defendants' market research and business plans.  Pharmaceutical industry marketing experts see patient-focused advertising, including direct-to-consumer marketing, as particularly valuable in "increas[ing] market share . . . by bringing awareness to a particular disease that the drug treats."[100]  Evidence also demonstrates that physicians are willing to acquiesce to patient demands for a particular drug—even for Opioid Drugs for conditions for which they are not generally recommended.[101]

452.    These observations were not lost on the Manufacturer Defendants.  Endo's research, for example, found that patient-oriented advertising resulted in greater patient "brand loyalty," with longer durations of Opana ER therapy and fewer discontinuations.  An Actavis marketing plan similarly noted that "[d]irect-to-consumer marketing affects prescribing decisions."

453.    Manufacturer Defendants' consumer-directed marketing took many forms, including patient-focused "educational" materials, such as pamphlets, videos, websites, print advertisements in magazines available in physician offices, and Front Group messages targeting pain sufferers.

---

[100] Kanika Johar, Comment, *An Insider's Perspective: Defense of the Pharmaceutical Industry's Marketing Practices,* 76 ALB. L. REV. 299, 308 (2013).
[101] According to one study, nearly 20% of sciatica patients requesting oxycodone would receive a prescription for it, compared with 1% making no request. More than half of patients requesting a strong Opioid Drug received one.  J.B. McKinlay et al., *Effects of Patient Medication Requests on Physician Prescribing Behavior: Results of a Factorial Experiment,* 52(2) MED. CARE 294 (2014).

454.    Manufacturer Defendants created information campaigns – including literature, websites, community groups, and programs – targeting individuals who suffer from chronic non-cancer pain from illnesses such as low back pain, shingles, migraines, osteoarthritis, phantom limb pain, fibromyalgia, and multiple sclerosis, among others.  Many individuals affected by these conditions have formed affinity groups and online communities that provide support to people seeking to address conditions that produce persistent pain or that may necessitate long-term treatment.  The Manufacturer Defendants targeted these communities and used these community-building efforts to promote the use of Opioid Drugs for treating these conditions.   The Manufacturer Defendants did so despite the fact that there was little or no scientific evidence supporting the use of Opioid Drugs for these conditions, and little or no evidence supporting or even suggesting that the use of Opioid Drugs for these conditions would provide more pain relief than harm from the many known and significant Opioid Drug treatment risks.

455.    Further, Manufacturer Defendants employed rebates, co-pay assistance, and free trials to lower the cost for patients seeking relief from chronic pain and to encourage the patients to fill the prescriptions.

456.    Through consumer-directed marketing, Manufacturer Defendants bombarded patients with various misrepresentations and omissions aimed at increasing patient demand for Opioid Drugs, including statements: (1) highlighting the existence of a "pain epidemic" and urgency with which it must be addressed; (2) that living with pain is a "choice;" (3) the efficacy with which long-term Opioid Drug therapy treats or manages long-term chronic pain; (4) downplaying the serious risk of addiction; (5) suggesting patients "advocate" for themselves with their doctors, should not "take no for an answer" and, threaten to leave prescribers who did not provide Opioid Drugs; and (6) actively concealing, and causing others to conceal, information

about the safety (including addiction risk), efficacy, and usefulness of Opioid Drugs to treat long-term chronic pain.

457.    The tools with which the Manufacturer Defendants spread these misrepresentations and omissions (or otherwise increased patient demand) included: (1) direct marketing or advertising to consumers; (2) indirect marketing through bogus Front Groups; (3) media campaigns or otherwise influencing media coverage; and (4) financial incentives for would-be patients (such as coupons or rebates).  Manufacturer Defendants further targeted particularly vulnerable patient populations (namely the elderly and wounded veterans).  Each of these characteristics is explained in greater detail below.

### 1.    Direct-to-Consumer Marketing

458.    Though much of their consumer-oriented marketing was done through their sham Front Groups, Manufacturer Defendants also engaged in marketing under their own banner aimed directly at consumers.  This consisted in large part of "educational" written materials, videos, and Opioid Drug websites.

459.    Manufacturer Defendants distributed pamphlets, videos, and other publications they referred to as patient-focused "education and support" materials.  These materials were made available to patients on the internet and in their doctors' offices including, upon information and belief, those that are a part of Plaintiff's provider network.

### 2.    Indirect Marketing to Consumers through Front Groups

460.    As noted above, Manufacturer Defendants entered into arrangements with numerous Front Groups to promote their Opioid Drugs, particularly as an appropriate long-term treatment for chronic pain.  While some of these Front Groups focused their messaging solely on

prescribers, others—masquerading as "patient advocacy" groups—sought to "educate" consumers suffering from chronic pain.

461.    For example, APF issued education guides for patients that touted the benefits of Opioid Drugs for chronic pain and trivialized their risks, particularly the risk of addiction.  Its patient guide found on its website even went so far as to discourage the use of non-opioid pain killers citing harmful side-effects, all while encouraging the use of Opioid Drugs and minimizing the far more crippling side-effects and debilitating risk of addiction.

462.    APF's *Treatment Options: A Guide for People Living with Pain*, misleadingly told patients that addiction was limited to extreme cases of unauthorized dose escalations, getting Opioid Drugs from multiple sources, or theft.

463.    APF also engaged in a significant multimedia campaign—through radio, television, and the internet—to educate patients about their "right" to pain treatment, namely Opioid Drugs. All of the programs and materials were available nationally and were intended to reach Louisiana consumers, physicians, patients, and payors, including the EBRCOC.

464.    AGS and AAPM also developed materials focused on patients, such as their "education" pamphlet entitled *Finding Relief: Pain Management for Older Adults*.

465.    NIPC also undertook various initiatives containing false and misleading statements aimed at consumers, such as its painknowledge.org website.

### 3.    *Media Campaigns and Influencing Media Coverage*

466.    Manufacturer Defendants also developed public relations strategies with respect to how Opioid Drugs—and the so-called "epidemic of pain"—were covered by media organizations who served the public at large (and thus patients).

467.    Defendants were also well aware that media organizations would be understandably skeptical of claims originating from the manufacturers themselves, and thus enlisted the help of their Front Groups.  The Front Groups held themselves out as an independent resource for reporters writing stories on Opioid Drugs.

468.    One example is A Reporter's Guide: Covering Pain and Its Management, published by APF exclusively for reporters.[102]  APF developed the Guide "as a primer on pain and pain management to help meet the informational needs of busy reporters, editors and producers covering the pain story."  APF even offered to "connect reporters with a wide array of leading pain experts" (which upon reasonable belief included various KOLs).[103]

469.    Indeed, the first page notes that pain is "frequently misunderstood by the public," and listed the "common misconceptions about pain" that the media can help dispel through solid reporting:[104]

---

[102] *A Reporter's Guide: Covering Pain and Its Management,* AM. PAIN FOUND. (Oct. 2008), *available at* https://assets.documentcloud.org/documents/277606/apf-reporters-guide.pdf.
[103] *Id.* at 3.
[104] *Id.* at 1.

Pain is complex and frequently misunderstood by the public. The issue of pain is riddled with myths and misperceptions, which makes the task of informing and educating people about pain and its management that much more challenging.

**SOME COMMON MISCONCEPTIONS ABOUT PAIN**

- **Pain is "all in your head."** Although this is partially true because we need our brains for the perception of pain, that does not mean pain is imaginary when the source of pain is not well understood. Pain is all too real to the person who lives with it day in and out.

- **Pain is just something one has to live with**—an inevitable part of a disease or condition. The fact is most pain can be relieved with proper pain management.

- **Pain is a natural part of growing older**. While pain is more common as we age because conditions that cause pain (e.g., arthritis, degenerative joint diseases, cancer, shingles, osteoporosis) are more frequent in older adults, it should not be something people have to struggle with.

- **The best judge of pain is the physician or nurse.** Studies have shown that there is little correlation between what a physician or nurse might "guess" about someone's actual pain. The person with pain is the authority on the existence and severity of his/her pain. The self-report is most reliable indicator.

- **Seeking medical care for pain is a sign of weakness.** Pain carries a stigma, and many people hesitate talking about their pain and how it affects their daily life; they also don't want to be considered a "bad" patient.

- **Use of strong pain medication leads to addiction.** Many people living with pain and even some healthcare providers falsely believe opioids (strong pain medicines) are universally addictive. Studies have shown that the risk of addiction is small when these medicines are properly prescribed and taken as directed. As with any medication, there are risks, but these risks can be managed.

470.    The guide also warned reporters of the "challenges" of reporting on pain, including the "stigma of pain management, especially among legal and governmental regulatory bodies."  In other words, the media should turn to APF—not the FDA, CDC or other agencies—in the search for "unbiased, credible information about pain."[105]  One such unbiased source of information is Dr. Fine, who is quoted in the Guide as saying "[w]hen opioids are prescribed for pain control in adequately evaluated, selected, and monitored patients, addiction is rare."[106]

471.    Manufacturer Defendants' KOLs also appeared on television programming with a broad audience including patients.  One example is Dr. Portenoy's appearance on Good Morning America, discussed *supra*.

---

[105] *Id.* at 2.
[106] *Id.* at 29.

472.    Manufacturer Defendants' KOLs also gave interviews for print publications with a broad audience (encompassing chronic pain sufferers).  For example, Dr. Portenoy in 2008, gave an interview to *Health Magazine*, in which he said that many chronic pain sufferers resistant to treatment "tend to underreport" their pain.  This situation, he explained, "can be improved a great deal if the person brings a spouse or another family member to the [doctor's] appointment."

### 4.    *Financial Assistance for Consumer Co-payments and Deductibles*

473.    The Manufacturer Defendants also knew that one of the largest obstacles to patients starting and remaining on their branded Opioid Drugs—including by switching from a competitor's drug—was out-of-pocket cost.  They recognized they could overcome this obstacle by providing patients financial assistance with their insurance co-payments, and each of the Manufacturer Defendants did so through vouchers and coupons distributed during detailing visits with prescribers.

### 5.    *Targeting Vulnerable Patient Populations*

474.    Manufacturer Defendants also targeted vulnerable subgroups of the population at large; namely the elderly and wounded war veterans.

475.    Guidelines published by the Manufacturer Defendants' Front Group AGS promoted the idea that "[a]ll patients with moderate to severe pain . . . should be considered for opioid therapy."[107]   There has never been any scientifically-based evidence to support this audacious claim.

476.    The Manufacturer Defendants' marketing misleadingly minimized the particular risks affecting the elderly population.  Elderly patients are at greater risk of adverse drug effects and interactions; indeed, a 2010 paper in the *Archives of Internal Medicine* reported that elderly

---

[107] *Pharmacological Management of Persistent Pain in Older Persons,* 57 J. AM. GERIATR. SOC'Y 1331, 1339, 1342 (2009), *available at* http://onlinelibrary.wiley.com/doi/10.1111/j.1526-4637.2009.00699.x/full.

patients who used Opioid Drugs had a significantly higher rate of death, heart attacks, and strokes than users of NSAIDs. While these risks are acknowledged somewhat in the Manufacturer Defendants' labeling, they are (upon information and belief) downplayed in the marketing aimed at the elderly population.

477.    The Manufacturer Defendants also promoted the notion—also without adequate scientific foundation—that the elderly are particularly unlikely to become addicted to Opioid Drugs. AGS's 2009 Guidelines, for example, which the Manufacturer Defendants publicized, alleged the risk of addiction is "exceedingly low in older patients with no current or past history of substance abuse."[108] Yet, a 2010 study examining overdoses among long-term opioid users found that patients 65 or older were among those with the largest number of serious overdoses.

478.    Manufacturer Defendants' efforts have paid off. Since 2007, prescriptions for the elderly have grown at twice the rate of prescriptions for adults between the ages of 40 and 59.

479.    Another group aggressively targeted by the Manufacturer Defendants are veterans, for whom Opioid Drugs are particularly dangerous.

480.    According to a study published in the 2013 Journal of American Medicine, veterans returning from Iraq and Afghanistan who were prescribed Opioid Drugs have a higher incidence of adverse clinical outcomes, like overdoses and self-inflicted and accidental injuries; 40% of veterans with post-traumatic stress disorder received Opioid Drugs and benzodiazepines (anti-anxiety drugs) that, when mixed with alcohol, can cause respiratory depression and death. Yet, according to a VA Office of Inspector General Report, 92.6% of veterans who were prescribed Opioid Drugs were also prescribed benzodiazepines. Again, as with elderly patients, Defendants

---

[108] *Id.*

both purposefully sought to increase Opioid Drug prescribing to this vulnerable group and omitted

from their promotional materials the known, serious risks Opioid Drugs they faced.

481.    Clinical Guidelines on Management of Opioid Therapy for Chronic Pain, issued by

the DOD, discloses that its review "revealed the lack of solid evidence based research on the

efficacy of long-term opioid therapy.  Almost all of the randomized trials of opioids for chronic

non-cancer pain were short-term efficacy studies.  Critical research gaps…include: lack of

effectiveness studies on long-term benefits and harms of opioids…; insufficient evidence to draw

strong conclusions about optimal approaches to risk stratification…; lack of evidence on the utility

of informed consent and opioid management plans…; and treatment of patients with chronic non-

cancer pain at higher risk for drug abuse or misuse."  These disclosures are missing from the

Manufacturer Defendants' marketing to veterans.

482.    The Manufacturer Defendants' marketing to veterans has had devastating

consequences.  A 2008 survey showed prescription drug abuse among military personnel doubled

from 2002 to 2005, and then nearly tripled again over the next three years.  In 2009, military

doctors wrote 3.8 million prescriptions for narcotic pain pills—four times as many as they did in

2001.  Further, one-third of veterans prescribed Opioid Drugs as of 2012 remained on take-home

Opioid Drugs for more than 90 days.  Although many of these veterans are returning from service

with traumatic injuries, the increase in opioid prescribing is disproportionate to the population and,

in far too many cases, unsuited for their treatment.

483.    Among former service members receiving VA services nationally in a single year

(2005), 1,013 had died of accidental drug overdoses—double the rate of the civilian population.

6.    *Marketing Measures Used by Particular Defendants to Promote Unsafe, Unapproved Use of Opioids Drugs*

(a)    **Marketing by Abbott**

484.    Abbott utilized advertisements, websites, front-groups, and bogus "initiatives" to increase patient demand for Opioid Drugs by falsely representing the safety and efficacy of long-term opioid therapy for the treatment of chronic pain. These patient-oriented marketing measures are in addition to those (alleged above) undertaken by the Front Groups, with whom Abbott was intertwined.

(b)    **Marketing by Teva**

485.    Teva utilized advertisements, websites, front-groups, and bogus "initiatives" to increase patient demand for Opioid Drugs by falsely representing the safety and efficacy of long-term opioid therapy for the treatment of chronic pain. These patient-oriented marketing measures are in addition to those (alleged above) undertaken by the Front Groups, with whom Teva was intertwined.

(c)    **Marketing by Janssen**

486.    Janssen utilized advertisements, websites, front-groups, and bogus "initiatives" to increase patient demand for Opioid Drugs by falsely representing the safety and efficacy of long-term opioid therapy for the treatment of chronic pain. These patient-oriented marketing measures are in addition to those (alleged above) undertaken by the Front Groups, with whom Janssen was intertwined.

487.    Janssen sponsored, developed, and approved content of a website, Let's Talk Pain in 2009, acting in conjunction with the APF, AAPM, and ASPMN, whose participation in Let's Talk Pain Janssen financed and orchestrated. This website featured an interview, which was edited by Janssen personnel, claiming that Opioid Drugs were what allowed a patient to "continue to

function," inaccurately implying her experience would be representative.  This video is still available today on YouTube.

488.    Janssen worked with AAPM and AGS to create a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which described as "myth" the claim that Opioid Drugs are addictive, and asserted as fact that "[m]any studies show that opioids are rarely addictive when used properly for the management of chronic pain."

489.    In doing so, Janssen contracted with a medical publishing firm, Conrad & Associates, LLC.  The content was drafted by a writer ("Medical Writer X") hired by Conrad & Associates and funded by Janssen.  These materials were reviewed, in detail, by Janssen's medical-legal review team, which conducted detailed reviews and gave him editorial feedback on his drafts, which was adopted in the published version.

490.    Medical Writer X understood, without being explicitly told, that since his work was funded and reviewed by Janssen, the materials he was writing should aim to promote the sale of more drugs by overcoming the reluctance to prescribe or use Opioid Drugs to treat chronic pain. He knew that the publication was undertaken in connection with the launch of a new drug and was part of its promotional effort.  Medical Writer X knew of the drug company sponsoring the publication, and he would go to the company's website to learn about the drug being promoted. He also knew that his clients—including Janssen—would be most satisfied with his work if he emphasized that: (a) even when used long-term, Opioid Drugs are safe and the risk of addiction is low; (b) Opioid Drugs are effective for chronic pain; and (c) Opioid Drugs are under-prescribed because HCPs are hesitant, confused, or face other barriers.

491.    Finding Relief promises: "Used properly, opioid medications may make it possible for people with chronic pain to 'return to normal' – get back to work, walk or run, and play sports,

and participate in other activities."  Finding Relief describes Opioid Drugs as "rarely addicting when used properly for the management of chronic pain" and assures that "unless the underlying cause of your pain gets worse . . . you will probably remain on the same dose or only need small increases over time."  These contentions are wholly lacking in scientific or clinical support.

492.    Janssen also targeted vulnerable patient populations.  It provided significant funding to APF for the distribution of *Exit Wounds*, which (as alleged *supra*), aggressively and misleadingly targeted wounded war veterans suffering from chronic pain.

493.    Janssen also provided financial assistance to would-be users of their Opioid Drugs. For example, in 2012, Janssen planned to distribute 1.5 million savings cards worth $25 each.

#### (d)    Marketing by Endo

494.    Endo utilized advertisements, websites, front-groups, and bogus "initiatives" to increase patient demand for Opioid Drugs by falsely representing the safety and efficacy of long-term opioid therapy for the treatment of chronic pain.  These patient-oriented marketing measures are in addition to those (alleged above) undertaken by the Front Groups, with whom Endo was intertwined.

495.    Upon information and belief, Endo distributed a pamphlet with the Endo logo entitled *Living with Someone with Chronic Pain*, which stated that "[m]ost health care providers who treat people with pain agree that most people do not develop an addiction problem."

496.    Endo also distributed a pamphlet edited by KOL Dr. Portenoy entitled *Understanding Your Pain: Taking Oral Opioid Analgesics* (2004).  In Q&A format, it asked "If I

take the opioid now, will it work later when I really need it?"  The response is, "The dose can be increased.  You won't 'run out' of pain relief."[109]

497.    Endo, on information and belief, has distributed and made available on its no longer active website opana.com, a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs like construction worker, and chef, misleadingly implying that the drug would provide long-term pain-relief and functional improvement.

498.    Through its substantive control of NIPC, Endo, upon information and belief, was responsible for the content on the patient-oriented painknowledge.org website.  That website make numerous false and misleading representations, such as: "[While using opioids] your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse" and that "people that have no history of drug abuse, including tobacco, and use their opioid medication as directed will probably not become addicted."  It did not even rule out the possibility that those with a history of opioid addiction should steer clear of Opioid Drugs.

499.    Upon information and belief, the Pain Knowledge website in 2009, claimed that opioid dosages may be increased until "you are on the right dose of medication for your pain."

500.    Upon information and belief, another Endo website, PainAction.com, stated "Did you know?  Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them."  Endo also distributed an "Informed Consent" document on PainAction.com that misleadingly suggested that only people who "have problems with substance abuse and addiction" are likely to become addicted to Opioid Drugs.

---

[109] Margo McCaffery and Chris Pasero, Endo Pharm., *Understanding Your Pain: Taking Oral Opioid Analgesics* (Russell            K.            Portenoy,            M.D.,            ed.,            2004), http://www.thblack.com/links/RSD/Understand_Pain_Opioid_Analgesics.pdf.

501.    Endo also targeted vulnerable patient populations.  It provided significant funding to APF for the distribution of *Exit Wounds*, which (as alleged *supra*), aggressively and misleadingly targeted wounded war veterans suffering from chronic pain.

502.    Upon information and belief, Endo also provided financial assistance to would-be users of their Opioid Drugs.

### (e)    Marketing by Actavis

503.    Actavis utilized advertisements, websites, front-groups, bogus "initiatives," and financial incentives to increase patient demand for Opioid Drugs by falsely representing the safety and efficacy of long-term opioid therapy for the treatment of chronic pain.  These patient-oriented marketing measures are in addition to those (alleged above) undertaken by the Front Groups, with whom Actavis was intertwined.

504.    For example, Actavis's predecessor caused a patient education brochure, *Managing Chronic Back Pain*, to be distributed beginning in 2003, that admitted that opioid addiction is possible, but falsely claimed that it is "less likely if you have never had an addiction problem." The term "less likely" is never defined and gives the reader the impression that the risk is so low as to not be a concern.  The brochure also stated that "Over time, your body may become tolerant of your current dose.  You may require a dose adjustment to get the right amount of pain relief. This is not addiction."  Based on Actavis's acquisition of its predecessor's marketing materials along with the rights to Kadian, it appears that Actavis continued to use this brochure in 2009, and beyond.

505.    Actavis's predecessor also created a patient brochure for Kadian in 2007 that also stated, "Over time, your body may become tolerant of your current dose.  You may require a dose adjustment to get the right amount of pain relief.  This is not addiction."

506.    Actavis also targeted vulnerable patient populations.  As noted supra, Actavis sponsored "studies" with pre-determined outcomes.  One of these studies was undertaking to show that its Opioid Drug was well tolerated in elderly patients (which it was not), and was published in the Journal of the American Geriatrics Society.

507.    Actavis also provided financial assistance to would-be users of their Opioid Drugs. A 2008, Actavis business review, for example, highlighted co-pay assistance, good for up to $600 per patient per year, as a way to drive conversions to Kadian from competitor drugs like Avinza (Pfizer) and MS Contin.

508.    Actavis also used its co-pay assistance program as a vehicle with which to deliver more false and misleading information directly to consumers.  On February 18, 2010, the FDA issued a warning letter to Actavis for distributing a false and misleading co-pay assistance brochure and comparison detailer.

509.    The FDA's findings were based on Actavis's omissions and its minimization of serious risks associated with Kadian in its brochure; Actavis's failure to present the limitations to Kadian's approved indication for use and its suggestions that it could be used for broader purposes than indicated; and its unsubstantiated claims of superiority and effectiveness.

510.    The brochure presented several effectiveness claims regarding Kadian, but failed to present any contraindications and, additionally, omitted several warnings, precautions, drug interactions, and adverse events.  It also failed to present risk information with a prominence and readability that is reasonably comparable to the presentation of benefit information.

511.    The brochure also minimized the serious and significant risks associated with the use of Kadian by describing the serious and potentially fatal risks in highly complex, medically technical language not likely to be understood by consumers.  The brochure simply included the

following language, "Please see accompanying complete Prescribing Information" in an effort to mitigate the misleading omission and/or minimization of risk information.

512.    In what amounted to direct marketing to consumers, Kadian's brochure included the following erroneous claims:

- "Allow for less breakthrough pain and more consistent pain relief for patients;"
- "Better pain control . . .;"
- "Allow patients to live with less pain . . .;" and
- "Less pain. More options."

513.    The FDA informed Actavis that its brochure and detailer were false and misleading because they omitted and minimized the serious risks associated with Kadian, broadened and fail to present the limitations to the approved indication of Kadian, and presented unsubstantiated claims of superiority and effectiveness.

514.    The FDA found Actavis's brochure and detailer for Kadian failed to include important and serious risk information including contraindications, adverse events, and warnings regarding potentially fatal abuse of Opioid Drugs.

515.    The FDA also found Actavis's brochure and detailer presented broad claims about Kadian's use in treating pain, therefore implying that Kadian was appropriate for use for a broader range of indications than the indications for which FDA approval was granted.

516.    Finally, the FDA found Actavis's detailer included efficacy claims and presentations which were unsubstantiated, misleading, and implied Kadian was superior to other opioid therapies.

517.    Prior to the co-pay assistance program, as noted in the 2003 GAO Report, Actavis also used a coupon program for Kadian, which provided a free introductory prescription for which no co-pay paid by the customer was required.

(f)        **Marketing by Mallinckrodt**

518.    Mallinckrodt utilized advertisements, websites, front-groups, and bogus "initiatives" to increase patient demand for Opioid Drugs by falsely representing the safety and efficacy of long-term opioid therapy for the treatment of chronic pain.  These patient-oriented marketing measures are in addition to those (alleged above) undertaken by the Front Groups, with whom Mallinckrodt was intertwined.

519.    Mallinckrodt's brochure *Your Guide to Taking Oxycodone Safely* describes the side effects of oxycodone but omits meaningful and material discussion of the risks of addiction, simply advising patients worried about addiction to talk to their doctor. The brochure misleadingly omits that physical dependence is a symptom of addiction. Another Mallinckrodt brochure *Ease your Pain—a Guide to Feeling Better* touts the benefits of opioid medication for pain, without mentioning addiction risk at all stating: "[b]oth generic and brand-name drugs can help control pain quickly and effectively."

520.    The company was subpoenaed on January 27, 2018, by federal prosecutors in Florida seeking documents related to Mallinckrodt's generic drugs containing oxymorphone.  The subpoena seeks documents related to distribution, marketing, and sale of its oxymorphone based drugs.  This follows an August subpoena seeking the same information regarding Mallinckrodt's sale of its branded drugs Exalgo and Xartemis XR.

521.    Mallinckrodt offers a Co-Pay Card, printable online, that allows consumers to pay $15 of their copay and have up to $60 of any remaining out-of-pocket cost covered for its hydromorphone drug, Exalgo.

522.    Upon information and belief, Mallinckrodt also provided financial assistance to would-be users of their Opioid Drugs.

#### (g)    Marketing by Mylan

523.    Mylan utilized advertisements, websites, front-groups, and bogus "initiatives" to increase patient demand for Opioid Drugs by falsely representing the safety and efficacy of long-term opioid therapy for the treatment of chronic pain.  These patient-oriented marketing measures are in addition to those (alleged above) undertaken by the Front Groups, with whom Mylan was intertwined.

#### iv.    Targeting Insurance Companies to Gain Formulary Access

524.    Gaining both access to and preferred placement on insurers' formularies[110] (including self-insurers like the EBRCOC) was also a priority for Defendants in their efforts to expand the Opioid Drug market, as increasing formulary coverage was necessary to allow prescribers to write more prescriptions in response to patient demand.

525.    The Manufacturer Defendants understood how prescribing HCPs were more likely to prescribe Opioid Drugs if covered on a formulary.  The Manufacturer Defendants further understood how insurers (including the EBRCOC) made coverage decisions, and devised schemes to influence that process.

526.    Further, Defendants knew that insurers such as the EBRCOC would re-evaluate formulary placement for Opioid Drugs if provided evidence of massive drug diversion.  It was thus critical to maintain favorable formulary access to keep Opioid Drug sales from plummeting.  To accomplish that, insurers like the EBRCOC could not know about the rampant diversion underway.

527.    Each Manufacturer Defendant provided insurers, including the EBRCOC and/ or its contracted pharmacy benefit manager ("PBM") or third party administrator ("TPA"), materials that discussed or suggested that the Opioid Drugs were safe and/or effective for the long-term

---

[110]The formulary is a list of medications that have been selected for the purpose of encouraging high quality and cost-effective prescribing of pharmaceuticals within a patient population.

treatment of chronic pain.  Insurers (including the EBRCOC and/or its contracted PBM or TPA) relied on these materials in making coverage and formulary placement decisions.

528.    Concepts such as "pseudoaddiction" were key not only to increasing prescriber demand, but important for securing formulary access.  Had the Manufacturer Defendants not pushed the notion of "pseudoaddiction"—that addiction was not really addiction—there would have been far more addiction-related adverse events reported with respect to Opioid Drugs.  This in turn would have impacted the EBRCOC's and/or its contracted PBM's or TPA's review of Opioid Drugs with respect to both formulary access and preferred status compared to other painkillers that would have exhibited a lower rate of addiction-related adverse events.

529.    Similarly, the Manufacturer Defendants also advised prescribers of "techniques" to ensure health plan reimbursement.  These included both the way Opioid Drugs were prescribed (amount vs. frequency of dosage) and the reported conditions for which they were prescribed in the first place.  Upon reasonable belief, physicians writing Opioid Drug prescriptions reimbursed by Plaintiff utilized these techniques.

530.    Although the physician prescribes the Opioid Drugs, it is the patients and their insurance company that pay their costs.

531.    Absent prescription drug coverage, patients are responsible for paying 100% of the cost of their prescribed Opioid Drugs.  Physicians were either opposed or reluctant to prescribe Opioid Drugs if their patients were responsible for money out of pocket when the Opioid Drugs were not "on formulary."

532.    Thus, gaining prescription drug coverage was essential to both growing the entire market for opioids as well as the sales of their respective Opioid Drugs, as physicians based their prescribing on Plaintiff's drug coverage.

533.    As such, the Manufacturer Defendants worked to ensure preferred formulary status for Opioid Drugs. In doing so, the Manufacturer Defendants made numerous misrepresentations to insurers themselves (or those acting on their behalf) to achieve a formulary placement that they would not have otherwise received.  Most of these placements were achieved either through aggressive marketing tactics or through rebate contracts with PBMs or TPAs.  PBMs and TPAs are responsible for managing an insurance company or self-insurer's prescription drug coverage, which includes maintaining the drug formulary.

534.    Following the initial launch of OxyContin, Purdue engaged in such aggressive marketing to limit the formulary restrictions on its drug that it effectively removed any safeguard in the system that may have slowed the growth in the prescribing of OxyContin and the ensuing opioid epidemic.  This included aggressive targeting of PBMs.

535.    Upon information and belief, other Manufacturer Defendants followed suit, negotiating national contracts with PBMs based on whether their respective Opioid Drugs were included on a certain tier related to copay or whether they required prior authorization.   Some tiers are more restrictive and require a higher copay. Defendants wanted to keep their Opioid Drugs on the least restrictive tier and without prior authorization restrictions.

536.    Prior authorization programs typically require doctors to get approval from the insurance company before prescribing a drug to the patient. In this way access is limited for those that abuse the drug.  The insurer generally sets limits on the conditions and duration for which a drug can be prescribed.  A doctor will also likely be more inclined to prescribe a different drug that does not require pre-authorization.

537.    A CDC study shows how a private insurer's use of a prior authorization plan in Massachusetts reduced Opioid Drug prescriptions by 15%.

538.    Upon information and belief, Defendants entered into contracts with multiple PBMs that actively sought to deceive and manipulate insurers into maintaining formularies with Opioid Drugs on the least restrictive tier throughout the State of Louisiana, including East Baton Rouge Parish.

539.    Defendants' misrepresentations intended to ensure formulary access, and thus increased access to Opioid Drugs, have caused Plaintiff significant damages.

540.    Plaintiff provides medical and pharmacy benefits to its employees, retirees and their dependents through its health benefits plans.

541.    Typically self-insured groups, like the EBRCOC, contract with a PBM or TPA to develop a formulary containing a list of FDA-approved prescription drugs and to develop formulary management initiatives, conducted under the direction of a Pharmacy and Therapeutics ("P&T") Committee ("P&T").   Generally, formularies and formulary management initiatives developed by a contracted PBM or TPA are customized, selected and/or adopted by self-insured groups.

542.    The use of a P&T Committee is meant to assure that the formulary is clinically sound, is sufficiently robust to meet the medical needs of the population being served, and is not unduly burdensome to providers and patients when accessing care.

543.    The decision whether to place a given pharmaceutical product on a drug formulary is first and foremost a clinical decision.  As such, a P&T Committee will review the FDA approved clinical indications for the product or products in question and FDA comments associated with the approval of the products.  A P&T Committee relies on published studies and other materials that evaluate product efficacy, safety and, when available, directly compare the product to other agents in the appropriate therapeutic category or with comparable clinical uses.

544.    Manufacturers often submit a formulary dossier and other materials about their drug products for use by the P&T Committee during the drug review process.  A P&T committee will also review any existing utilization of the product, or of comparable products, by health plan members.  A P&T Committee's evaluation is limited to a review of published medical information, such as clinical studies published in peer-reviewed articles and the formulary dossier provided by the manufacturer, and drug utilization data.  A P&T Committee does not engage in primary research and cannot detect instances in which information about a drug may have been suppressed by a manufacturer, is unpublished, or is inaccurately represented in the medical literature or other information provided by the manufacturer.

545.    It is common for pharmaceutical companies to pay rebates and regularly contact contracted PBMs, TPAs and other vendors to gain preferential treatment for their drugs on insurance formularies.  Manufacturer Defendants no doubt engaged in similar conduct with the EBRCOC, its contracted PBM, TPA and/or its other vendors to ensure formulary access for their respective drugs, thereby increasing the amount of Opioid Drugs flowing into East Baton Rouge Parish.

546.    Opioid Drugs have been widely accepted on the formularies used by the EBRCOC.  The EBRCOC, its contracted PBM, TPA and/or its other vendors have relied on various representations and omissions made by Defendants regarding the addictiveness (or lack thereof) of Opioid Drugs to provide formulary access.  Due to Defendants' misrepresentations regarding addictiveness and concealment of drug diversion evidence, the EBRCOC believed that the Opioid Drugs were clinically safe and effective.

547.    Absent Defendants' misrepresentations and concealment of drug diversion evidence, Plaintiff's health plans would not have made the coverage and formulary placement

decisions it did with respect to Opioid Drugs, and would have expended far less money on the reimbursement of Opioid Drugs.

548.    Absent Defendants' concerted efforts to illegally suppress evidence of drug diversion, insurers like Plaintiff would have been on notice that a significant amount of the Opioid Drugs for which it had paid were not prescribed for legitimate medical needs, but rather made their way to the black market.  This would have led the EBRCOC to employ various fraud fighting tools to thwart "market prescribing," and also affected its formulary access and status decisions regarding Opioid Drugs.  It would also have revealed to the EBRCOC that representations regarding the non-addictive properties of Opioid Drugs were false.

549.    Further, but for Defendants' misrepresentations and concealment efforts, which Defendants were legally obligated to report, but failed to do so, the EBRCOC would have required strict formulary control (such as prior authorizations, step edits, days' quantity supply limits) or other tools to manage drug utilization within the insured population.

550.    At all relevant times hereto, the EBRCOC, its contracted PBM, TPA and/or its vendors have made decisions, based on FDA approvals, manufacturer-supplied information, and clinical studies, to include or exclude new or existing prescription drugs from their formularies, or to implement tools to control utilization or to modify coverage criteria.

**B.    Defendants Nurtured the Expansion of the Unsafe and Unapproved Market to Use Opioid Drugs to Treat Chronic Pain, Which Created a "Black Market" of Diversion**

551.    The expansion of the prescription market was only one aspect of the Defendants' financial gain.  All Defendants intentionally flouted state and federal regulations by concealing evidence of drug diversion in a concerted effort to nurture the expansion of the market for Opioid Drugs as well.

552.    Though Defendants collected information relating to suspicious prescribing and pharmacy dispensing patterns, they did not (as they were required by law) provide such information to state or federal agencies.  Defendants also encouraged others involved in the scheme to conceal this information from regulatory agencies.

553.    Defendants' concealment efforts were not merely aimed at the government.  Rather, Defendants knew that payors, including the EBRCOC, would re-evaluate formulary placement for Opioid Drugs if provided evidence of massive drug diversion.  It was thus critical to maintain favorable formulary access to keep sales from plummeting.  To accomplish that, payors, including the EBRCOC, could not know about the rampant diversion underway.

554.    But Defendants did not merely conceal such data.  Rather, they shared this information with one another to coordinate micro-targeting opportunities and drive higher sales. In other words, they not only identified where and how the market for Opioid Drugs flourished, but worked to help such markets thrive and expand, thus creating the engine for "black market" diversion.

555.    Defendants even continued to supply Opioid Drugs to fulfill demand generated by physicians and pharmacies that their own employees had red-flagged as highly suspicious. Employees who were not "on board" with this scheme were pressured to suppress or even change their opinions.

556.    Defendants were thus part of a scheme to protect and nurture the market for Opioid Drugs, which in turn would spin out of control into rampant black market diversion.

557.    The black market for Opioid Drugs expanded greatly throughout the country, including in Louisiana and East Baton Rouge Parish, as a result of Defendants' illegal and profit-driven conduct.  Much of the data regarding Opioid Drug distribution, sales, and consumption is

in the hands of Defendants or others.  Louisiana as a whole and certain parts in particular, including

East Baton Rouge Parish, consume an amount of Opioid Drugs that can be explained only by the

diversion of Opioid Drugs for non-medical uses.

      **i.**      **Defendants' Duty to Monitor, Detect, Investigate, Refuse to Fill, and Report Suspicious Orders of Prescription Opioid Drugs**

558.    Recognizing that there is a need for greater scrutiny over controlled substances, like

opioids, due to their potential for abuse and danger to public health and safety, Congress enacted

the Federal Controlled Substances Act ("CSA") in 1970.[111] 21 U.S.C. § 801 *et seq.* In doing so,

Congress specifically designed a closed chain of distribution, with multiple ways of identifying

and preventing diversion through active participation of registrants at each link in the chain, to

prevent the "widespread diversion of [legally produced controlled substances] into the illicit

market."[112] Realizing and anticipating that highly addictive drugs like opioids could easily be

abused and diverted to the black market, Congress in the CSA set forth two important controls on

such drugs.

559.    First, the DEA sets limits on the quantity of Schedule II controlled substances such

as opioids-that may be produced in the United States in any given year. *See* 21 U.S.C. § 826(a),

28 C.F.R. § 0.100.  This quota system was intended to reduce or eliminate diversion from

"legitimate channels of trade" by controlling the "quantities of the basic ingredients needed for the

manufacture of [controlled substances], and the requirement of order forms for all transfers of these

---

[111] Joseph T. Rannazzisi Decl. ~ 4, *Cardinal Health, Inc. v. Eric Holder, Jr., Attorney General,* D.D.C. Case No. 12-cv-1 85, ECF No. 14-2 (February 10, 2012).

[112] *Gonzalez v. Raich,* 545 U.S. l , 12-14 (2005); 21 U.S.C. § 80 l (20; 21 U.S.C. §§ 821-824, 827. 880; H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. 4566, 4572 (Sept. 10, 1970). See Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United States Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sitesfdefault/files /Rannazzisi%20Testimony _ O.pdf); Statement of Joseph T. Rannazzisi before the Caucus on International Narcotics Control United States Senate, July 18, 2012 (available at https://www.justice.govfsites/default/files/testimonies/witnesses/attachments/07 /18/ 12/07 -18-12-dea-rannazzisi.pdt).

drugs."[113] [303] When determining production quotas, the DEA considers a variety of data including: sales, production, inventories, exports, disposals, and inventories. It is unlawful for a registrant to manufacture a controlled substance in Schedule II, like prescription opioids, that is (1) not expressly authorized by its registration and by a quota assigned to it by DEA, or (2) in excess of a quota assigned to it by the DEA.[114]

560. Second, the CSA requires every actor within the closed system of drug distribution and opioid supply chain (i.e. manufacturers, wholesale distributors, and retailers) to register with the DEA. Every registrant, in turn, is charged with being vigilant in deciding whether a customer, whether a pharmacy, wholesaler, or end-customer, can be trusted to deliver or use controlled prescription narcotics only for lawful purposes. 21 U.S.C. § 823(e).

561. As the Supreme Court explains, "Congress was particularly concerned with the diversion of drugs from legitimate channels. It was aware that registrants, who have the greatest access: to controlled substances and therefore the greatest opportunity for diversion, were responsible for a large part of the illegal drug traffic."[115] This responsibility is critical, as Congress has expressly declared that the illegal distribution of controlled substances, like opioid drugs, has a substantial and detrimental effect on the health and general welfare of the American people.

562. Every registrant is required to "maintain effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels." 21 U.S.C. § 823(b)(1). Further the Code of Federal Regulations requires all registrants to "design and operate a system to disclose to the registrant suspicious orders of controlled substances." 21 C.F.R. § 1301.74(b). Federal law also imposes a duty upon Defendants to comply with applicable State and

---

[113] H.R. Rep. No. 91 -1444, *reprinted in* 1970 U.S.C.C.A.N. 4566, 4589; *see also* Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United States Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files!Rannazzisi %20Testimony _ 0. pdf).
[114] H.R. Rep. No. 91 -1444, *reprinted in* 1970 U.S.C.C.A.N. 4566, 46 15 (citing 21 U.S. C. § 842(b)).
[115] *United States v. Moore,* 423 U.S. 122, 135 (1 975).

local laws. *See* 21 U.S.C. § 823(b)(2). When determining if a registrant has provided effective controls, the DEA Administrator refers to the security requirements set forth in §§ 130 1.72-1301.76 as standards for the physical security controls and operating procedures necessary to prevent diversion. *See* § 1301.71.

563.    In addition to the requirement of implementing a system for diversion control, the CSA and its implementing regulations require all registrants to: (1) report suspicious orders of prescription opioids to the DEA and (2) perform required due diligence *prior to filling* any suspicious orders. (emphasis added) *See* 21 U.S.C. § 823(b)(1); 21 C.F.R. § 1301.74(b). A "suspicious order" is defined as including "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. §1301.74(b).

564.    To further prevent unauthorized users from obtaining opioids, the CSA creates a distribution monitoring system for controlled substances.    At the heart of this system are registration and tracking requirements imposed upon anyone authorized to handle controlled substances. The DEA's Automation of Reports and Consolidation Orders System ("ARCOS") is an automated drug reporting system which monitors the flow of Schedule II controlled substances from their point of manufacture through commercial distribution channels to point of sale. ARCOS accumulates data on the Manufacturer and Distributor Defendants' controlled substances acquisition/distribution transactions, which are then summarized into reports used by the DEA to identify any diversion of controlled substances into illicit channels of distribution. Each person or entity that is registered to distribute ARCOS Reportable controlled substances must report acquisition and distribution transactions to the DEA.

565.    Acquisition and distribution transaction reports must provide data on each acquisition to inventory (identifying whether it is, *e.g.,* by purchase or transfer, return from a

customer, or supply by the Federal Government) and each reduction from inventory (identifying whether it is, *e.g.,* by sale or transfer, theft, destruction or seizure by Government agencies) for each ARCOS reportable controlled substance. *See* 21 U.S.C. § 827(d)(l); 21 C.F.R. §§ 1304.33(e), (d). Inventory that has been lost or stolen must also be reported separately to the DEA within one business day of discovery of such loss or theft.

566.    In addition to filing acquisition/distribution transaction reports, each registrant is required to maintain on a current basis a complete and accurate record of each substance manufactured, imported, received, sold, delivered, exported, or otherwise disposed of. *See* 21 U.S.C. §§ 827(a)(3), 1304.2 1a), 1304.22(b). It is unlawful for any person to negligently fail to abide by the recordkeeping and reporting requirements.

567.    Reflecting the importance of CSA compliance, the DEA has repeatedly provided guidance to registrants emphasizing their obligations under the CSA. A DEA letter dated September 27, 2006, sent to every commercial entity in the United States registered with the DEA, outlined specific circumstances that might be indicative of diversion: a) Ordering excessive quantities of a limited variety of controlled substances while ordering few if any other drugs. b) Ordering a Limited variety of controlled substances in quantities disproportionate to the quantity of non-controlled medications ordered. c) Ordering excessive quantities of a limited variety of controlled substances in combination with excessive quantities of lifestyle drugs. d) Ordering the same controlled substance from multiple distributors.

568.    Additionally, the letter implored the Distributor Defendants to know their pharmacy customers, and to follow up with said pharmacy customers, regarding: a) What percentage of the pharmacy's business does dispensing controlled substances constitute? b) Is the pharmacy complying with the laws of every state in which it is dispensing controlled substances

c) Is the pharmacy soliciting buyers of controlled substances via the internet or is the pharmacy associated with an internet site that solicits orders for controlled substances? d) Does the pharmacy, or internet site affiliated with the pharmacy, offer to facilitate the acquisition of a prescription for a controlled substance from a practitioner with whom the buyer has no pre-existing relationship? e) Does the pharmacy fill prescriptions issued by practitioners based solely on an on-line questionnaire without a medical examination or bona-fide doctor-patient relationship? f) Are the prescribing practitioners licensed to practice medicine in the jurisdictions to which the controlled substances are being shipped, if such a license is required by state law? g) Are one or more practitioners writing a disproportionate share of the prescriptions for controlled substances being filled by the pharmacy? h) Does the pharmacy offer to sell controlled substances without a prescription? i) Does the pharmacy charge reasonable prices for controlled substances? j) Does the pharmacy accept insurance payment for purchases of controlled substances made via the internet?

569.    In 2007, the DEA sent letters to every registered manufacturer or distributor of controlled substances, including Defendants. As stated in the letter, "the purpose of [the] letter [wa]s to reiterate the responsibilities of controlled substance manufacturers and distributors to inform the DEA of suspicious orders in accordance with 21 C.F.R. 1301.74(b)."

570.    In the letter, the DEA expressly warned that the regulation "requires that the registrant inform the local DEA Division Office of suspicious orders when discovered by the registrant." The DEA also warned that "[r]egistrants are reminded that their responsibility does not end merely with the filing of a suspicious order report. Registrants must conduct an independent analysis of suspicious orders prior to completing a sale to determine whether the controlled substances are likely to be diverted from legitimate channels. Reporting an order as

suspicious will not absolve the registrant of responsibility if the registrant knew, or should have known, that the controlled substances were being diverted."

571.    In addition, the DEA warned that the "regulation specifically states that suspicious orders include orders of an unusual size, orders deviating substantially from a normal pattern, and orders of an unusual frequency. These criteria are disjunctive and are not all inclusive. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious. Likewise, a registrant need not wait for a 'normal pattern' to develop over time before determining whether a particular order is suspicious. The size of an order alone, whether or not it deviates from a normal pattern, is enough to trigger the registrant's responsibility to report the order as suspicious. The determination of whether an order is suspicious depends not only on the order patterns of the particular customer, but also on the patterns of the registrant's customer base and the patterns throughout the relevant segment of the regulated industry."

572.    Reporting an order as suspicious will not absolve a distributor of responsibility if the distributor knew, or should have known, that the prescription opioids were being diverted. Indeed, reporting a suspicious order, then filling said order with knowledge it may be suspicious constitutes a failure to maintain effective controls against diversion under 21 U.S.C. §§ 823 and 824.

573.    The DEA has repeatedly provided guidance on compliance with the foregoing CSA regulations to effectively combat opioid diversion.  Since 2006 the DEA has conducted one-on-one briefings with distributors regarding downstream customer sales, due diligence, and regulatory responsibilities. The DEA also provides distributors with data on controlled substance distribution patterns and trends, including data on the volume and frequency of orders and the percentage of

controlled versus non-controlled purchases. The DEA has also hosted conferences for opioid distributors and has participated in numerous meetings and events with trade associations.

574.    Opioid Drug manufacturers and distributors, including Defendants, owe a duty under Louisiana law, (46 La. Admin. Code Pt XCI, § 313),[116] similar to federal law (21 U.S.C. § 823, 21 C.F.R. § 1301.74) to monitor, detect, investigate, refuse to fill, and report suspicious orders of prescription Opioid Drugs.  Opioid Drugs are a controlled substance and are categorized as "controlled dangerous substances" under federal and Louisiana law. *See* La. R.S. §§ 40:961(8), (29).  These "Schedule II" drugs are controlled substances with a "high potential for abuse."  21 U.S.C. §§ 812(b), 812(2)(A)-(C); La. R.S. §§ 40:963(B), 40:964.

575.    Each manufacturer and distributor of Opioid Drugs has an affirmative duty under Louisiana law to obtain a controlled dangerous substance license ("CDS license") and act as a gatekeeper guarding against the diversion of the highly addictive, dangerous Opioid Drugs.  La. R.S. § 40:973(A)(1).

576.    Like federal law, the issuance of Louisiana CDS licenses are contingent on the "[m]aintenance of effective controls against diversion of particular controlled dangerous substances. . . into other than legitimate medical, scientific, or industrial channels," "the existence in the establishment of effective controls against diversion," and   "[s]uch other factors as are relevant to and consistent with the public health and safety." *See* La. R.S. §§ 40:974(A)(1), (A)(4), (A)(5).  Further, to receive and maintain a CDS license, Defendants assume a duty to comply with "applicable state and local laws and regulations," La. R.S. § 40:974(A)(2).

---

[116] La. R.S. § 40:973(A)(1) requires manufacturers and distributors of any controlled substances to obtain a controlled dangerous substance license issued by the Louisiana Board of Pharmacy. Thereafter, the regulations refer to manufacturers and distributors collectively as "licensee[s]."

577.    The Louisiana State Board of Pharmacy has the authority to suspend or revoke a CDS license issued to manufacturers and distributors who violate the Louisiana CDS Law or "any state or federal laws pertaining to the manufacture, distribution or dispensing of controlled dangerous substances." La. R.S. § 40:975. Under Louisiana law, except as authorized, it is unlawful to knowingly or intentionally "manufacture, distribute, or dispense" Schedule II drugs. La. R.S. § 40:967(A). Additionally, manufacturers and distributors are required to fill orders for Schedule II substances in compliance with the procedures set forth in 21 U.S.C. § 828 and 21 C.F.R. § 1305.

578.    Relying upon federal and state laws and regulations, various State Boards of Pharmacy have directly disciplined distributors of prescription opioids for failure to prevent diversion, a duty recognized under federal and state laws and regulations.

579.    To receive a license under the Louisiana Drug and Device Distributors Act ("Louisiana DDD Act"), distributors have to meet "all applicable requirements under federal law and regulation." La. R.S. § 37:3469; *see also* La. R.S. §§ 37:3467; 37:3472 ("Failure to comply with state and federal laws or the board's regulations shall be prima facie evidence of a violation of this Chapter and shall subject the applicant or licensee either to disciplinary action ... or forfeiture of the license."); La. Admin. Code Pt XCI, § 711.

580.    Louisiana law, similar to federal law, requires wholesale distributors "adhere to written policies and procedures, which shall be followed for the receipt, security, storage, inventory, and distribution of drugs or devices, including policies and procedures for identifying, recording, and reporting losses or thefts." 46 La. Admin. Code Pt XCI, § 313; *see also* La. R.S. § 40:974(A)(1), (A)(4). Additionally, Louisiana law mandates compliance with procedures to

review suspicious purchases and to notify the board in writing after discovering any theft or diversion of a drug. *Id.*

581. The Louisiana Board of Drug and Device Distributors can "deny, revoke or suspend a license" for "violation of any federal, state or local law or regulation relating to drugs." 46 La. Admin. Code Pt XCI § 711.

582. Under Louisiana law, licensees have a non-delegable duty to design and operate a system to disclose suspicious orders of controlled substances. The licensees shall inform the Louisiana Board of Drug of suspicious orders when discovered. Manufacturers and distributors must also maintain records and inventories of all controlled substances for at least two years. La. R.S. § 40:976. Such inventories are required to comply with the federal regulations codified at 21 C.F.R. §1304.11(e)(2).

583. "Suspicious purchases" include orders of an unusual size, orders deviating substantially from a normal pattern and orders of unusual frequency. *See* 21 C.F.R. § 1301.74(b). These criteria are disjunctive and are not all inclusive. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious. Likewise, a registrant need not wait for a normal pattern to develop over time before determining whether a particular order is suspicious. The size of an order alone, regardless of whether it deviates from a normal pattern, is enough to trigger the registrant's responsibility to report the order as suspicious.

584. The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer but also on the patterns of the entirety of the registrant's customer base and the patterns throughout the relevant segment of the industry.

585.    In addition to reporting all suspicious orders, registrants must also stop shipment on any order that is flagged as suspicious and only ship orders that were flagged as suspicious if, after conducting due diligence, the registrant can determine that the order is not likely to be diverted into illegal channels. *Masters Pharmaceutical, Inc. v. Drug Enforcement Administration*, No. 15-11355 (D.C. Cir. June 30, 2017).  Regardless, all flagged orders must be reported. *Id.*

586.    The sheer volume of prescription Opioid Drugs shipped to pharmacies in Louisiana, and/or to pharmacies from which the registrants, including Defendants, knew the Opioid Drugs were likely to be diverted, is in multiples greater than the defensible medical needs of the population served and thus, facially suspicious.  These red flags are so obvious that no one who engages in the legitimate distribution of controlled substances can reasonably claim ignorance of them.

587.    Defendants failed to report "suspicious purchases" originating from Louisiana, or which they knew were likely to be diverted there, to federal and state authorities, including the Louisiana Board of Pharmacy, the Louisiana Board of Drug and Device Distributors, as well as the DEA.  The Defendants unlawfully filled suspicious orders of unusual size, orders deviating substantially from a normal pattern and/or orders of unusual frequency in Louisiana, and/or in areas from which the Defendants knew Opioid Drugs were likely to be diverted.

588.    Defendants breached their duty to monitor, detect, investigate, and report suspicious orders of prescription Opioid Drugs originating from Louisiana, and/or in areas from which the Defendants knew Opioid Drugs were likely to be diverted.  The Defendants breached their duty to maintain effective controls and procedures to guard against theft and diversion of prescription Opioid Drugs into other than legitimate channels.

ii.    **Defendants' Combined Efforts to Expand Opioid Drug Diversion through False and Misleading Acts and Omissions**

589.    During the same time frame, each and every Defendant combined its own respective personnel and financial resources with other Defendants and third parties through which Defendants intentionally ignored their legal obligations to identify, monitor, and report suspicious activity indicating drug diversion, and actively concealed evidence of the same.

590.    Each Defendant and its associated participants established and carried out its respective schemes to accomplish the common goal of protecting and nurturing the expansion of the Opioid Drug market.

591.    Defendants disseminated false and misleading statements to state and federal regulators claiming that (1) the quotas for prescription Opioid Drugs should be increased; (2) they were complying with their obligations to maintain effective controls against diversion of their prescription Opioid Drugs; (3) they were complying with their obligations to design and operate a system to disclose to the registrant suspicious orders of their prescription Opioid Drugs; (4) they were complying with their obligation to timely notify the state and federal enforcement agencies of any suspicious orders or diversion of their prescription Opioid Drugs; and (5) they did not have the capability to identify suspicious orders of controlled substances despite their possession of national, regional, state, and local prescriber and patient-level data that allowed them to track prescribing patterns over time, which the Defendants obtained from data companies, including but not limited to: IMS Health, QuintilesIMS, Iqvia, Pharmaceutical Data Services, Source Healthcare Analytics, NDS Health Information Services, Verispan, Quintiles, SDI Health, ArcLight, Scriptline, Wolters Kluwer, and/or PRA Health Science, and all of their predecessors or successors in interest (the "Data Vendors").  Defendants further created inter-personal relationships among themselves, cooperating with one another to encourage high-volume-and-increased-profits

business models throughout the entire Opioid Drug supply chain, and sharing ordering information in exchange for rebates and discounts on the Opioid Drugs which facilitated further expansion of the black market.

592.    The opioid epidemic was further fueled by all Defendants' failure to follow the specific mandates in the Louisiana CDS Law and Louisiana DDD Act requiring them to help ensure that highly addictive drugs are not diverted to illegal use.  The brunt of the opioid epidemic, as well as the damages suffered by the EBRCOC, could have been, and should have been, prevented had Defendants fulfilled their duties set by statute and common law.  Defendants, who operate at every level of the Opioid Drug supply chain, had an obligation and duty to act.  They did not, and the EBRCOC paid the price.

593.    On information and belief, Defendants knowingly, recklessly, and/or negligently supplied suspicious quantities of prescription Opioid Drugs to obviously suspicious physicians and pharmacies, without disclosing suspicious orders as required by regulations and otherwise circumventing their statutory obligations under state and federal laws.

594.    Defendants could have (and should have) reported and stopped the flow of prescription Opioid Drugs into the black market.  Defendants intentionally, recklessly, and/or negligently failed to investigate, report, and halt suspicious orders.

595.    Defendant Cardinal's executive chairman admitted that as a result of Cardinal's actions, certain pharmacies were allowed "to continue to receive certain volumes of hydrocodone and oxycodone from Cardinal Health for longer than I think they should have."[117]

---

[117] Testimony of George S. Barrett, Executive Chairman, Cardinal Health, Hearing Before the United States House of Representatives Committee on Energy and Commerce, Subcommittee on Oversight and Investigations, at 7 (May 8, 2018).

596.    As a direct result of Defendants' misconduct, substantial and dangerous quantities of prescription Opioid Drugs were illegally diverted and overprescribed.

597.    For example, for over a decade, Mallinckrodt was well aware of the scale of the opioid epidemic. Rather than taking steps to stop the harm, it persistently goaded distributors to sell more of the company's Opioid Drugs.

598.    Similarly, a Los Angeles Times investigation revealed that opioid manufacturer Purdue collected extensive evidence suggesting illegal trafficking of OxyContin for more than a decade and did not share this information with law enforcement or stem the tide of pills flooding the market.  A former Purdue executive charged with monitoring pharmacies for criminal activity acknowledged that even when the manufacturer had evidence that a pharmacy was colluding with drug dealers, it did not stop supplying the distributors selling to those stores.  According to court and law enforcement records, including some of Purdue's own internal documents, the OxyContin manufacturer knew about many suspicious doctors and pharmacies from their prescribing records, pharmacy orders, reports from sales representatives, and its own surveillance operations.

599.    In fact, Manufacturer Defendants have access to a stream of data showing how individual doctors across the country are prescribing their drugs.  According to Los Angeles Times, this information comes from IMS, "a company that buys prescription data from pharmacies and resells it to drugmakers for marketing purposes."  Upon information and belief, each of the Manufacturer Defendants target high and low prescribing doctors in their in-office sales detailing and other marketing in an effort to either push for continued high prescribing or to encourage increased prescribing.  As such, each of the Manufacturer Defendants has the ability, not to mention the legal responsibility, to track suspicious prescribing.

600.    The Defendants also applied political and other pressure on the United States Department of Justice ("DOJ") and DEA to halt prosecutions for failure to report suspicious orders of prescription Opioid Drugs and lobbied Congress to strip the DEA of its ability to immediately suspend registrations pending investigation by passing the "Ensuring Patient Access and Effective Drug Enforcement Act."[118]

601.    The Distributor Defendants developed "know your customer" questionnaires and files.  This information was intended to help the Defendants identify suspicious orders or customers who were likely to divert prescription Opioid Drugs.[119]  On information and belief, the "know your customer" questionnaires informed the Distributor Defendants of the number of pills that the pharmacies sold, how many non-controlled substances are sold compared to controlled substances, whether the pharmacy buys from other distributors, the types of medical providers in the area, including pain clinics, general practitioners, hospice facilities, cancer treatment facilities, among others, and these questionnaires put the recipients on notice of suspicious orders.

602.    The Defendants purchased nationwide, regional, state, and local prescriber- and patient-level data from the Data Vendors that allowed them to track prescribing trends, identify suspicious orders, identify patients who were doctor shopping, identify pill mills, etc.  The Data Vendors' information purchased by the Defendants allowed them to view, analyze, compute, and track their competitor's sales, and to compare and analyze market share information.[120]

---

[118] *See id.*

[119] Suggested Questions a Distributor Should Ask Prior to Shipping Controlled Substances, DRUG ENFORCEMENT ADMINISTRATION, *available at* https://www.deadiversion.usdoj.gov/mtgs/pharm_industry/14th_pharm/levinl_ques.pdf; Richard Widup, Jr. and Kathleen H. Dooley, Esq., *Pharmaceutical Production Diversion: Beyond the PDMA*, Purdue Pharma and McGuireWoods LLC, *available at* https://www.mcguirewoods.com/news-resources/publications/lifesciences/product_diversion_beyond_pdma.pdf.

[120]   A Verispan representative testified that the Manufacturer Defendants use the prescribing information to "drive market share."  *Sorrell v. IMS Health Inc.*, 2011 WL 661712, *9-10 (U.S., 2011).

603.    IMS, for example, provided the Defendants with reports detailing prescriber behavior and the number of prescriptions written between competing products.[121]



604.    Similarly, Wolters Kluwer, an entity that eventually purchased data mining companies that were created by Defendant McKesson (Source) and Defendant Cardinal Health (ArcLight), provided the Defendants with charts analyzing the weekly prescribing patterns of multiple physicians, organized by territory, regarding competing drugs, and analyzed the market share of those drugs.[122]

---

[121] Paul Kallukaran and Jerry Kagan, *Data Mining at IMS HEALTH: How we Turned a Mountain of Data into a Few Information-rich Molehills*, Figure 2 at 3, *available at*, http://www2.sas.com/proceedings/sugi24/Dataware/p127-24.pdf.
[122] *Sorrell v. IMS Health Inc.*, 2011 WL 705207, *467-471 (U.S., 2011).

3. Territory Summary Report shows Prescriber Roster information aggregated at a territory level

**Territory Summary**

| Name | Spec | Zip | Product A NRX | Product A MM Share | Product A Rank | Market NRX | Market Rank |
|---|---|---|---|---|---|---|---|
| ABNEY, RAY C. | P | 05302 | 6 | 10.7% | 43 | 56 | 38 |
| ALLISTER, ROBERT | P | 03820 | 6 | 18.8% | 43 | 32 | 63 |
| ALTMAN, LEE S. | P | 01655 | 34 | 14.0% | 3 | 247 | 3 |
| BALLARD, HARLOW | P | 05801 | 0 | 0.0% | 93 | 8 | 96 |
| BARNEY, CHRISTINE A. | P | 03766 | 6 | 26.1% | 43 | 23 | 85 |
| BARTON, GAIL | P | 03755 | 13 | 32.5% | 18 | 40 | 50 |
| BERNSTEIN, RICHARD A. | P | 05401 | 0 | 0.0% | 93 | 14 | 94 |
| BOHNERI, MICHAEL | P | 03060 | 3 | 4.5% | 73 | 66 | 29 |
| BOSTIC, JEFFERY O. | CHP | 03079 | 5 | 10.9% | 55 | 45 | 44 |
| BREITHOLTZ, TIMOTHY | P | 03870 | 13 | 34.2% | 18 | 38 | 52 |
| BROWN, KENNETH | P | 03941 | 4 | 10.0% | 61 | 40 | 50 |
| BUCHANAN, KEVIN | P | 05701 | 5 | 16.1% | 55 | 31 | 70 |
| CARMAN, MEGAN W. | P | 03246 | 10 | 12.3% | 28 | 81 | 18 |
| CARSEN, MARJORIA | P | 05701 | 6 | 18.2% | 43 | 33 | 59 |
| CATPANO-FRIEDMAN, LISA | P | 05201 | 5 | 8.6% | 43 | 70 | 25 |
| CLARKE-RUBIN, LORNA | P | 12901 | 8 | 24.2% | 32 | 33 | 59 |
| COHEN, DEVRA H. | CHP | 03060 | 3 | 6.5% | 73 | 46 | 44 |
| COLE, STEPHEN A. | P | 05101 | 5 | 13.2% | 55 | 38 | 52 |
| COTTON, PAUL G. | P | 05401 | 13 | 28.3% | 18 | 46 | 44 |
| CUSI, PRISCILLA M. | P | 03104 | 17 | 7.9% | 14 | 215 | 5 |
| DAVISON, MARTHA F. | P | 03110 | 14 | 11.3% | 16 | 124 | 8 |
| DEJONG, JACOB | P | 03067 | 0 | 0.0% | 93 | 21 | 87 |
| DELFAUSSE, PETER O. | P | 03301 | 6 | 35.3% | 43 | 17 | 90 |
| DENNETT, DOUGLAS E. | CHP | 05401 | 0 | 0.0% | 93 | 33 | 59 |
| DEPPE, SUSAN L. | P | 05401 | 1 | 0.3% | 87 | 300 | 2 |
| DEVENDERRAO, T. | P | 03060 | 7 | 9.6% | 37 | 73 | 21 |

471

605.   This information allowed the Defendants to track and identify instances of, overprescribing.[123]  In fact, one of the Data Vendors' experts testified that a manufacturer of "narcotic analgesics" used the Data Vendors' information to track, identify, report, and halt suspicious orders of controlled substances.[124]

---

[123] *See Sorrell v. IMS Health Inc.*, 2011 WL 1449043, *37-38 (Ala. Civ. App., 2011) (arguing that data had been used to "identify overuse of antibiotics in children," and "whether there is a wide use of anthrax prophylactic medicines after the scares happened in 2001").  The Data Vendor Respondents also cited evidence from the trial court proving that "because analysis of PI data makes it possible to 'identify overuse of a pharmaceutical in specific conditions, the government employs the data to monitor usage of controlled substances."  *Id.*

[124] *Id*. at *38.  Eugene "Mick" Kolassa testified as an expert on behalf of the Data Vendor stating that "a firm that sells narcotic analgesics was able to use prescriber-identifiable information to identify physicians that seemed to be

[455] Q.  Besides marketing and promotion, are there any other uses for prescriber-identifiable data?

A.  There's a number of other uses.

Q.  And what are those?

A.  The one that I was most impressed with was a firm that used it to identify – a firm that sells narcotic analgesics was able to use prescriber-identifiable information to identify physicians that seemed to be prescribing an inordinately high number of prescriptions for their product and they would use that to notify the DEA and other authorities of potential problems.

606.    Therefore, the Defendants were collectively aware of the suspicious orders that flowed daily from their manufacturing and distribution facilities.

607.    The Defendants refused to identify, investigate, and report suspicious orders to the state and federal enforcement agencies when they became aware of the same despite their actual knowledge of drug diversion rings.  The Defendants refused to identify suspicious orders and diverted drugs despite the DEA issuing final decisions against the Distributor Defendants in 178 registrant actions between 2008 and 2012,[125] and 117 recommended decision in registrant actions from The Office of Administrative Law Judges.  These numbers include 76 actions involving orders to show cause and 41 actions involving immediate suspension orders – all for failure to report suspicious orders.[126]

---

prescribing an inordinately high number of prescriptions for their product." *Id*; *see also* Joint Appendix in *Sorrell v. IMS Health*, 2011 WL 687134, at *204 (U.S., 2011).
[125] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions* 6 (2014), https://oig.justice.gov/reports/2014/e1403.pdf.
[126] *Id.*

608.    Defendants' scheme had a decision-making structure driven by the Manufacturer Defendants and corroborated by the Distributor Defendants.  The Manufacturer Defendants worked together to control the state and federal governments' response to the manufacture and distribution of prescription Opioid Drugs by increasing production quotas through a systematic refusal to maintain effective controls against diversion and identify suspicious orders and report them.

609.    The Defendants worked together to control the flow of information and influence state and federal governments and political candidates to pass legislation that was pro-opioid.  The Manufacturer and Distributor Defendants did this through their participation in the PCF, discussed above, as well as the HDA.

610.    The HDA is an association of pharmaceutical manufacturers and distributors.  The HDA states its mission is to "protect patient safety and access to medicines through safe and efficient distribution" and acts as the pharmaceutical "convener of the supply chain," representing 35 drug distributors and 130 drug manufacturers.  Upon information and belief, members of the HDA included Manufacturer Defendants Endo, Johnson & Johnson (Janssen's parent company), Actavis, Teva, Mylan, Mallinckrodt and the Distributor Defendants Morris and Dickson, McKesson, Cardinal Health, and AmerisourceBergen.  These Defendants are members, participants, sponsors and/or serve on the board of directors or executive committees of the HDA and utilized the HDA to further their common goal of protecting and nurturing the expansion of the Opioid Drug market.  The HDA and the PCF are but two examples of the overlapping relationships and concerted joint efforts to accomplish common goals and demonstrates that the leaders of each of the Manufacturer and Distributor Defendants were intimately involved in communication and cooperation.

611.    Not surprisingly, each of the Manufacturer and Distributor Defendants who stood to profit from expanded prescription Opioid Drug use is a member, sponsor and/or participant in the PCF.[127]   In 2012, membership and participating organizations included the HDA (of which certain Manufacturer and Distributor Defendants are members).[128]   Each of the Manufacturer Defendants worked together through the PCF to advance their interests.   But the Manufacturer Defendants were not alone.   The Distributor Defendants also actively participated, and continue to participate in the PCF, at a minimum, through their trade organization, the HDA.[129]   Upon information and belief, the Distributor Defendants participated directly in the PCF as well.

612.    Additionally, the HDA led to the formation of interpersonal relationships and an organization between the Manufacturer and Distributor Defendants.   The HDA and each of the Distributor Defendants eagerly sought the active membership and participation of the Manufacturer Defendants by emphasizing the many benefits of members, including "strengthening . . . alliances."[130]

613.    Beyond strengthening alliances, the benefits of HDA membership included the ability to, among other things, "network one on one with manufacturer executives at HDA's members-only Business and Leadership Conference," "networking with HDA wholesale distributor members," "opportunities to host and sponsor HDA Board of Directors events," "participate on HDA committees, task forces and working groups with peers and trading partners,"

---

[127]   *PAIN   CARE   FORUM:   2012   Meetings   Schedule*,   (last   updated   December   2011), https://assets.documentcloud.org/documents/3108982/PAIN-CARE-FORUM-Meetings-Schedule-amp.pdf.
[128] *Id*. Upon information and belief, Mylan and Mallinckrodt became active members of the PCF sometime after 2012.
[129] *Id*. The Executive Committee of the HDA (formerly the HDMA) currently includes the Chief Executive Officer, Pharmaceutical Segment for Cardinal Health, Inc., the Group President, Pharmaceutical Distribution and Strategic Global Source for AmerisourceBergen Corporation, and the President, U.S. Pharmaceutical for McKesson Corporation.   *Executive   Committee*, Healthcare Distribution Alliance (last visited Mar. 26, 2018), https://www.healthcaredistribution.org/about/executive-committee.
[130]    *Manufacturer     Membership     Benefits*,   HEALTHCARE     DISTRIBUTION     ALLIANCE, https://www.healthcaredistribution.org/~/media/pdfs/membership/manufacturer-membership-benefits.ashx?la=en (last visited Mar. 26, 2018).

and "make connections."[131]   Clearly, the HDA and the Distributor Defendants believed that membership in the HDA was an opportunity to create interpersonal and ongoing organizational relationships and "alliances" between the Manufacturer and Distributor Defendants.

614.   The application for manufacturer membership in the HDA further indicates the level of connection between the Defendants and the level of insight that they had into each other's businesses.[132]   For example, the manufacturer membership application must be signed by a "senior company executive," and it requests that the manufacturer applicant identify a key contact and any additional contacts from within its company.

615.   The HDA application also requests that the manufacturer identify its current distribution information, including the facility name and contact information

616.   Manufacturer Members were asked to identify their "most recent year end net sales" through wholesale distributors, including the Distributor Defendants Morris and Dickson, AmerisourceBergen, Cardinal Health, and McKesson and their subsidiaries.

617.   The closed meetings of the HDA's councils, committees, task forces and working groups provided the Manufacturer and Distributor Defendants with the opportunity to work closely and confidentially together to develop and further their common purpose and interest in expanding the Opioid Drug market.

618.   The HDA also offers a multitude of conferences, including annual business and leadership conferences.  The HDA and the Distributor Defendants advertise these conferences to the Manufacturer Defendants as an opportunity to "bring together high-level executives, thought leaders and influential managers . . . to hold strategic business discussions on the most pressing

---

[131] *Id.*
[132] *Manufacturer Membership Application Instructions*, HEALTHCARE DISTRIBUTION ALLIANCE, https://www.healthcaredistribution.org/~/media/pdfs/membership/manufacturer-membership-application.ashx?la=en (last visited Mar. 26, 2018).

industry issues."[133]   The conferences also gave the Manufacturer and Distributor Defendants "unmatched opportunities to network with [their] peers and trading partners at all levels of the healthcare distribution industry."[134]   The HDA and its conferences were significant opportunities for the Manufacturer and Distributor Defendants to interact at a high-level of leadership.  It is clear that the Manufacturer Defendants embraced this opportunity by attending and sponsoring these events.[135]

619.    In addition, the Distributor Defendants and the Manufacturer Defendants participated in HDA Webinars and other meetings designed to exchange detailed information regarding their prescription Opioid Drug sales, including purchase orders, acknowledgements, ship notices, and invoices.[136]   For example, on April 27, 2011, the HDA offered a webinar to "accurately and effectively exchange business transactions between distributors and manufacturers . . .":



**Webinar Leveraging EDI: Order-to-Cash Transactions CD Box Set**

(Webinar held: April 27, 2011) Using EDI to accurately and efficiently exchange business transactions (i.e., purchase orders, acknowledgements, ship notices, invoices, etc.) between distributors and manufacturers in the healthcare supply chain is critical. The development and use of voluntary guidelines for specific EDI standards provide industry trading partners with a means to effectively convey the necessary information.

Hear updates on HDMA's Order-to-Cash Guidelines for Electronic Data Interchange (EDI) in the Healthcare Product Supply Chain, including the 810 Invoice; 850 Purchase Order; 855 Purchase Order Acknowledgement; and the 856 Ship Notice/Manifest.

---

[133] *Business and Leadership Conference – Information for Manufacturers*, HEALTHCARE DISTRIBUTION ALLIANCE, https://www.healthcaredistribution.org/events/2015-business-and-leadership-conference/blc-for-manufacturers  (last visited September 14, 2017).
[134] *Id.*
[135] *2015 Distribution Management Conference and Expo*, HEALTHCARE DISTRIBUTION ALLIANCE, https://www.healthcaredistribution.org/events/2015-distribution-management-conference (last visited September 14, 2017).
[136] *Webinar Leveraging EDI: Order-to-Cash Transactions*, HEALTHCARE DISTRIBUTION ALLIANCE (Apr. 27, 2011), https://www.healthcaredistribution.org/resources/webinar-leveraging-edi.

620.    On information and belief, the Manufacturer Defendants used this information to gather high-level data regarding overall distribution and direct the Distributor Defendants on how to most effectively sell the prescription Opioid Drugs.

621.    The HDA asked Manufacturer Members to identify their "most recent year end net sales" through wholesale distributors, including the Distributor Defendants as follows:

| Company | Most Recent Year End Net Sales |
|---|---|
| Henry Schein, Inc. | |
| Henry Schein Distribution Centers (7) | |
| Hospital Pharmaceutical Consulting (1) | |
| KeySource Medical, Inc. (1) | |
| Louisiana Wholesale Drug Co. Inc. (1) | |
| McKesson Corporation (71) | |
| McKesson Supply Solutions (25) | |
| McKesson Canada (12) | |
| McKesson Corporation (4) | |
| McKesson Specialty Health (1) | |
| McKesson Strategic Redistribution Center (1) | |
| McKesson Medical Surgical (1) | |
| Physician Sales & Service (PSS) (25) | |
| US Oncology (1) | |
| DeVictoria Healthcare, Inc. PR (1) | |
| Miami-Luken, Inc.  (1) | |
| Morris & Dickson Co., LLC (1) | |
| Mutual Wholesale Drug Co. (1) | |
| PBA Health (1) | |
| Prescription Supply, Inc. (1) | |
| Prodigy Health Supplier Corporation (1) | |
| Quality Care Products, LLC (1) | |
| RDC (3) | |
| R&S Northeast LLC (2) | |
| Richie Pharmacal Co., LLC (1) | |
| Seacoast Medical LLC (1) | |
| Smith Drug Company, Div. JM Smith Corporation (4) | |
| Burlington Drug Company, Inc. (1) | |
| Smith Drug Company, Div. JM Smith Corporation (3) | |
| Top Rx (4) | |
| Value Drug Company (1) | |
| VaxServe (1) | |
| **TOTAL SALES (millions)** | $            0 |

622.    Members of the PCF and the HDA also lobbied for the passage of legislation to weaken state and federal enforcement authority to further the common goals of the Defendants. To this end, the Ensuring Patient Access and Effective Drug Enforcement Act significantly reduced the state Board of Pharmacy and the DEA's ability to issue orders to show cause and to suspend and/or revoke registrations, which allowed Defendants to continue filling orders for and dispensing excessive amounts of Opioid Drugs, thus better following-through on their shared scheme to expand the Opioid Drug market.[137]    The HDA and other members of the PCF

---

[137] *See HDMA is Now the Healthcare Distribution Alliance*, PHARMACEUTICAL COMMERCE (July 6, 2016), http://pharmaceuticalcommerce.com/business-and-finance/hdma-now-healthcare-distribution-alliance/;        Lenny

contributed substantial amounts of money to political campaigns for federal candidates, state candidates, political action committees and political parties.  Upon information and belief, the PCF and its members and HDA poured millions into such efforts.

623.    The Defendants also worked together to ensure that the Aggregate Production Quotas, Individual Quotas, and Procurement Quotas allowed by the DEA remained artificially high and ensured that suspicious orders were not reported to the DEA in order to guarantee that the DEA had no basis for refusing to increase or decrease production quotas due to diversion.

624.    The scheme devised and implemented by the Defendants amounted to a common course of conduct characterized by a refusal to maintain effective controls against diversion, all designed and operated to ensure the continued unlawful sale of controlled substances.

### iii.    Failure of the Manufacturer Defendants Regarding Diversion of the Opioid Drugs

625.    Manufacturers are the source of the prescription drugs in the pharmaceutical supply chain.  The pharmaceutical manufacturing industry is composed of two distinct business models: manufacturers of brand-name drugs and manufacturers of generic drugs.  Manufacturers manage the actual distribution of drugs from manufacturing facilities to drug wholesalers, and in some cases, directly to retail pharmacy chains, mail-order and specialty pharmacies, hospital chains, and some health plans.  Manufacturers may also distribute products directly to government purchasers, such as the Veterans Administration.  Upon information and belief, the Manufacturer Defendants

---

Bernstein & Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, WASH. POST (Oct. 22, 2016), https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html; Lenny Bernstein & Scott Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis*, WASH. POST (Mar. 6, 2017), https://www.washingtonpost.com/investigations/us-senator-calls-for-investigation-of-dea-enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-b1e9-a05d3c21f7cf_story.html; Eric Eyre, *DEA Agent: "We Had no Leadership" in WV Amid Flood of Pain Pills*, CHARLESTON GAZETTE-MAIL (Feb. 18, 2017), https://www.wvgazettemail.com/news/health/dea-agent-we-had-no-leadership-in-wv-amid-flood/article_928e9bcd-e28e-58b1-8e3f-f08288f539fd.html .

collected, tracked, and monitored extensive data concerning suspicious physicians and pharmacies through third-party organizations and through Defendant Distributors and pharmacies in exchange for rebates or other consideration to better drive sales.

626.    With knowledge that retail pharmacies and prescribing HCPs were facilitating diversion, Manufacturer Defendants failed to report each instance of diversion to the state and federal enforcement agencies while rolling out marketing campaigns to churn their prescription Opioid Drug sales.

627.    Indeed, upon information and belief, the Manufacturer Defendants withheld from the state and federal enforcement agencies information about suspicious orders—and induced Distributor Defendants and retail pharmacies to do the same—to obfuscate the extent of the opioid epidemic.  Upon information and belief, Manufacturer Defendants knew that if they or the other Defendants disclosed suspicious orders, the state and federal enforcement agencies would become aware that many Opioid Drugs were being diverted to illegal channels and would refuse to increase the production quotas for Opioid Drugs.

628.    IMS Health furnished Manufacturer Defendants with detailed information about the prescribing habits of individual HCPs and the ordering habits of individual pharmacies.

629.    The Manufacturer Defendants could have used this data to identify diversion as required under state and federal law, to satisfy its duty of "effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels."  *See* 21 U.S.C. §823(b)(1).

630.    Instead, they utilized the data to understand which regions, and which HCPs, to encourage laser-focused targeting of promotions and marketing through their sales force to further increase sales.

631.    Manufacturer Defendants also unlawfully and unfairly failed to report or address illicit and unlawful prescribing of its drugs, despite knowing about it for years.  Through their extensive network of sales representatives and data, Defendants had and continue to have knowledge of the prescribing practices of thousands of HCPs and could identify HCPs who displayed red flags for diversion such as those whose waiting rooms were overcrowded, whose parking lots had numerous out-of-state vehicles, and whose patients seemed young and healthy or homeless.  Upon information and belief, Manufacturer Defendants using this information have maintained databases of HCPs suspected of inappropriately prescribing Opioid Drugs.

632.    Rather than report these HCPs to state medical boards or law enforcement authorities (as Defendants are legally obligated to do) or cease marketing to them, Defendants ignored the rampant diversion and used the lists to further their own agendas. For years Defendants failed to take action against suspicious pharmacies – even when Defendant employees personally witnessed the diversion of drugs.  The same was true of prescribers.

633.    Manufacturer Defendants were clearly aware of the obvious diversion but did not shut off the supply of highly addictive Opioid Drugs, often times years later only after criminal or formal charges were brought by the authorities.  Through this concealment, Manufacturer Defendants protected their own profits at the expense of public health and safety.

### 1.    *Abbott*

634.    On information and belief, Abbott Defendants have engaged in similar conduct in violation of their responsibilities to prevent diversion.

635.    Abbott failed to design and operate a system to disclose suspicious orders of controlled substances and/or failed to notify the appropriate authority of suspicious orders.

636.    The Abbott Defendants' actions and omission in failing to effectively prevent diversion and failing to monitor, report, and prevent suspicious orders have enabled the unlawful diversion of Opioid Drugs.

### 2.    *Teva*

637.    On information and belief, Teva Defendants have engaged in similar conduct in violation of their responsibilities to prevent diversion.

638.    Teva failed to design and operate a system to disclose suspicious orders of controlled substances and/or failed to notify the appropriate authority of suspicious orders.

639.    The Teva Defendants' actions and omission in failing to effectively prevent diversion and failing to monitor, report, and prevent suspicious orders have enabled the unlawful diversion of Opioid Drugs.

### 3.    *Janssen*

640.    On information and belief, Janssen Defendants have engaged in similar conduct in violation of their responsibilities to prevent diversion.

641.    Janssen failed to design and operate a system to disclose suspicious orders of controlled substances and/or failed to notify the appropriate authority of suspicious orders.

642.    The Janssen Defendants' actions and omission in failing to effectively prevent diversion and failing to monitor, report, and prevent suspicious orders have enabled the unlawful diversion of Opioid Drugs.

### 4.    *Endo*

643.    Endo has been cited for its failure to set up an effective system for identifying and reporting suspicious prescribing.  In its settlement agreement with Endo, the NY AG found that Endo failed to require sales representatives to report signs of abuse, diversion, and inappropriate

prescribing; paid bonuses to sales representatives for detailing prescribers who were subsequently arrested or convicted for illegal prescribing; and failed to prevent sales representatives from visiting prescribers whose suspicious conduct had caused them to be placed on a no-call list.[138]

644.    The NY AG's investigation further revealed that in cases where Endo's sales representatives detailed prescribers who were convicted of illegal prescribing of Opioid Drugs, those representatives could have recognized potential signs of diversion and reported those prescribers but failed to do so. Certain Endo sales representatives testified that "they did not know about any policy or duty to report problematic conduct observed in [HCPs'] offices, and did not report anyone, even when they saw suspicious behavior."[139]

### 5.    *Actavis*

645.    On information and belief, Actavis Defendants have engaged in similar conduct in violation of their responsibilities to prevent diversion.

646.    Actavis failed to design and operate a system to disclose suspicious orders of controlled substances and/or failed to notify the appropriate authority of suspicious orders.

647.    The Actavis Defendants' actions and omission in failing to effectively prevent diversion and failing to monitor, report, and prevent suspicious orders have enabled the unlawful diversion of Opioid Drugs.

---

[138] *See* Press Release, New York State Office of the Attorney General, A.G. Schneiderman Announces Settlement With Endo Health Solutions Inc. & Endo Pharmaceuticals Inc. Over Marketing Of Prescription Opioid Drugs (March 3, 2016), https://ag.ny.gov/press-release/ag-schneiderman-announces-settlement-endo-health-solutions-inc-endo-pharmaceuticals; Attorney General of the State of New York, *In the Matter of Endo Health Solutions Inc. and Endo Pharmaceuticals Inc.,* Assurance No.: 15-228 Assurance of Discontinuance Under Executive Law Section 63, Subdivision 15 (March 1, 2016), https://ag.ny.gov/pdfs/Endo_AOD_030116-Fully_Executed.pdf.

[139] Attorney General of the State of New York, *In the Matter of Endo Health Solutions Inc. and Endo Pharmaceuticals Inc.,* Assurance No.: 15-228 Assurance of Discontinuance Under Executive Law Section 63, Subdivision 15 (March 1, 2016), https://ag.ny.gov/pdfs/Endo_AOD_030116-Fully_Executed.pdf.

###### 6.    *Mallinckrodt*

648.    Mallinckrodt is one of the largest generic manufacturers in the nation, producing over a billion oxycodone pills every year since at least 2006. Yet for years its monitoring program consisted solely on verifying that a customer had a valid DEA registration and that the order was accurately logged into the DEA tracking database. Between 2003 and 2011 Mallinckrodt "logged more than 53 million orders, cited nearly 38,000 as potentially suspicious and stopped 33 of them."[140] According to court and law enforcement records, including some of Mallinckrodt's own internal documents, the manufacturer was aware of many suspicious prescriber, pharmacy and distributor orders but failed to identify the orders as such and continued to fill the orders. For years Mallinckrodt silently stood by and watched its volume of Opioid Drug sales exponentially escalate and the addiction crisis blossom.

649.    On July 11, 2017, Manufacturer Defendant Mallinckrodt agreed to pay $35 million to the DOJ to settle charges stemming from violations of certain provisions of the CSA, such as (1) 21 C.F.R. §1301.74(b) for failing to design and operate a system to disclose to the registrant suspicious orders of controlled substances and to inform the DEA Field Division office of such suspicious orders when discovered, and (2) 21 C.F.R. § 1301.71(a) for failing to provide effective controls and procedures to guard against theft and diversion of controlled substance.[141]

650.    As the DOJ Press Release highlights: "This is the first settlement of its magnitude with a manufacturer of pharmaceuticals resolving nationwide claims that the company did not

---

[140] Jared Hopkins and Joseph Walker, *New Details Emerge Over Mallinckrodt's Role in Opioid Crisis,* WALL ST. J., (Aug. 25, 2019), https://www.wsj.com/articles/new-details-emerge-over-mallinckrodts-role-in-opioid-crisis-11566734401.

[141] Press Release, U.S. Dep't of Justice, Mallinckrodt Agrees to Pay Record $35 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs and for Recordkeeping Violations (July 11, 2017), *available at* https://www.justice.gov/opa/pr/mallinckrodt-agrees-pay-record-35-million-settlement-failure-report-suspicious-orders.

meet its obligations to detect and notify DEA of suspicious orders of controlled substances such as oxycodone, the abuse of which is part of the current opioid epidemic."[142]

651.    Mallinckrodt agreed that its "system to monitor and detect suspicious orders did not meet the standards outlined in letters from the DEA Deputy Administrator, Office of Diversion Control, to registrants dated September 27, 2006 and December 27, 2007."[143]

652.    The July 2017, agreement by Mallinckrodt also settled charges by the DOJ stemming from Mallinckrodt's failure to utilize charge back data received from distributors to identify suspicious orders of customers further down in the supply chain, such as orders from pharmacies or pain clinics.  Mallinckrodt required distributors provide it with detailed ordering information regarding downstream customers in order to obtain chargeback discounts.

653.    Mallinckrodt chose to ignore such information and its responsibility to report suspicious orders as 500 million of its pills ended up in Florida between 2008 and 2012.  Federal prosecutors summarized the case by saying that Mallinckrodt's response was that everyone knew what was going on in Florida, but they had no duty to report it.

654.    In addition to the significant monetary penalty, the DOJ settlement also included "a groundbreaking parallel agreement with the DEA, as a result of which the company will analyze data it collects on orders from customers down the supply chain to identify suspicious sales.  The resolution advances the DEA's position that controlled substance manufacturers need to go beyond 'know your customer' to use otherwise available company data to 'know your customer's customer' to protect these potentially dangerous pharmaceuticals from getting into the wrong hands."[144]  Finally, the agreement settled charges stemming from allegations by the DOJ that

---

[142] *Id.*
[143] *Administrative Memorandum of Agreement* at 2–3 (July 7, 2017), https://www.justice.gov/usao-edmi/press-release/file/986026/download.
[144] *Id.*

Mallinckrodt was guilty of record-keeping violations at its manufacturing facility in upstate New York, which showed discrepancies between the actual number of oxycodone tablets manufactured in a batch and the number of tablets Mallinckrodt reported on its records.[145]

### 7.    *Mylan*

655.    On information and belief, Mylan Defendants have engaged in similar conduct in violation of their responsibilities to prevent diversion.

656.    Mylan failed to design and operate a system to disclose suspicious orders of controlled substances and/or failed to notify the appropriate authority of suspicious orders.

657.    The Mylan Defendants' actions and omission in failing to effectively prevent diversion and failing to monitor, report, and prevent suspicious orders have enabled the unlawful diversion of Opioid Drugs.

### iv.    Failure of the Distributor Defendants to Track and Report Suspicious Sales of the Opioid Drugs

658.    The Distributor Defendants purchase prescription Opioid Drugs from the Manufacturer Defendants to distribute to a variety of customers, hospitals, long-term care, and other medical facilities (e.g., community clinics, physician offices and diagnostic laboratories).

659.    The top four wholesale distributors, Defendant Morris and Dickson, Defendant McKesson, Defendant Cardinal Health, and Defendant AmerisourceBergen, account for over 90% of the entire wholesale drug market.  This consolidation has forced the industry to change its revenue model, evolving its core distribution business into a low-margin enterprise that makes money by maximizing economies of scale, i.e. the more Opioid Drugs they distribute the lower their margins.

---

[145] *Id.*

660.    The Distributor Defendants utilize "just-in-time" delivery methods.  In order to keep inventory and liability of pharmaceutical drugs as low as possible, most pharmacies receive drug deliveries from distributors every day of the week.  This allows the pharmacy to hold as little inventory of pharmaceutical drugs on site as possible.   In making just-in-time deliveries, sometimes multiple times a day to a single pharmacy, distributors know precisely how many Opioid Drug prescriptions and individual pills they are delivering to a specific pharmacy.

661.    On information and belief, the Distributor Defendants supplied the Manufacturer Defendants with distribution data in exchange for rebates or other consideration so the Manufacturer Defendants could better drive sales.

662.    The Distributor Defendants report the sale of all prescription Opioid Drugs to the ARCOS database.  The ARCOS database's purpose is to monitor the flow of DEA controlled substances from their point of manufacture through commercial distribution channels but does not include prescription or doctor data.

663.    The ARCOS database does not alert the DEA to the suspicious nature of a particular order.  The DEA investigators regard the database as unwieldy because it encompassed dozens of drugs sold by more than a thousand companies and is frequently six months out of date.

664.    Distributors are a crucial link in the closed system envisioned by Congress in enacting the CSA.  Wholesale distributors are the closest link to pharmacies in the pharmaceutical supply chain, as such, they are best situated to determine whether a pharmacy is facilitating the diversion of prescription Opioid Drugs.

665.    Industry compliance guidelines established by the HDA, including the Distributor Defendants, are "[a]t the center of a sophisticated supply chain" and, therefore, "are uniquely

situated to perform due diligence in order to help support the security of the controlled substances they deliver to their customers."

666.    The Distributor Defendants are a key link in the pharmaceutical supply chain in Louisiana and elsewhere, as they have the power to determine that an order is suspicious— thereby preventing diversion before it can even occur.

667.    Reporting an order as suspicious will not absolve a distributor, including the Distributor Defendants, of responsibility if the registrant and distributor knew, or should have known, that the prescription Opioid Drugs were being diverted.  Indeed, reporting a suspicious order, then filling said order with knowledge it may be suspicious constitutes a failure to maintain effective controls against diversion under 21 U.S.C. §§ 823 and 824 and state regulations.

668.    Rather than comply with DEA enforcement of suspensions of registrations to distribute controlled substances, manufacturers and distributors spent at least $102 million to undermine the DEA's ability to do so.

669.    On February 19, 2014, acting at the behest of industry lobbyists, Representative Tom Marino introduced the "Ensuring Patient Access and Effective Drug Enforcement Act" as a supposed effort to define "imminent danger" in the 1970 act.  A DEA memo noted that this bill would essentially destroy the agency's power to file an immediate suspension order of any suspicious drug shipments.

670.    This bill required that the DEA show the company's actions had shown "substantial likelihood of an immediate threat," whether in death, serious bodily harm, or drug abuse before a suspension order can be sought.  It also gave drug companies the ability to submit "corrective action" plans before any penalties could be issued.  The law essentially makes it impossible for

the DEA to halt any suspicious narcotic shipments before Opioid Drugs are diverted to the illegal black market.

671.    Despite their duties to prevent diversion, the Distributor Defendants have repeatedly knowingly or negligently allowed diversion.[146]  The DEA has repeatedly taken action to attempt to force compliance, including 178 registrant actions between 2008 and 2012, 76 orders to show cause issued by the Office of Administrative Law Judges, and 41 actions involving immediate suspension orders.[147]  The Distributor Defendants' wrongful conduct and inaction have resulted in numerous civil fines and other penalties and continue to be the subject of ongoing investigations.

### *1.    AmerisourceBergen*

672.    As noted above, AmerisourceBergen is one of the largest distributors of pharmaceuticals in the United States.  Upon information and belief, this distribution center has shipped drugs to Louisiana and East Baton Rouge Parish.

673.    In 2007, AmerisourceBergen lost its license to send controlled substances from a distribution center in Florida amid allegations that it was not controlling shipments of prescription Opioid Drugs to Internet pharmacies.

---

[146] Scott Higham and Lenny Bernstein, *The Drug Industry's Triumph Over the DEA*, WASH. POST, (Oct. 15, 2017), https://www.washingtonpost.com/graphics/2017/investigations/dea-drug-industry-congress/?utm_term=.eff03e845e7a; Lenny Bernstein, David S. Fallis, and Scott Higham, *How drugs Intended for Patients Ended Up in the Hands of Illegal Users: 'No One was Doing Their Job,'* WASH. POST (Oct. 22, 2016), https://www.washingtonpost.com/investigations/how-drugs-intended-for-patients-ended-up-in-the-hands-of-illegalusers-no-one-was-doing-their-job/2016/10/22/10e79396-30a7-11e6-8ff7-7b6c1998b7a0_story.html?utm_term=.3076e67a1a28.
[147] *The Drug Enforcement Administration's Adjudication of Registrant Actions* 6, Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice (May 2014), *available at* https://oig.justice.gov/reports/2014/e1403.pdf.

674.    By way of background, AmerisourceBergen was again implicated for CSA violations in 2012, for failing to protect against diversion of controlled substances into non-medically necessary channels.

675.    In 2012, West Virginia sued Defendants AmerisourceBergen, McKesson, and Cardinal Health, as well as several smaller wholesalers, for numerous causes of action, including violations of the CSA, consumer credit and protection, and antitrust laws and the creation of a public nuisance.  Unsealed court records from that case demonstrate that AmerisourceBergen, along with McKesson and Cardinal Health, together shipped 423 million pain pills to West Virginia between 2007 and 2012.  AmerisourceBergen itself shipped 80.3 million hydrocodone pills and 38.4 million oxycodone pills during that time period.  Moreover, public documents also demonstrate that that the average dose of each tablet distributed grew substantially during that time period.  The Distributor Defendants, including AmerisourceBergen, shipped large quantities of oxycodone and hydrocodone tablets to the state.  In 2016, AmerisourceBergen agreed to settle the West Virginia lawsuit by paying $16 million dollars to the state, with the funds set aside to fund drug treatment programs in order to respond to the opioid addiction crisis.

## 2.    *Cardinal*

676.    As noted above, Cardinal is a significant distributor of Opioid Drugs in the United States and has distribution centers located in Louisiana, including one in Baton Rouge.  Upon information and belief, this distribution center has shipped drugs in Louisiana and East Baton Rouge Parish.

677.    By way of relevant background – as evidenced below, Cardinal has repeatedly ignored its responsibilities as a distributor to prevent abuse and diversion of Opioid Drugs.

Cardinal has been the subject of numerous DEA Orders to Show Cause and Immediate Suspension

Orders, including:

- On November 28, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Auburn, Washington, for failure to maintain effective controls against diversion. On December 5, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Lakeland, Florida, for failure to maintain effective controls against diversion.

- On December 7, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Swedesboro, New Jersey, for failure to maintain effective controls against diversion.

- On January 30, 2008, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Stafford, Texas, for failure to maintain effective controls against diversion.

- On February 2, 2012, the DEA issued another Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Lakeland, Florida, for failure to maintain effective controls against diversion.

678.    Cardinal has also entered into several settlements, incurring small monetary

penalties compared to its enormous profits derived from the excessive distribution of Opioid

Drugs, including a 2008 agreement to pay $34 million dollar penalty to settle allegations regarding

Opioid Drug diversion taking place at seven of its warehouses in the United States.

679.    In 2012, Cardinal reached an administrative settlement with the DEA relating to

Opioid Drug diversion between 2009 and 2012, in multiple states.

680.    Cardinal again reached a settlement agreement with the DOJ in December of 2016,

paying a $44 million dollar penalty for similar violations of the CSA.  On information and belief,

in connection with the investigations of Cardinal, the DEA uncovered evidence that Cardinal's

own investigator warned Cardinal against selling Opioid Drugs to a particular pharmacy in

Wisconsin that was suspected of Opioid Drug diversion. Cardinal did nothing to notify the DEA

or cut off the supply of drugs to the suspect pharmacy.  Cardinal did just the opposite, pumping up

Opioid Drug shipments to the pharmacy to almost 2,000,000 doses of oxycodone in one year, while other comparable pharmacies were receiving approximately 69,000 doses/year.

681.    Cardinal, through an executive, falsely assured the public that its diversion controls were effective, claiming that it used "advanced analytics" to monitor the supply chain and falsely represented that it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."

682.    In the settlement agreement, Cardinal admitted, accepted and acknowledged that it had violated the CSA between January 1, 2009 and May 14, 2012, by failing to: (a) "timely identify suspicious orders of controlled substances and inform the DEA of those orders, as required by 21 C.F.R. §1301.74(b)"; (b) "maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels, as required by 21 C.F.R. §1301.74, including the failure to make records and reports required by the CSA or DEA's regulations for which a penalty may be imposed under 21 U.S.C. §842(a)(5)"; and (c) "execute, fill, cancel, correct, file with the DEA, and otherwise handle DEA Form 222 order forms and their electronic equivalent for Schedule II controlled substances, as required by 21 U.S.C. §828 and 21 C.F.R. Part 1305."

683.    In the press release announcing the settlement agreement, U.S Attorney for the District of Maryland, Rod Rosenstein, stated: "Pharmaceutical suppliers violate the law when they fill unusually large or frequent orders for controlled substances without notifying the DEA. . .Abuse of pharmaceutical drugs is one of the top federal law enforcement priorities.  Cases such as this one, as well as our $8 million dollar settlement with CVS in February 2016, reflect the federal commitment to prevent the diversion of pharmaceutical drugs for illegal purposes."

684.    In another press release, DEA's Washington Division Special Agent-in-Charge Karl Colder further clarified that the settlement specifically concerned oxycodone: "[The] DEA is responsible for ensuring that all controlled substance transactions take place within DEA's regulatory closed system.  All legitimate handlers of controlled substances must maintain strict accounting for all distributions and Cardinal failed to adhere to this policy . . . Oxycodone is a very addictive drug and failure to report suspicious orders of oxycodone is a serious matter.  The civil penalty levied against Cardinal should send a strong message that all handlers of controlled substances must perform due diligence to ensure the public safety."

### 3.    *McKesson*

685.    As noted above, McKesson is a significant distributor of Opioid Drugs in the United States and has a distribution center in all 50 states, including in Louisiana. Upon information and belief, this distribution center has shipped drugs to Louisiana and East Baton Rouge Parish.

686.    By way of background, in May 2008, McKesson entered into a $13.25 million dollar settlement with the DEA on claims that McKesson failed to maintain effective controls against diversion of controlled substances. McKesson allegedly failed to report suspicious orders from rogue Internet pharmacies around the country, resulting in millions of doses of controlled substances being diverted.

687.    As a result, McKesson developed a Controlled Substance Monitoring Program ("CSMP") but nevertheless failed to design and implement an effective system to detect and report "suspicious orders" for controlled substances distributed to its independent and small chain pharmacy customers – i.e., orders that are unusual in their frequency, size, or other patterns. McKesson continued to fail to detect and disclose suspicious orders of controlled substances.  It failed to conduct adequate due diligence of its customers, failed to keep complete and accurate

records in the CSMP files maintained for many of its customers and bypassed suspicious order reporting procedures set forth in the CSMP.

688.    Despite the CSMP, a DEA investigation revealed that between 2008 and 2013, McKesson continued to fail to inform the DEA about a plethora of suspicious orders of prescription Opioid Drugs.  In that time period, a single warehouse in Aurora, Colorado filled 1.6 million prescription orders and reported only .001% as suspicious.

689.    As recently as December 17, 2017, facts continue to emerge regarding McKesson's misdeeds.  According to both the Washington Post Article and "60 Minutes," McKesson's failures from 2008 to 2013, were so egregious that members of the DEA believed that it warranted a criminal case against the drug distribution company.  Apparently, members of the DEA thought prison sentences for McKesson executives would be warranted.

690.    The DEA's Denver field division, in conjunction with a local law enforcement investigation into Platte Valley Pharmacy in Brighton, Colorado, ascertained that the vast majority of pills prescribed at the Platte Valley Pharmacy originated at McKesson's warehouse in Aurora, Colorado.  According to local law enforcement, a single pharmacist, Jeffrey Clawson, was selling as many as 2,000 Opioid Drugs a day.

691.    None of the 16 suspicious orders that McKesson actually reported from 2008 to 2013, were related to the Platte Valley Pharmacy, or to Jeffrey Clawson.

692.    This was in spite of the fact that, from 2008-2011, the percentage increase for oxycodone 30 mg orders supplied by McKesson to Platte Valley Pharmacy was approximately 1,469%. Jeffrey Clawson was eventually indicted and convicted of drug trafficking charges and was given a 15-year prison sentence.

693.    McKesson did eventually report Jeffrey Clawson's suspicious orders, but only after he had been convicted and the Platte Valley Pharmacy was closed and no longer a source of revenue.

694.    In a recent 2017, Administrative Memorandum of Agreement between McKesson and the DEA, McKesson admitted that it "did not identify or report to [the] DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious based on the guidance contained in the DEA Letters." McKesson was fined $150 million dollars. McKesson further admitted that it failed to maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific and industrial channels by sales to certain customers in violation of the CSA and its implementing regulations, 21 C.F.R. Part 1300 et seq., at McKesson distribution centers.

### 4.    *Morris and Dickson*

695.    As noted above, Morris and Dickson is a wholesale distributor of Opioid Drugs in the United States with its headquarters in Louisiana. Upon information and belief, Morris and Dickson has multiple distribution centers in Louisiana and has shipped drugs to Louisiana and East Baton Rouge Parish.

696.    On May 2, 2018, Morris and Dickson was issued an Order to Show Cause and an Immediate Suspension Order[148] based on DEA investigations and audits between 2014 and 2017 conducted at its Shreveport facility in Louisiana alleging Defendant "failed to identify . . . large suspicious orders resulting in millions of dosages of Oxycodone and Hydrocodone being distributed in violation of the law." The investigation revealed that Louisiana pharmacies were

---

[148] This was the first time since 2012 that the DEA had taken such a drastic measure against a distributor. However, shortly thereafter on May 18, 2018, the then-acting DEA Administrator voluntarily issued a notice of rescission of the Immediate Suspension Order after Morris and Dickson filed for an injunction to enjoin enforcement of same in federal court.

allowed to purchase "as much as six times the quantity of narcotics the pharmacy would normally order" and that certain "independent" pharmacies were allowed to purchase "more than ten times the amount of narcotics the average Louisiana pharmacy purchased per month." Responding to the allegations, Attorney Jeff Sessions noted: "many large suspicious orders for opioids were made, filled, and unreported by Morris and Dickson. We can only imagine how many pills were diverted, abused, and how many addictions began as a result."

697.    Correspondence produced by Endo subsidiary Qualitest pursuant to a Senate investigation corroborates the DEA's allegations that Morris and Dickson's knowingly failed to report suspicious orders and failed to maintain effective controls against the diversion of opioid drugs. For example, Qualitest in a December 2014 letter to Morris and Dickson stated that after reviewing chargeback data it was "unable to justify the quantities of Hydrocodone sold" to a list of customers and further requested Morris & Dickson "immediately cease distribution and selling of Qualitest Hydrocodone to the customers listed because sales represent an undue risk."[149] Despite knowledge on the part of both Defendants as to the unjustified quantities and potential risk of diversion in fulfilling these Opioid Drug orders, in the bulk of these exchanges – each Defendant turned a blind eye failing to report suspicious orders to enforcement as required under state and federal law.[150]

698.    In May of 2019, Morris and Dickson agreed to pay $22 million dollars in civil penalties to resolve the allegations that it failed to report suspicious orders and further agreed to invest millions of dollars to "make significant upgrades to its compliance program."[151]

---

[149] U.S. Senate Homeland Security & Governmental Affairs Committee, *Fueling an Epidemic: A Flood of 1.6 Billion Doses of Opioids into Missouri and the Need for Stronger DEA Enforcement,* 115th Cong., (July 12, 2018) https://www.hsdl.org/?abstract&did=812961.
[150] *Id.*
[151] Press Release, U.S. Dep't of Justice, DEA and U.S. Attorney in the Western District of Louisiana Announce Settlement with Drug Distributor (May 24, 2019), *available at* https://www.dea.gov/press-releases/2019/05/24/dea-and-us-attorney-western-district-louisiana-announce-settlement-drug-0.

v.   **Defendants' Failures to Track and Report Suspicious Sales of Opioid Drugs Caused Significant Opioid Drug Diversion throughout East Baton Rouge Parish**

699.   Defendants' refusal to report and investigate suspicious orders had far-reaching effects.

700.   There has been substantial evidence of opioid drug diversion in Louisiana and throughout East Baton Rouge Parish that went unreported by Defendants.   Thus, mass prescriptions of Opioid Drugs continued, as well as large incidents of drug trafficking, resulting in a public health crisis and increased damages to the EBRCOC.

701.   Multiple physicians throughout Louisiana, including those practicing in East Baton Rouge Parish, have been charged with illegally prescribing Opioid Drugs and selling them to drug dealers or for profit.   For example, Shanta Barnes, former director of a detoxification and rehabilitation treatment center in Baton Rouge, was convicted of illegally obtaining more than 5,800 oxycodone pills through false prescriptions and distributing the pills "outside the ordinary channels of lawful distribution" for profit. Dr. Fredrick Floyd pled guilty to running a pair of "pill mills" in New Orleans East, illegally prescribing millions of dosages of oxycodone, fentanyl and other addictive drugs to patients without conducting or after a mere cursory medical exam seeing between 50 and 70 patients a day. Dr. Gerard Dileo, former owner of a chain of pain management clinics located throughout Louisiana, was convicted of conspiring to unlawfully distribute potent opioid and pharmaceutical drugs in exchange for $8.5 million dollars in case from his patients. The distribution conspiracy resulted in the fatal overdoses of at least two patients.

702.   Kendrick Alexander of Baton Rouge and New Iberia was sentenced to ten years in prison for trafficking oxycodone after a series of recorded conversations captured Alexander negotiating a price of $60,000 for 5,000 oxycodone tablets and agreeing to conduct weekly drug

deals under the same terms. At trial evidence showed Alexander intended to sell the oxycodone pills to other drug dealers for further distribution.

703.    The failure of Defendants to monitor Opioid Drug shipments, in direct contravention of federal and state law and with the main objective of placing profits over people has caused and will continue to cause substantial damages in Louisiana and to the EBRCOC.

704.    The failure on the Defendants' part to monitor shipments of drugs eventually flooded the black market and allowed criminals to re-sell and create even more powerful synthetic versions of dangerous Opioid Drugs.  In August of 2017, White House drug czar Michael Botticelli backed calls for a ban on high-strength Opioid Drugs, like prescription OxyContin manufactured by the defendants,[152] that created "a pain-management crisis that led to increased demand for heroin, now overwhelmingly smuggled from Mexico, and fentanyl, now largely imported from labs in China."[153]

705.    Following the 2010, reformulation of OxyContin, many users switched to Endo's Opana.  In rural communities, home and pharmacy robberies increased as people sought out the oxymorphone drug.  One report out of Scott County, Indiana indicates that elderly patients in need of extra income were selling Opana for as much as $90 per pill.

706.    Still more drug users switched to other illicit drugs such as heroin or cocaine as traditional street drugs are often cheaper alternatives to Opioid Drugs. Often makers of illicit drugs will disguise them as traditional prescription pharmaceuticals.

---

[152] Chris McGreal, *Obama's Former Drug Czar Calls to Ban High-Grade Opioids at Center of Epidemic*, THE GUARDIAN (Aug. 31, 2017), https://www.theguardian.com/us-news/2017/aug/31/obamas-ex-drug-czar-call-to-ban-high-grade-opioids-at-center-of-epidemic.
[153] Edward Helmore, *US Overdose Deaths From Fentanyl and Synthetic Opioids Doubled in 2016*, THE GUARDIAN (Sept. 3, 2017), https://www.theguardian.com/us-news/2017/sep/03/fentanyl-synthetic-opioids-deaths-doubled-us.

707.    Despite the localized effects of drug use, the drugs themselves come from across the country and around the globe before they eventually flood the Parish.

708.    In March 2017, a California man along with nine others were indicted for distributing over 30,000 heroin pills pressed to resemble oxycodone in Baton Rouge. Upon delivery of the pills in Baton Rouge, they were then distributed to mid-level drug dealers and ultimately sold to drug abusers in East Baton Rouge and Livingston Parishes. In Louisiana, heroin use resulted in 48 deaths in 2012, but that nearly tripled to 141 in 2016.

709.    However, more and more frequently, drug dealers are lacing these drugs with dangerous synthetic opioids, generally fentanyl, which are highly potent. Those addicted to Opioid Drugs that switch to more affordable illicit drugs face significant danger with each use.

710.    Defendants' negligent marketing techniques combined with their practice of putting profits over people and ignoring suspicious shipments, have resulted in a black market of illegal drugs that has increased crime rates, domestic violence, the need for children and family welfare services and death tolls across East Baton Rouge Parish.  The EBRCOC continues to incur increased employment costs and judicial and related court costs, associated in part as a result of these crimes and fatalities.

711.    Had Defendants fulfilled their obligations under both federal and state law to report and stop suspicious orders of Opioid Drugs, these shipments would not have even reached or been dispersed in such high quantities within East Baton Rouge Parish.  In turn, the EBRCOC would not have expended thousands of dollars on inappropriate prescriptions and treatments or employment and judicial related court costs.  The Defendants' failure to comply with the CSA as well as Louisiana's Prescription Monitoring Program and Louisiana CDS Law and Louisiana DDD Act regulations is the direct and proximate cause of the damages suffered by the EBRCOC.

712.     Furthermore, had the Defendants informed the DEA and relevant state authorities of the pill mills and suspicious prescribers and shipments in Louisiana, the EBRCOC would have been able to take action to stymie the black market of Opioid Drugs far sooner and thus mitigate its damages. The EBRCOC and its vendors could have worked together to implement controls to stem the tide of the opioid epidemic.  The Manufacturer and Distributor Defendants had this knowledge at their fingertips, yet their greed and practice of putting profits over people ruled their actions and ultimately exacerbated the EBRCOC's damages.

## C.     Defendants' Fraudulent Marketing and Diversion Concealment Efforts Have Caused Significant Damages to Plaintiff EBRCOC

713.     As a foreseeable, direct, and proximate result of the unlawful conduct of Defendants, the Plaintiff has been subject to a devastating public health crisis that has required and unprecedented response by the Plaintiff.

714.     Defendants' deceptive and misleading marketing schemes and blatant disregard for the CSA and related state regulations drastically increased the number of prescriptions and distribution of Opioid Drugs written and filled.  Because the Manufacturer Defendants withheld material information about the true safety and efficacy of Opioid Drugs and manipulated medical literature regarding the risks of addiction associated with Opioid Drugs, the prescribing physicians did not have the knowledge necessary to make informed decisions regarding Opioid Drug prescriptions. Plaintiff, unaware of Defendants' schemes, paid for these prescriptions.   The Manufacturer Defendants' promotion and marketing of Opioid Drugs safety and effectiveness has been highly successful, resulting in Defendants receiving unprecedented billions of billions of dollars in profits, representing ill-gotten gains to which Defendants were not entitled and leaving a ravaged opioid addicted population in its wake.

715.    Plaintiff, an entity that provides health care and prescription drug benefits to its employees, retirees and dependents, and that reimburses all or a portion of the cost of Opioid Drugs, pain management treatments, and other medical and emergency services, was directly harmed and suffered an economic loss as a result of Defendants' multi-layered and inter-connected schemes, which have led to a significant increase in opioid and opioid-related prescriptions, and in turn, a significant increase in opioid addiction and necessary treatments and services to manage the same.

716.    Plaintiff has suffered foreseeable, significant, ongoing, and prospective damages, including increased heath care costs for Opioid Drugs and medical services to treat conditions and injuries caused by addiction and chronic Opioid Drug use (such as sedation and constipation), as well as increased employment costs and judicial related court costs, associated in part to increased crime rates and the need for children and family welfare services, as a result of Defendants' actions and omissions and the ensuing opioid crisis.

717.    But for Defendants' actions, Plaintiff would not have paid for excessive Opioid Drug prescriptions through its employee health care plans that were of no therapeutic benefit or were further diverted into the black market.  Moreover, but for Defendants' actions, Plaintiff would not have had to pay for the costs of care related to its members' adverse medical, behavioral, mental and addiction-treatment related events.

i.    **Health Care Plans**

718.    Claims for opioid-related prescriptions and treatments paid by the EBRCOC through its employee health plans have risen dramatically in recent years.

719.    The EBRCOC provides comprehensive health care benefits, including prescription drug coverage, to its current and retired employees and their dependents through the EBRCOC's

employee health plans.   Hundreds of persons are enrolled in these plans.   The EBRCOC's employee health plans are self-funded, meaning that EBRCOC bears the charges for all services and products used by the plans' beneficiaries.

720.    Typically the medical benefits provided to employees of self-funded groups like the Plaintiff EBRCOC are administered by a TPA and management of the payments for prescription drugs and formulary development are handled by a contracted PBM.

721.    When listed on the formulary, Plaintiff reimburses a portion of the cost for Opioid Drugs.   Upon information and belief, each of the Manufacturer Defendants' Opioid Drugs are or have been listed on Plaintiff's formulary.

722.    Under the employee health care plan, payments for benefits will be made for medically necessary and appropriate diagnoses and treatment.

723.    This may include, in part, prescriptions for Opioid Drugs, inpatient and outpatient hospital services, including office visits for pain management, and treatment of medical emergencies related to any adverse outcomes from chronic opioid therapy, such as an overdose or addiction.

724.    Most long-term use of Opioid Drugs to treat chronic pain is not medically necessary or appropriate.

725.    Defendants caused Plaintiff to pay for excessive Opioid Drug prescriptions that were not medically necessary, as they were prescribed to treat conditions for which the drugs are not FDA-approved, for which there was no reliable scientific evidence that they were safe or effective.   On top of this, there was reliable evidence (and Defendants were fully aware) that Opioid Drugs have a high risk of addiction and were not safe for long-term use in non-cancer pain, and Defendants acting in concert and separately concealed this information from the public,

prescribing HCPs and from Plaintiff EBRCOC (and/or its contracted PBM and TPA). Even worse, the Defendants not only had ready access to data and information to expose suspicious ordering and identify excessive quantities of opioids entering the community, they orchestrated a plan to work together to conceal this information from the DEA, state and governmental officials, the public and Plaintiff to prevent them from discovering the causes of action asserted herein.

726.    Patients, including those whose prescription drug charges were paid by Plaintiff, and who were prescribed Opioid Drugs for non-indicated and unsafe uses, received no therapeutic benefit and were subject to life threatening side effects. Likewise, Plaintiff paid for worthless Opioid Drug prescriptions, many of which were diverted to the black market. Absent Defendants' jointly and coordinated conduct, Plaintiff would not have paid for the Opioid Drugs that were not eligible for coverage.

727.    As a result of Defendants' deceptive marketing practices and diversion concealment efforts, EBRCOC incurred additional and consequential costs under its health plans for patients who used Opioid Drugs long-term to treat chronic pain, including the costs of office visits, toxicology screenings, hospitalizations for overdoses and infections, rehabilitation, and addiction-related therapy, and other treatments necessitated by the adverse effects of branded and generic Opioid Drugs.

728.    Plaintiff reasonably and justifiably relied on Defendants' supposed compliance with CSA, Louisiana CDS Law and Louisiana DDD Act regulations and obligations to provide truthful, scientifically-based and clinically relevant information when deciding to include Opioid Drugs on its formularies or to provide coverage for payment of Opioid Drug prescriptions. Ultimately, Plaintiff has shouldered the responsibility of paying for the Opioid Drug prescriptions.

729.    According to EBRCOC's internal documents, with thousands of claims being submitted to the EBRCOC, payments for Opioid Drugs since 2012, alone reached over one hundred thousand dollars.  The startling increase in Opioid Drug prescriptions and sales correlates directly to the Manufacturer Defendants' deceptive physician and consumer marketing efforts as well as Defendants' collective scheme to conceal drug diversion.

### ii.    Additional Costs Incurred by the EBRCOC

730.    The over-prescription of Opioid Drugs has had a significant impact on the citizens of Louisiana and East Baton Rouge Parish.

731.    In 2015 there were 285 opioid-related emergency department hospital visits in East Baton Rouge Parish, up from 154 in 2013. Similarly, the Parish saw an increase in opioid-related inpatient visits from 61 in 2014 to 93 in 2017.

732.    Opioid-related overdoses in East Baton Rouge Parish dramatically increased from 28 in 2012 to 89 deaths in 2016.[154] During that time, heroin overdose deaths spiked from "5 in 2012 to 41 in 2015."[155] As of November 2017, here were 92 drug-related deaths in East Baton Rouge Parish.[156] Paramedics had administered 737 doses of the overdose-reversing drug naloxone in 2017 as of November, a 40% increase from the 525 doses given during the same period in 2016.[157]

733.    EBRCOC has incurred damages, through its self-insured health plans related to emergency services and treatments to deal with opioid use and overdoses. For example, the EBRCOC has incurred thousands of dollars in costs for health services and medications to treat

---

[154] Annie Ourso Landry, "Prescription for disaster: Louisiana's opioid epidemic," *Great Baton Rouge Business Report,* June 21, 2017, available at https://www.businessreport.com/business/opioid-baton-rouge-epidemic.
[155] *Id.*
[156] Emma Disher, "Baton Rouge area families cope with opioid epidemic as overdoses continue to climb," *The Advocate,*    (Nov.    25,    2017),    available    at http://www.theadvocate.com/baton_rouge/news/crime_police/article_f038c5d4-c4f2-11e7-8aa3-2f2b3fe3de07.html
[157] *Id.*

opioid dependence and addiction, including but not limited to, Suboxone and buprenorphine-naloxone prescriptions. EBRCOC's damages also include prescriptions to combat opioid withdrawal symptoms – including severe anxiety, nausea, headaches, tremors and pain.

734.    The EBRCOC has also incurred employment costs, including the cost of hiring and training new employees to fill vacancies left by those on leave, in treatment, or let go due to Opioid Drug use, as well as the costs associated with treatment.  Opioid Drug prescriptions have had a significant impact on the workforce. Research shows that 20% of the overall decline in the labor force participation for working age men between 2014 and 2016, was due to Opioid Drug prescriptions.  There was a smaller decline in women's participation, 25% of which is attributable to Opioid Drug prescriptions.

735.    The realities of opioid addiction and abuse have put an enormous strain on Louisiana's courts, including EBRCOC, as a recent report from the National Judicial Opioid Task Force aptly notes, the opioid epidemic's stress on the courts has become a "crisis within a crisis."[158]

736.    The EBRCOC has incurred a significant increase in judicial and related costs, which are associated in part with the increased crime rate resulting from the opioid epidemic caused by Defendants.  "Drug-related arrests involving opioids are skyrocketing. In many communities, court dockets and probation caseloads are filled with individuals with opioid-use disorders."[159] The court systems have been overburdened with opioid-related crimes, which has in turn strained the resources of the EBRCOC and public defenders. This is especially true given the complexity of opioid and addiction cases.

---

[158] National Judicial Opioid Task Force, Convening, Collaborating, Connecting: Courts as Leaders in the Crisis of Addiction,    Nov.    18,    2019,    https://www.ncsc.org/~/media/Files/PDF/Topics/Opioids-and-the-Courts/NJOTF_Final_Report_111819.ashx.
[159]    National    Center    for    State    Courts,    Opioid    Epidemic    and    the    Courts,    2017,    https://www.ncsc.org/microsites/trends/home/Monthly-Trends-Articles/2017/Opioid-Epidemic-and-the-Courts.aspx.

737.    In addition to the impact on criminal courts, the EBRCOC has incurred significant judicial related costs linked in part to the increased need for children and family welfare social services resulting from the opioid epidemic caused by Defendants. Neonatal Abstinence Syndrome (NAS), a collection of symptoms newborn babies experience withdrawing from opioid medications taken by the mother, quadrupled in Louisiana from 2003 to 2013, and related expenditures increased six-fold for inpatient services.[160]    The number of newborns born with alcohol or drugs in their system rose from 569 in 2008 to 1,659 in 2016, according to the Department of Children and Family Services, with opioids being the most common drug found in these infants.[161] In 2016, Baton Rouge had the most infants born exposed to drugs or alcohol with 290 reported cases.[162]    A recent report from the Administration for Children and Families shows that from 2012 to 2016, the number of children in foster care drastically rose across the nation, with percentage of removals due to parental substance abuse increasing from 13% to 32.2%.[163]

738.    Indeed, the costs related to the opioid crisis are steep. The Louisiana Commission on Preventing Opioid Abuse has estimated that opioid abuse costs Louisiana $296 million a year in health care expenditures alone.[164]

739.    While the use of Opioid Drugs has taken an enormous toll on Louisiana, East Baton Rouge Parish and Plaintiff EBRCOC, Defendants have realized significant profits.  In 2014 alone, Opioid Drugs generated $11 billion in revenue for drug companies like Defendants.  Financial

---

[160] *Prevention, Screening & Treatment of Neonatal Abstinence Syndrome*, (March 1, 2016) at 3, available at https://wwwcfprd.doa.louisiana.gov/boardsAndCommissions/RulesAndRegulations/223_Response%20to%20House%20Concurrent%20Resolution%20162-FINAL3-1-2016%20(3).pdf.
[161] Julia O'Donoghue, "Louisiana infants born exposed to drugs, alcohol triples in 8 years," *The Times Picayune,* (Sept. 18, 2017), available at http://www.nola.com/politics/index.ssf/2017/09/louisiana_newborns_drugs.html.
[162] *Id.*
[163] National Center for State Courts, Opioid Epidemic and the Courts, 2017, https://www.ncsc.org/microsites/trends/home/Monthly-Trends-Articles/2017/Opioid-Epidemic-and-the-Courts.aspx.
[164] Louisiana Commission on Preventing Opioid Abuse, citing Matrix Global Advisors, LLC (2014) Health Care Costs from Opioid Abuse: A State by State Analysis.

information indicates that each Defendant experienced a material increase in sales, revenue, and profits from the false and deceptive advertising and other unlawful and unfair conduct as described herein.

**D.    Defendants' Fraudulently Concealed the Nature of Plaintiff's Claims**

740.    The claims set forth herein are timely because – among other reasons – Plaintiff in the exercise of reasonable diligence was unable to discover their injuries and because Defendants' fraudulently concealed their illegal conduct, aggressively countering any negative publicity regarding Defendants' promotion of the Opioid Drugs, and the extent of Defendants' concealment of Opioid Drug diversion was unknown, even to government officials, until just recently.

741.    As evidenced by the allegations in this Complaint, Defendants have concealed and/or failed to adequately disclose the Opioid Drugs' propensity to cause abuse and addiction, have employed and continue to employ practices and techniques of secrecy and public denial in order to avoid detection of, to assuage potential concern, and have fraudulently hidden their deceptive and conspiratorial behavior regarding the safety and efficacy of Opioid Drugs.

742.    As such, Plaintiff has not been effectively alerted to the existence and scope of this industry-wide fraud and thus was not on notice of their potential claims until shortly prior to the filing of this Complaint.

743.    The accrual of Plaintiff's claims is tied to the recent discovery of diversion concealment, and disclosures regarding the true rates of addiction and efficacy for Opioid Drugs. In pursuit of their efforts to promote Opioid Drugs and conceal the diversion of Opioid Drugs for non-medically legitimate purposes, Defendants concealed and failed to disclose the known or reasonably knowable serious adverse side effects, rates of addiction and lack of long-term efficacy for chronic non-cancer pain described herein.  Plaintiff could not have known, nor could it have

reasonably discovered Opioid Drugs' propensity to cause same, for the data and information was exclusively within the hands of Defendants and were not generally known until very recently.

744.    Plaintiff could not have acquired such knowledge through the exercise of reasonable diligence.  Through their public statements, marketing and advertising, Defendants' self-concealing schemes, which were also designed to prevent Plaintiff from discovering its injuries, as well as their affirmative conduct to perpetuate their fraud, deprived Plaintiff of actual or presumptive knowledge of facts sufficient to put them on notice as to its potential claims.

745.    The false and misleading marketing, publications, Front Groups, KOLs and illegal kickback schemes, depended on Defendants' concealment of their involvement, because of the various prohibitions on manufacturers in promoting their products for unapproved uses, and the obvious illegality of bribing physicians in the form of kickbacks and conspiring to conceal Opioid Drug diversion.  Indeed, Defendants' CME and promotional speaker programs as well as the medical literature and publishing programs, were only successful because Defendants managed to hide the true extent of their control over these activities.  Defendants strove to make these CME seminars, medical journal articles, and speaking events appear as independent and legitimate as possible, when in reality the physicians and researchers participating in the schemes were merely the paid mouthpieces for Defendants' false and misleading promotions.  And, of course, the written materials were in large part less explicit about false and misleading promotion, even though Defendants trained their sales force to deliver explicit unapproved and unsafe pitches during sales calls.  The result of this concealment was a body of medical literature and a roster of well-respected teaching physicians supporting the unsafe uses, lack of efficacy and risk of addiction of Opioid Drugs.

746.    Defendants, jointly and acting in concert, sought to create the impression to Plaintiff, to patients, and to physicians that the increased utilization of Opioid Drugs was for safe and effective usage that was simply underdiagnosed.  Defendants, however, knew and understood that promotion of Opioid Drugs for chronic pain and other unapproved conditions was inappropriate and that Defendants' own data and studies suggested that Opioid Drug use in these populations, as well as others, was inappropriate and dangerous, and likely to be diverted from proper distribution channels and lead to addiction and abuse. Defendants failed to make adequate disclosures and warnings knowing if they had, the vast majority of Opioid Drug prescribing and distribution, and reimbursement never would have occurred.

747.    To the extent that anyone publicly called into question Defendants' false and fraudulent promotional activities or diversion concealment schemes, Defendants were highly aggressive in their attacks against such negative media.

748.    To ensure that Defendants' counter-messaging reached its intended subjects, Defendants had equipped their sales forces with scripts and talking points regarding Opioid Drug therapy to reassure patients, physicians, Plaintiff and others, thereby creating a market for drugs that weren't necessary.

749.    The EBRCOC was thus not put on inquiry notice of any injuries by articles and publications on account of Defendants' extreme and successful efforts to attack and undermine negative media reports.  Moreover, it was not until just recently that ARCOS data revealed the slightest inkling as to Defendants' elaborate concealment scheme that Opioid Drug diversion became public.  Defendants have demonstrated an unparalleled ability to further lobby and conceal such Opioid Drug diversion tactics that exponentially increased the number of Opioid Drug prescriptions entering the market.

750.    Likewise, Defendants' involvement in their primary false and fraudulent promotional activities as well as in their attacks on any negative press and diversion concealment was hidden because Defendants largely used intermediaries and Front Groups to deliver their deceptive messages.  These activities, and others described above, concealed Defendants' false and misleading promotional activities and deceptive concealment of Opioid Drug diversion were designed such that the EBRCOC could not have discovered the alleged scheme or their causes of action earlier in the exercise of reasonable diligence. Much of the scheme – to this day – remains concealed.

751.    Furthermore, due to their illegality, physician kickbacks for prescriptions were concealed or disguised as payments for other purposes for obvious reasons through a number of artifices described above, including sham "honoraria," bogus "speaker program fees" and other methods.

752.    Thus, any applicable statutes of limitation have not commenced and/or have been tolled by Defendants' knowing and active concealment and public denials of the facts alleged herein.  The EBRCOC has been kept in ignorance of vital information essential to the pursuit of these claims without any fault or lack of diligence on its part, and as part of each Defendant's scheme. The EBRCOC could not have reasonably discovered the fraudulent nature of Defendants' conduct, and in fact was prevented from discovering the fraudulent nature of Defendants' conduct on account of Defendants' respective schemes to prevent Plaintiff from discovering that Opioid Drugs were being prescribed for ineffective, unsafe, and unapproved uses. Accordingly, Defendants are estopped from relying on any statute of limitations to defeat any of Plaintiff's claims.

753.    Defendants' motives in concealing the serious adverse side effects and negative safety profiles of the Opioid Drugs, along with turning a blind eye to the CSA and federal law, Louisiana CDS Law, Louisiana DDD Act and various state regulations mandating effective diversion controls and reporting of suspicious ordering, was to obtain additional revenues from the illegal, false and misleading marketing and concealment of the diversion of branded and generic Opioid Drugs into the black market, which would have had significantly lower sales had they only been sold for approved indications and if the true safety and efficacy profile of the drugs and grave risk of abuse and addiction had been disclosed. Due to the conduct described herein, Defendants achieved billions of dollars in combined sales.

## STATUTE OF LIMITATIONS ARE TOLLED AND DEFENDANTS ARE ESTOPPED FROM ASSERTED STATUTE OF LIMITATIONS AS DEFENSES

### A.  Continuing Conduct

754.    Plaintiff contends it continues to suffer harm from the unlawful actions by the Defendants, as alleged herein.

755.    The continued tortious and unlawful conduct by the Defendants causes a repeated or continuous injury. The damages have not occurred all at once but have continued to occur and have increased as time progresses. The tort is not completed nor have all the damages been incurred until the wrongdoing ceases. The wrongdoing and unlawful activity by Defendants have not ceased. The public nuisance remains abated. Further, the conduct causing the damages remains unabated.

### B.  Equitable Estoppel

756.    Defendants are equitably estopped from relying upon a statute of limitations or prescription defense, to the extent any such defense even applies to Plaintiff's claims, because they undertook efforts to purposefully conceal their unlawful conduct and fraudulently assure the

public, including the State of Louisiana, East Baton Rouge Parish and Plaintiff EBRCOC, that they were undertaking efforts to comply with their obligations under Louisiana CDS Law, Louisiana DDD Act regulations, Louisiana Prescription Drug Monitoring, and related state and federal laws, all with the goal of protecting their registered manufacturer or distributor status and to continue generating profits. Notwithstanding the allegations alleged herein, the Defendants affirmatively assured the public, including the State of Louisiana, East Baton Rouge Parish and the EBRCOC, that they were working to curb diversion and the opioid epidemic.

757.    For example, a Cardinal executive claimed that it uses "advanced analytics" to monitor its supply chain and assured the public that it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."[165]

758.    Similarly, McKesson publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders," and claimed it is "deeply passionate about curbing the opioid epidemic in our country."[166]

759.    Defendants, through their Front Groups, made the following statements in furtherance of their efforts to affirmatively conceal their unlawful conduct and avoid detection:

- "[HDA] members not only have statutory and regulatory responsibilities to guard against diversion of controlled prescription drugs, but undertake such efforts as responsible members of society."

- "Distributors take seriously their duty to report suspicious orders, utilizing both computer algorithms and human review to detect suspicious orders based on generalized information that is available to them in the ordering process."

---

[165] Lenny Bernstein et al., *How Drugs Intended for Patients Ended Up in the Hands of Illegal Users: "No One Was Doing Their Job,"* Wash. Post, Oct. 22, 2016, https://www.washingtonpost.com/investigations/how-drugs-intendedfor-patients-ended-up-in-the-hands-of-illegal-users-no-one-was-doing-their-job/2016/10/22/10e79396-30a7-11e6-8ff7-7b6c1998b7a0_story.html.

[166] Scott Higham et al., *Drug Industry Hired Dozens of Officials from the DEA as the Agency Tried to Curb Opioid Abuse,* Wash. Post, Dec. 22, 2016, https://www.washingtonpost.com/investigations/key-officials-switch-sides-fromdea-to-pharmaceutical-industry/2016/12/22/55d2e938-c07b-11e6-b527-949c5893595e_story.html.

- "Distributors also monitor for and report abnormal behavior by pharmacies placing orders, such as refusing to provide business contact information or insisting on paying in cash."

760.    Through the above statements made on Defendants behalf by their Front Groups, and other similar statements assuring their continued compliance with their legal obligations, Defendants not only acknowledged that they understood their obligations under the law, but they further affirmed that their conduct was in compliance with those obligations.

761.    As noted above, the Defendants have also concealed and prevented discovery of information, including data from the ARCOS database that would confirm their identities and the extent of their wrongful and illegal activities relating to Opioid Drugs.

762.    The Manufacturer Defendants distorted the meaning or import of studies, literature and CMEs as evidence for propositions they did not support. They further invented and promoted "pseudoaddiction" and presented false and misleading information about ineffectual strategies to avoid or control opioid addiction and abuse to an unsuspecting medical community. The Manufacturer Defendants recommended that dosages could be increased without disclosing crucial safety information and the risks associated with the same. Over a period of years, the Manufacturer Defendants spent millions of dollars on an aggressive misinformation campaign aimed at highlighting Opioid Drugs' alleged benefits lacking scientific support or evidence and disguising the dangerous risks of abuse, addiction and diversion and promoting sales.   The medical community, patients, insurers, including EBRCOC, and the State's communities were duped by the Manufacturer Defendants' campaign to misrepresent and conceal the truth about the Opioid Drugs they were pushing in the State and East Baton Rouge Parish.

763.    Defendants intended that their actions and omissions would be relied upon by the public, the patients, health care providers, and insurers like the EBRCOC. Plaintiff did not know, and did not have the means to know, the truth due to Defendants' actions and omissions.

764.    The State, East Baton Rouge Parish and the EBRCOC all reasonably relied on Defendants' affirmative statements regarding their purported compliance with their obligations under the law.

## C. Fraudulent Concealment

765.    The Plaintiff's claims are further subject to equitable tolling and/or extension of the statute of limitations, stemming from Defendants knowingly and intentionally fraudulently concealing the facts as alleged herein. As set forth above, the Defendants were fully aware of their wrongful acts, had material information pertinent to their discovery, and intentionally concealed them from the public, HCPs and healthcare benefit plans and self-insured groups, including Plaintiff EBRCOC. The Plaintiff did not know or could not have known through the exercise of reasonable diligence, of its cause of action, as a result of Defendants' conduct.

766.    Defendants' self-concealing schemes, including their public statements, marketing and advertising, were designed to prevent Plaintiff EBRCOC from discovering its injuries. Defendants' affirmative conduct to perpetuate their fraud deprived Plaintiff EBRCOC of actual or presumptive knowledge of facts sufficient to put them on notice as to its potential claims.

767.    The false and misleading activities of the Opioid Marketing Enterprise and the Opioid Diversion Concealment Enterprise, and their respective marketing, publications, use of Front Groups and KOLs and kickback schemes, depended on the Defendants' concealment of their involvement because of the various prohibitions on manufacturers in promoting their products for unapproved uses, and the obvious illegality of kickbacks and conspiring to conceal Opioid Drug diversion. Indeed, Defendants' CME and promotional speaker programs, as well as the medical literature and publishing programs, were only successful because Defendants managed to hide the true extent of their control over these activities. And Defendants have further demonstrated an unparalleled ability to address and negative press and lobby and conceal their Opioid Drug

diversion tactics that exponentially increased the number of Opioid Drug prescriptions entering the market.

768.    As alleged in the Enterprises, the Defendants jointly and acting in concert sought to create the impression to Plaintiff EBRCOC, to patients, to HCPs among others, that the increased utilization of Opioid Drugs was safe and effective for pain that was simply underdiagnosed. Defendants, however, knew and understood that promotion of the Opioid Drugs for chronic, non-cancer pain and other conditions was inappropriate and that Defendants' own data and studies suggested that Opioid Drug use in these populations, as well as others, was inappropriate and dangerous, and likely to be diverted from proper distribution channels and lead to addiction and abuse. Defendants failed to make adequate disclosures because the vast majority of Opioid Drug prescribing and distribution, and reimbursement never would have occurred had adequate disclosures and warnings been made.

769.    Under the Louisiana doctrine of *contra non valentem agree nulla currit praescriptio,* the prescription period does not run on the state law causes of action that were not reasonable known to Plaintiff when Defendants have concealed information and misled the Plaintiff. Defendants are estopped from asserting any statute of limitations or peremptory period as defenses because they intentionally concealed facts and engage in fraudulent that prevented Plaintiff from discovering their wrongful conduct.

770.    The Plaintiff filed suit promptly upon discovering the facts essential to its claims, as alleged herein. Thus, the purposes of the statute of limitations period and peremptory periods, if any, are satisfied and Defendants cannot claim prejudice as to the facts they knowingly concealed.

771.    In light of numerous public statements to the media, in legal filings and in settlements, it is clear that Defendants had actual and/or constructive knowledge that their conduct was deceptive, in that they consciously concealed the schemes set forth herein.

772.    Defendants synergistically, continually and secretly engaged in the schemes alleged herein to avoid compliance with their legal obligations. Only Defendants and their agents knew or could have known about Defendants' unlawful actions because Defendants made deliberate efforts to keep their conduct hidden and concealed. As a result, the Plaintiff was unable to obtain vital information bearing on its claims absent any fault or lack of due diligence on its part.

## CAUSES OF ACTION

### Count I
### VIOLATION OF RACKETEER INFLUENCED AND
### CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c)
### (Opioid Marketing Enterprise)
### Against All Manufacturer Defendants

773.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

774.    Plaintiff brings this Claim against the Manufacturer Defendants, because of the impact of this scheme on Plaintiff EBRCOC as described herein.

775.    The Manufacturer Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3), who participated in the conduct of the affairs of the Opioid Marketing Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

776.    The Opioid Marketing Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of: (a) the Manufacturer Defendants, including their employees, agents and representatives; (b) advocacy groups and professional societies known as Front Groups (as described herein), including their employees, agents and representatives; (c) HCPs associated

with the Manufacturer Defendants (or their Front Groups) known as KOLs (as described herein); and (d) others whose identities are not yet known but will be learned in discovery.

777.   The Opioid Marketing Enterprise is an ongoing organization that functions as a continuing unit. It was created and used by each Manufacturer Defendant as a tool to effectuate a pattern of racketeering activity. The Manufacturer Defendant "persons" are distinct from the Opioid Marketing Enterprise.  The Manufacturer Defendants were aware of the essential nature and scope of this Enterprise and intended to participate and/or conduct it.

778.   The Opioid Marketing Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of groups of "persons" associated together for the common purpose of producing and disseminating publication materials of a scientific or academic nature and/or producing and disseminating materials to HCPs, consumers and others, which promote Opioid Drugs for unsafe uses and earning profits therefrom.

779.   The Manufacturer Defendants have conducted and participated in the affairs of the Opioid Marketing Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, described herein. The false and misleading predicate acts of racketeering activity committed, or caused to be committed, by the Manufacturer Defendants number in the hundreds if not thousands, and the Manufacturer Defendants committed, or caused to be committed, at least two of the predicate acts within the requisite ten (10) year period.

780.   The Opioid Marketing Enterprise engaged in and affected interstate commerce, because, *inter alia*, it marketed, sold, or provided Opioid Drugs to thousands of entities and

individuals throughout the United States and engaged in the prohibited conduct alleged herein throughout the United States.

781.    The Manufacturer Defendants placed their own employees and agents in positions of authority and control over the Opioid Marketing Enterprise.

782.    The Manufacturer Defendants exerted control over the Opioid Marketing Enterprise and participated in the operation or management of the affairs of the Enterprise, through a variety of actions, including fraudulently financing KOLs and Front Groups and controlling or exerting control over the deceptive and misleading content of messages being delivered by the Opioid Marketing Enterprise:

(a) by its sales representatives, who met individually and/or telephonically with prescribing HCPs;

(b) in advertisements in trade publications, medical journals read by prescribing healthcare officials;

(c) on the Manufacturer Defendants' own websites, which included information for prescribing HCPs and information for consumers suffering from chronic pain (and/or their family members);

(d) in communications to prescribing HCPs concerning Opioid Drugs by various KOLs and Front Groups;

(e) at CME events, or similarly purportedly "education" events for prescribing HCPs, funded or hosted by Manufacturer Defendants, Front Groups and/or KOLs;

(f) in scientific literature publications and the marketing messages contained therein, including misinformation and false statements as described herein;

(g) by selecting, approving and funding KOLs and Front Groups to serve as "authors" and controlling the KOL-drafted and Front Group-drafted publications comprising Opioid Marketing Enterprise publications;[167]

---

[167] As detailed herein, the Manufacturer Defendants' Opioid Marketing Enterprise publications consisted primarily of: (1) clinical studies; (2) Consensus Statements; (3) Treatment Guidelines; (4) Model Policies; (5) academic journal publications; and (6) Front Group reviews and official statements criticizing FDA and CDC initiatives.

(h) by funding the dissemination of Opioid Marketing Enterprise publications, which made them more effective;

(i) by paying and therefore sponsoring KOLs and Front Groups that participated in the Opioid Marketing Enterprise;

(j) in promoting Opioid Marketing Enterprise publications by utilizing such publications at CMEs and sponsoring speeches and conferences where KOLs or Front Groups would make presentations based on such publications;

(k) in pamphlets and other "educational" written materials provided directly to consumers;

(l) in "education guides" (or similar information material) provided to consumers suffering from chronic pain by various Front Groups;

(m) through the content of various media appearances and media campaigns – meant to reach a broad base of the population, including consumers suffering from chronic pain, operated by KOLs or Front Groups funded by Manufacturer Defendants;

(n) by targeting elderly consumers and wounded veterans with false and misleading statement regarding Opioid Drugs, through media campaigns, "educational" material available online, published "educational" pamphlets, and direct contact with the elderly and wounded veterans and/or groups advocating on their behalf; and

(o) by creating financial incentives to attract consumers to use Opioid Drugs, including co-payment assistance, coupons, and vouchers.

783.    Additionally, the Manufacturer Defendants used sophisticated data to micro-target prescribing HCPs with certain prescribing patterns and vulnerable patient populations to direct the false and misleading communications being delivered by the Opioid Marketing Enterprise.

784.    The Manufacturer Defendants concealed their relationship and control of Front Groups and KOLs from prescribing HCPs and further concealed their involvement in Opioid Marketing Enterprise publications to make the Enterprise more effective.

785.    The Manufacturer Defendants' Opioid Marketing Enterprise and related publications were aimed at increasing prescriber and consumer demand and securing formulary placement for Opioid Drugs, to preserve and expand the market for Opioid Drugs by ensuring their prescription for long-term chronic pain and other unsafe, unnecessary and unapproved uses, and

gaining profits therefrom. The "targets" of the misrepresentations and omissions contained in the Opioid Marketing Enterprise publications included prescribing HCPs, consumers suffering from chronic pain, as well as, individuals responsible for making formulary and coverage decisions on behalf of health benefit plans and self-insured groups (including Plaintiff EBRCOC and its contracted PBM and/or TPA).

786.    As detailed herein, the Manufacturer Defendants' Opioid Marketing Enterprise, in an effort to expand the market for Opioid Drugs, made various misrepresentations and omissions as to: (1) the existence of a "pain epidemic" and urgency with which it must be addressed; (2) the efficacy with which long-term Opioid Drug therapy treats or manages long-term chronic pain; (3) the ability of Opioid Drugs to improve life functions (such as psychological health, health-related quality of life, and quality of life itself); (4) downplaying the serious risk of addiction; (5) suggesting patients "advocate" for themselves with HCPs and should not "take no for an answer," and threaten to leave prescribers who did not provide Opioid Drugs; (6) creating and promoting the concept of "pseudoaddiction" when signs of actual addiction began appearing and advocated that the signs of addiction should be treated with more Opioid Drugs; (7) exaggerating the effectiveness of screening tools to prevent addiction; (8) claiming that opioid dependence and withdrawal are easily managed; (9) denying the risks of higher Opioid Drug dosages; and (10) actively concealing, and causing others to conceal, information about the safety (including addiction risk), efficacy, and usefulness of Opioid Drugs to treat long-term chronic pain.

787.    The illegal activities of the Opioid Marketing Enterprise required extensive use of the wires and mails by each of the Manufacturer Defendants, Front Groups, and KOLs including, *inter alia*: (1) making travel arrangements for sales representatives, speakers and KOLs (booking of hotels, airplane tickets, arranging meals, etc.); (2) teleconferences and telephonic training for

sales representatives and KOLs; (3) email communications with sales representatives, Front Groups and KOLs wherein Manufacturer Defendants exerted influence over misleading content as described herein; (4) the development and dissemination of sales representative training materials, Opioid Marketing Enterprise publications; (5) the dissemination of marketing materials to sales representatives, prescribers and consumers; (6) telephonic surveys of prescribers by third-party research firms; (7) developing advertising content for medical journals, pamphlets, brochures, videos and other materials (which were subsequently mailed or emailed); (8) developing websites for marketing to HCPs and consumers suffering from chronic pain; (9) developing and coordinating content of presentations made at conferences and CMEs; (10) publishing and disseminating CME materials; (11) disseminating press releases; (12) collecting data to micro-target certain HCPs and vulnerable patient populations; (13) paying "honoraria" to prescribers (such as the mailing of checks or wiring of funds); (14) paying general funds or grants to Front Groups; (15) paying KOLs and Front Groups (such as the mailing of checks or wiring of funds) to generate Opioid Marketing Enterprise publications and materials; (16) disseminating through the wires and mails in interstate commerce of formulary cards, detail pieces and advisory board materials; (17) widespread distribution of Opioid Marketing Enterprise publications (either by printing and mailing or emailing); (18) mailing of consumer marketing materials by Front Groups to various advocacy groups representing the interests of the elderly or wounded veterans; (19) mailing or emailing of consumer rebates, co-pay assistance vouchers, or coupons to physicians who provided them to consumers suffering from chronic pain; and (20) television broadcasting of various KOL and Front Group interviews aimed at disseminating marketing material to consumers suffering from chronic pain.

788.    Many of the precise dates of the fraudulent uses of the wires and mails by each Manufacturer Defendant are concealed from Plaintiff EBRCOC and cannot be alleged with more particularity without discovery and access to the Manufacturers' books, records and other documents.  However, Plaintiff EBRCOC has described the types of predicate acts of mail and wire fraud that occurred. The secretive nature of the Opioid Marketing Enterprise's activities make the unlawful tactics alleged herein even more deceptive and harmful.

789.    The Manufacturer Defendants' schemes and the above-described racketeering activities amounted to common courses of conduct intended to cause Plaintiff EBRCOC to pay for excessive amounts of Opioid Drugs.   Within the Opioid Marketing Enterprise, each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff EBRCOC. The Manufacturer Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to Plaintiff EBRCOC.  The Manufacturer Defendants and the other members of the Opioid Marketing Enterprise created and maintained systematic links for the common purpose of gaining revenue from marketing Opioid Drugs for the long-term treatment of chronic pain (including revenue from Plaintiff EBRCOC). Each of the members of the Opioid Marketing Enterprise received substantial revenue (including from Plaintiff EBRCOC) from misleadingly marketing Opioid Drugs in this manner. Such revenue was exponentially greater than it would have been if Opioid Drugs had been marketed appropriately.

790.    Within the Opioid Marketing Enterprise, certain activities have a hub and spoke organizational, decision-making structure, with the Manufacturer Defendants serving as the hub.

791.    All members of the Opioid Marketing Enterprise were aware of the Manufacturer Defendants' control over its activities, and each member benefited from the existence of the other members.

792.    The pattern of racketeering activities alleged herein and the Opioid Marketing Enterprise are separate and distinct from each other. The Manufacturer Defendants engaged in a pattern of racketeering activities alleged herein for the purpose of conducting the affairs of the Opioid Marketing Enterprise.

793.    Plaintiff EBRCOC has been injured in its property by reason of these violations. Through the Opioid Marketing Enterprise, Manufacturer Defendants caused prescribing HCPs to write far more prescriptions for Opioid Drugs than they would otherwise have written absent the Enterprise's racketeering activities. Further, through the Opioid Marketing Enterprise, Manufacturer Defendants caused health benefit plans and self-insured groups (including Plaintiff EBRCOC and its contracted TPA and/or PBM) to make coverage and formulary decisions that they would not have otherwise made absent the Opioid Marketing Enterprise's racketeering activities. This led Plaintiff EBRCOC to make hundreds of thousands of dollars in payments for Opioid Drugs—as well as payments for Opioid Drug-related addiction prescriptions and treatment services—that it would not have made otherwise.

794.    Plaintiff EBRCOC thus suffered direct, consequential and concrete financial loss flowing from the injury to its property by expending these funds, and thereby suffered out-of-pocket losses. And but for the predicate acts committed or caused to be committed by the Manufacturer Defendants, Plaintiff EBRCOC would not have suffered its RICO injuries.

795.    Plaintiff EBRCOC's injuries were directly and proximately caused by the Manufacturer Defendants' racketeering activities, as described herein. Plaintiff EBRCOC's

injuries were directly caused by the predicate acts and are not attributable to any independent or intervening factors; its injuries were a foreseeable and natural consequence of the Manufacturer Defendants' coordinated scheme; and there are no others, more directly injured, that could vindicate Plaintiff EBRCOC's claims.

796.    By virtue of these violations of 18 U.S.C. § 1962(c), the Manufacturer Defendants are jointly and severally liable to Plaintiff EBRCOC for three times the damages Plaintiff MMO has sustained, punitive damage, plus the cost of this lawsuit, including reasonable attorneys fees.

**Count II**
**VIOLATION OF RACKETEER INFLUENCED AND**
**CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c)**
**(Opioid Diversion Concealment Enterprise)**
**Against All Defendants**

797.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

798.    Plaintiff brings this Claim against all Defendants, because of the impact of this coordinated scheme on EBRCOC as described herein.

799.    The Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who participated in the conduct of the affairs of the Opioid Diversion Concealment Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

800.    The Defendants participated in the conduct of the affairs of Opioid Diversion Concealment Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Specifically, Defendants engaged in a conspiracy to expand the market for Opioid Drugs—thus inflating their own profits—by intentionally violating their legal requirements to identify, detect, monitor, and report evidence of Opioid Drug diversion. The Defendants' scheme allowed them to make billions of dollars in unlawful sales of Opioid Drugs and, in turn, increase

and/or maintain high production quotas with the purpose of ensuring unlawfully increasing revenues, profits, and market shares.

801.    The Opioid Diversion Concealment Enterprise is legal association and/or association-in-fact within the meaning of 18 U.S.C. § 1961(4), consisting of at a minimum, a Manufacturer Defendant, a Distributor Defendant and a pharmacy or retailer.  These legal associations and/or associations in fact are, for purposes of RICO, an enterprise (hereinafter, for purpose of this count, an "Enterprise," a "Opioid Diversion Concealment Enterprise," or collectively, the "Enterprises").

802.    Under the present facts, each Defendant either (a) agreed to operate or manage the Enterprise that did and does feloniously deal in controlled substances, an offense punishable under the laws of the United States, or (b) if a co-conspirator did not agree to operate or manage the Enterprise, each co-conspirator knowingly agreed to facilitate others who did and do operate or manage the Enterprise of felonious dealing in controlled substances, an offense punishable under the laws of the United States.

803.    To illustrate the concept of an Enterprise, consider the following example. A Manufacturer Defendant manufactures Opioid Drugs. The Manufacturer Defendant then sells the same Opioid Drugs to a Distributor Defendant. The Distributor Defendant then distributes, or sells, the same Opioid Drugs to a pharmacy or retailer.  Finally, the pharmacy or retailer sells the same Opioid Drugs to their customers who have been provided a prescription for the Opioid Drugs.

804.    To the Manufacturer Defendants, Distributor Defendants, and pharmacy or retailer, what the customer does with the Opioid Drugs once the final sale has been made is irrelevant. He may ingest the Opioid Drugs for legitimate medical purposes, such as to treat severe acute or chronic pain; he may abuse the Opioid Drugs personally by ingesting them for recreational

purposes or to support a drug habit; or he may give or sell them to a third-party abuser who ingests them recreationally or out of habit to support an addiction, thus supporting the black market for Opioid Drugs.

805.    Members of the Opioid Diversion Concealment Enterprise systematically violated their statutory duties to maintain effective controls against diversion of Opioid Drugs, to design and operate a system to identify suspicious orders of Opioid Drugs, to halt unlawful sales of suspicious orders, and to notify the DEA and authorities of suspicious Opioid Drug orders. Consequently, Defendants allowed hundreds of millions of pills to enter the illicit market, which allowed the Defendants to derive and be unjustly enriched by obscene profits.

806.    The Opioid Diversion Concealment Enterprise is an ongoing organization that functions as a continuing unit. It was created and used by each Defendant as a tool to effectuate a pattern of racketeering activity. The Defendant "persons" are distinct from the Drug Diversion Concealment Enterprise. The Defendants, however, were aware of the essential nature and scope of this Enterprise and intended to participate in and/or conduct it.

807.    The Opioid Diversion Concealment Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of promoting Opioid Drugs for unsafe uses, nurturing a diversion-based market for Opioid Drugs (to increase their profits), and securing formulary access and coverage for Opioid Drugs by denying health benefit plans and self-insured groups such as EBRCOC the knowledge needed to make informed formulary decisions.

808.    The Defendants have conducted and participated in the affairs of the Opioid Diversion Concealment Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and § 1961(5), which includes multiple instances of mail fraud in violation

of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, described herein. The false and misleading predicate acts of racketeering activity committed, or caused to be committed, by the Defendants number in the hundreds if not thousands, and the Defendants committed, or caused to be committed, at least two of the predicate acts within the requisite ten (10) year period.

809.    The Opioid Diversion Concealment Enterprise engaged in and affected interstate commerce, because, *inter alia*, it marketed, sold, or provided Opioid Drugs to thousands of entities and individuals throughout the United States and engaged in the prohibited conduct alleged herein throughout the United States.

810.    The Defendants exerted control over the Opioid Diversion Concealment Enterprise, and the Defendants participated in the operation or management of the affairs of the Opioid Diversion Concealment Enterprise in several ways including but not limited to:

(a) through their memberships in various industry groups, such as the PCF and the HDA;

(b) through their own contractual relationships;

(c) through their interpersonal relationships and communication network;

(d) without regard to their obligations under the CSA, Louisiana CDS Law and other state and federal laws and regulations, such as the obligation to report suspicious orders;

(e) without regard to whether the size of individual orders or collective volume of orders is appropriate, or extremely inappropriate, given the medical necessity for Opioid Drug prescriptions;

(f) without regard to whether an individual customer presents multiple Opioid Drug prescriptions from different doctors, who are unaware of each other, during a single month;

(g) without regard to whether the purchasers did in the past or continue to exhibit drug seeking behavior; and

(h) without regard to whether prescriptions were written by doctors who presently have a known history of engaging in suspicious or downright fraudulent over-prescribing.

811.    It was further part of said scheme and artifice that Defendants' communications directed toward government officials and courts would be and were designed to preserve and increase the market for prescription opioids while concealing Defendants' role in supporting an illegal market for Opioid Drugs, which in turn protected formulary access and coverage for the Opioid Drugs.

812.    Throughout the existence of the Opioid Diversion Concealment Enterprise, the Defendants purposefully failed to comply with all state and federal regulations regarding the identification and reporting of suspicious orders of prescription opioids—all the while espousing to the general public, to Congress, to federal and state agencies, and to health benefit plans and self-insured groups (including Plaintiff EBRCOC and/or it contracted PBM and TPA) their commitment to preventing diversion of prescription opioids.

813.    The felonious dealing described herein were made in furtherance of the Defendants' unified scheme to increase and maintain profits from unlawful sales of Opioid Drugs while thwarting the ability of federal and state regulators, as well as health benefit plans and self-insured groups (including Plaintiff EBRCOC) to prevent diversion. This unified scheme was furthered by (1) habitual noncompliance with federal and state law; (2) intensive lobbying of federal and state official to evade further regulation; and (3) increasing and/or maintaining high production quotas for their prescription Opioid Drugs from which Defendants could profit for as long as possible.

814.    The Defendants unlawfully, knowingly and intentionally combined, conspired, confederated, and agreed together with each other, and with others whose names are both known and unknown, to conduct and participate, directly and indirectly, in the overall objective of their unified scheme, and participated in the common course of conduct to fail to prevent the overprescribing and diversion of prescription Opioid Drugs.

815.    Each of the Defendants had to agree to implement similar tactics regarding marketing prescription Opioid Drugs and refusing to report suspicious orders. If any Defendants had properly disclosed and/or withheld suspicious orders, the conspiracy would be endangered.

816.    The illegal activities of the Opioid Diversion Concealment Enterprise required extensive use of the wires and mails by each of the Defendants including, *inter alia*: (1) Defendants' practice of asserting their commitment to preventing Opioid Drug diversion by various representations and statements in national publications; (2) providing false information by mail and/or wires (including the electronic submission of information) to federal agencies such as the DEA; (3) using webinars hosted by the HDA designed for Defendants to exchange detailed information regarding their prescription Opioid Drug sales, including purchase orders, acknowledgements, ship notices, and invoices; (4) using wires to transmit false acquisition and distribution transaction reports (as required by the CSA); (5) using wires to transmit false information to the DEA's ARCOS; (6) mailing and/or electronically transmitting orders of Opioid Drugs that Defendants knew would promote the Opioid Diversion Concealment Enterprise.

817.    Many of the precise dates of the fraudulent uses of the wires and mails by each of the Defendants are concealed from Plaintiff EBRCOC and cannot be alleged with more particularity without discovery and access to the Defendants' books, records and other documents. However, Plaintiff EBRCOC has described the types of predicate acts of mail and wire fraud that occurred. The secretive nature of the Opioid Diversion Concealment Enterprise's activities make the unlawful tactics alleged herein even more deceptive and harmful.

818.    The Defendants' schemes, including the fraudulent scheme to supply opioids in contradiction to public health and safety, and the above-described racketeering activities amounted to common courses of conduct intended to cause Plaintiff EBRCOC to pay for excessive amounts

of Opioid Drugs. Within the Opioid Diversion Concealment Enterprise, each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff EBRCOC. The Defendants' illegal activities, aimed at the concerted concealment of drug diversion data, are part of their ongoing business and constitute a continuing threat to Plaintiff EBRCOC.

819.    The Defendants and other potential members of the Opioid Diversion Concealment Enterprise created and maintained systematic links for the common purpose of securing Opioid Drug access and coverage, including on EBRCOC's formulary. This allowed each of the members of the Opioid Diversion Concealment Enterprise to receive substantial revenue (including from Plaintiff EBRCOC). Such revenue was exponentially greater than it would have been if Defendants had complied with their obligations to identify, monitor, and report evidence of drug diversion.

820.    The Opioid Diversion Concealment Enterprise has a hub and spoke organizational, decision-making structure, with the Defendants serving as the hub.

821.    All members of the Opioid Diversion Concealment Enterprise were aware of the Defendants' control over its activities. Furthermore, each member of the Opioid Diversion Concealment Enterprise benefited from the existence of the other members.

822.    The pattern of racketeering activities alleged herein and the Opioid Diversion Concealment Enterprise are separate and distinct from each other. The Defendants engaged in a pattern of racketeering activities alleged herein for the purpose of conducting the affairs of the Opioid Diversion Concealment Enterprise.

823.    Plaintiff EBRCOC has been injured in its business and/or property by reason of these violations. Through the Enterprises, Defendants secured and protected access and coverage with respect to health benefit plans' and self-insured groups' formularies, including EBRCOC's

formulary, which increased both prescriber and patient demand for Opioid Drugs. Defendants'
illegal conduct through their Enterprises led health benefit plans and self-insured groups (including
Plaintiff EBRCOC) to make coverage and formulary decisions that they would not have otherwise
made absent the Opioid Diversion Concealment Enterprise racketeering activities. This led
Plaintiff EBRCOC to make hundreds of thousands of dollars in payments for Opioid Drugs—as
well as payments for Opioid Drug-related addiction prescriptions and treatment services—that it
would not have made otherwise.

824.    As a direct result of the Defendants' fraudulent scheme, course of conduct, and
pattern of racketeering activity, they were able to extract billions of dollars from the addicted
American public, while entities like EBRCOC experienced substantial dollars of injury caused by
the reasonably foreseeable consequences of the prescription opioid addiction epidemic. For
example, Defendants' unlawful pattern of racketeering caused EBRCOC to make substantial
payments for increased medical and emergency services to deal with opioid use and overdoses; to
incur employment costs and loss of productivity due to opioid use; and incur increased judicial
costs associated in part with increased crime rates and increased children and family welfare
services resulting from opioid use and abuse, that EBRCOC would not have made or incurred
absent Defendants' conduct.

825.    Plaintiff EBRCOC thus suffered direct, consequential, and concrete financial losses
flowing from the injury to its property and/or business by expending these funds, and thereby
suffered out-of-pocket losses. And but for the predicate acts committed or caused to be committed
by the Defendants, Plaintiff EBRCOC would not have suffered its RICO injuries.

826.    Plaintiff EBRCOC's injuries were directly and proximately caused by the
Defendants' racketeering activity, as described above. Plaintiff EBRCOC's injuries were directly

caused by the predicate acts and are not attributable to any independent or intervening factors; its injuries were a foreseeable and natural consequence of the Defendants' scheme; and there are no others, more directly injured, that could vindicate Plaintiff EBRCOC's claims.

827.    By virtue of these violations of 18 U.S.C. § 1962(c), the Defendants are jointly and severally liable to Plaintiff EBRCOC for three times the damages Plaintiff EBRCOC has sustained, punitive damages, plus the cost of this lawsuit, including reasonable attorney fees.

**Count III**
**VIOLATION OF RACKETEER INFLUENCED AND**
**CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d)**
**(Civil RICO Conspiracy to Violate 18 U.S.C. § 1962(c))**
**Against All Defendants**

828.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

829.    Plaintiff brings this Claim against all Defendants, because of the impact of this scheme on EBRCOC as described herein.

830.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

831.    The Manufacturer Defendants have violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of the conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the Opioid Marketing Enterprise through a pattern of racketeering activity.

832.    Further, all Defendants have violated §1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of the conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the Opioid Diversion Concealment Enterprise through a pattern of racketeering activity.

833.    Defendants' co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including the numerous material misrepresentations and omissions as described in detail herein.

834.    The nature of the Defendants' acts, material misrepresentations, and omissions (as described herein) in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

835.    As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), EBRCOC has been and continues to be injured in its business or property as set forth more fully above.

836.    Defendants sought to and have engaged in the commission of and continue to commit overt acts, including the following unlawful racketeering predicate acts: (1) multiple instances of mail and wire fraud violations of 18 U.S.C. § 1341 and § 1343; and (2) multiple instances of unlawful activity in violation of 18 U.S.C. § 1952.

837.    Defendants' violations of the above federal laws and the effects thereof as detailed herein are continuing and will continue in the future, unless enjoined by this Court.

838.    Plaintiff EBRCOC has been injured in its property or business by reason of these violations in that EBRCOC has paid hundreds of thousands of dollars for Opioid Drugs and addiction-related costs that it would not have paid had Defendants not conspired to violate 18 U.S.C. § 1962(c). EBRCOC has likewise been injured by Defendants' violations in paying for emergency and medical services resulting from opioid use and overdoses, incurring increased

employment costs and loss of productivity due to opioid use and abuse, and incurring increased

judicial costs associated in part with an increase in crime rates and the need for children and family

welfare services because of opioid use and abuse.

839.    Injuries suffered by Plaintiff EBRCOC were directly and proximately caused by

Defendants' racketeering activity as described herein.

840.    By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are liable to

Plaintiff EBRCOC for compensatory damages, equitable and declaratory relief, punitive damages,

costs and reasonable attorney fees.

**Count IV**
**VIOLATION OF LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER
PROTECTION LAW, La. R.S. §§ 51:401, *et seq.***
**Against All Defendants**

841.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set

forth herein.

842.    Under LUTPA, La. R.S. § 51:1405: "[u]nfair methods of competition and unfair or

deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

843.    "Trade" or "commerce" are further defined under LUTPA as "advertising, offering

for sale, sale, or distribution of any services and any property. . . and includes any trade or

commerce directly or indirectly affecting people of the state." La. R.S. § 51:1402(10).

844.    LUTPA defines "person" as "a natural person, corporation, trust, partnership,

incorporated or unincorporated association, and any other legal entity." La. R.S. § 51:1402(8).

845.    LUTPA allows any "person" or "legal entity" who suffers any ascertainable loss of

money or property as a result of such acts declared unlawful under La. R.S. § 51:1405 to bring an

action to recover actual damages.

846.    Defendants are "persons" as defined by LUTPA and have advertised, offered for sale, sold and/or distributed services and property in the form of or relating to Opioid Drugs.

847.    Pharmaceutical manufacturers and distributors, including Defendants, are required to comply with the provisions of LUTPA in their marketing, sale and distribution of prescription drugs.

848.    At all times relevant to this Complaint, Defendants have violated LUTPA's prohibition of engaging in unconscionable commercial practices in their advertisement, offer for sale, and actual sale of the Opioid Drugs by:

> (a)    engaging in deceptive, fraudulent, false, and misleading marketing that was unsupported by substantial scientific evidence to support product claims;
>
> (b)    engaging in a marketing campaign that failed to present a fair balance of benefit and risk information in its promotion of Opioid Drugs, despite the known, serious risk of addiction and adverse effects posed by Opioid Drugs;
>
> (c)    promoting the purported advantages of Opioid Drugs over other pain relief products without substantial scientific evidence to support those claims;
>
> (d)    promoting high doses of Opioid Drugs for extended periods of time, in contravention of longstanding public policy to avoid and minimize the risk of addiction and abuse of controlled substances;
>
> (e)    misusing KOLs and creating false Front Groups, and infiltrating respectable scientific literature and medical societies to perpetuate their deceptive messaging to physicians in order to increase sales of their products;
>
> (f)    using unbranded marketing, Front Groups, and KOLs to evade federal and state oversight and rules prohibiting deceptive marketing and to deceive prescribers and consumers regarding the impartiality of the information conveyed;
>
> (g)    failing to disclose that Opioid Drugs are highly addictive with a high risk of overdose, death, or life-long damage to the brain;
>
> (h)    making false claims to the medical community and in public advertising that prescription Opioid Drugs were relatively safe for the treatment of chronic pain;
>
> (i)    causing misleading statements about Opioid Drugs to be disseminated;

(j)      making statements to promote the use of Opioid Drugs to treat chronic pain that omitted or concealed material facts;

(k)      failing to correct prior misrepresentations and omissions about the risks and benefits of Opioid Drugs.

(l)      misrepresenting the existence of a "pain epidemic" and urgency with which it must be addressed;

(m)      misrepresenting the efficacy with which long-term Opioid Drug therapy treats or manages chronic pain;

(n)      misrepresenting the ability of Opioid Drugs to improve life functions (such as psychological health, health-related quality of life, and quality of life itself);

(o)      downplaying the serious risk of addiction;

(p)      creating and promoting the concept of "pseudoaddiction" when signs of actual addiction began appearing and advocating that the signs of addiction should be treated with more Opioid Drugs;

(q)      exaggerating the effectiveness of screening tools to prevent addiction;

(r)      claiming that Opioid Drug dependence and withdrawal are easily managed;

(s)      denying the risks of higher Opioid Drug dosages;

(t)      exaggerating the effectiveness of "abuse-deterrent" Opioid Drug formulations to prevent abuse and addiction;

(u)      actively concealing, and causing others to conceal, information about the safety (including addiction risk), efficacy, and usefulness of Opioid Drugs long-term to treat chronic pain;

(v)      Failing to comply with non-delegable duty to guard against and prevent the diversion of Opioids Drugs to other than legitimate medical, scientific, and industrial channels;

(w)      Knowingly failing to report suspicious Opioid Drug orders of unusual size, orders deviating substantially from a normal pattern and orders of unusual frequency;

(x)      Failing to monitor, detect and investigate suspicious Opioid Drug orders;

(y)      Combining resources with other Defendants and third parties through which Defendants intentionally ignored their legal obligations to identify, monitor and report suspicious activity indicating drug diversion and actively concealing evidence of the same; and

(z)  Disseminating false and misleading statements to state and federal regulators claiming (1) the quotas for prescription Opioid Drugs should be increased; (2) they were complying with their obligations to maintain effective controls against diversion of their prescription Opioid Drugs; (3) they were complying with their obligations to design and operate a system to disclose to the registrant suspicious orders of their prescription Opioid Drugs; (4) they were complying with their obligation to timely notify the state and federal enforcement agencies of any suspicious orders or diversion of their prescription Opioid Drugs; and (5) they did not have the capability to identify suspicious orders of controlled substances despite their possession of national, regional, state, and local prescriber and patient-level data that allowed them to track prescribing patterns over time.

849.    These acts or practices were unconscionable because they unethically deprived prescribers of the information they needed to appropriately prescribe, or not prescribe, these dangerous drugs.  Patients who use Opioid Drugs can quickly become dependent and addicted, such that neither the patient nor the prescriber can avoid injury by simply stopping or choosing alternative treatment.

850.    By virtue of the acts alleged above, Defendants engaged in methods, acts and practices with the intent to defraud the EBRCOC, Louisiana healthcare providers, prescribers, consumers, and Louisiana elder persons and disabled persons.

851.    Defendants egregiously, knowingly and willfully engaged in the unfair and deceptive trade practices described herein.

852.    Defendants' unfair and deceptive trade practices are immoral, unethical, oppressive and offensive to established public policy, have the potential for repetition and will continue to have a direct injurious impact upon the EBRCOC and public interest.

853.    Each unfair and deceptive trade practice by Defendants constitutes a separate violation under LUTPA.

854.    By reason of Defendants' acts, the EBRCOC has been harmed and continues to be harmed, including but not limited to, the following ascertainable losses: increased costs for Opioid

Drugs and opioid-related prescriptions, services and treatments under the EBRCOC's health care plans; increased costs for health services and medications to treat opioid dependence and addiction, as well as prescriptions to combat opioid dependence and withdrawal symptoms when opioids are delayed or discontinued; medical and emergency services to deal with opioid overdoses; employment costs and loss of productivity due to opioid use; and increased judicial costs associated in part with increased crime rates and increased children and family welfare social services resulting from the opioid use and abuse.

855.    The EBRCOC is a legal entity and therefore a person and brings this count under LUTPA seeking all remedies available under La. R.S. §§ 51:1401, *et seq.*, including injunctive relief, compensatory damages, applicable civil penalties, restitution, disgorgement of profits, treble damages, attorney's fees and costs, pre- and post-judgment interest and any other appropriate relief.

### Count V
### VIOLATIONS OF THE LOUISIANA RACKETEERING ACT
### La. R.S. §§ 15:1351 *et seq.*
### (Opioid Marketing Enterprise)
### Against Manufacturer Defendants

856.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

857.    Manufacturer Defendants formed an association-in-fact enterprise referred to herein as the "Opioids Marketing Enterprise."  The Opioid Marketing Enterprise consists of (a) Manufacturer Defendants, including their employees and agents; (b) the Front Groups, including their employees and agents; and (c) physician KOLs.

858.    This association-in-fact enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity including the Manufacturer Defendants' financing of

fraudulent scientific articles about the safety and efficacy of Opioid Drugs and their control of the KOL physicians to promote false information about Opioid Drugs to induce fraudulent sales.

859.    The Opioids Marketing Enterprise is an ongoing and continuing business organization that created and maintained systematic links for a common purpose: to preserve and expand the market for Opioid Drugs by ensuring their prescription for chronic pain and other unsafe, unnecessary, and unapproved uses, and gaining profits therefrom.

860.    Manufacturer Defendants have controlled and operated the Opioid Marketing Enterprise by, among other things: (a) recruiting and funding KOLs within Louisiana to promote the sale and prescription of their Opioid Drugs;  (b) funding Front Groups for the purpose of promoting the sale of their Opioid Drugs; (c) providing research and data regarding the purported uses and safety of their Opioid Drugs to the Front Groups and KOLs for use in educational and CME materials, physician handbooks/brochures, newsletters, publications, and other consumer informational materials; and (d) financing and/or sponsoring CMEs which are used to promote the purported uses and safety of Opioid Drugs.

861.    The Louisiana RICO Act prohibits: "committing, attempting to commit, or soliciting, coercing, or intimidating another person to commit any crime that is punishable under . . . the Uniform Controlled Dangerous Substances Law," among other enumerated acts. La. R.S. § 15:1352(A).

862.    Opioid Drugs are categorized as "controlled dangerous substances" under Louisiana law and are further considered "Schedule II" drugs as they have a "high potential for abuse." *See* La. R.S. §§ 40:961(8), (29.1); 40:963(B); 40:964. Louisiana CDS Law explicitly provides that "[p]hysical dependence is an expected result of opioid use." La. R.S. § 40:961(29.1).

863.   Under the Louisiana CDS Law, it is unlawful "for any person to disseminate false advertisements by any means for the purposes of inducing, directly or indirectly, the purchase of . . . drugs." La. R.S. § 40:625(c). Additionally, any person who misbrands any drug with the intent to defraud or mislead violates the Louisiana CDS Law. La. R.S. §§ 40:971.3, 40:617. A drug is considered misbranded "if . . . it is dangerous to health under the conditions of use prescribed in the labeling or advertising thereof." La. R.S. § 40:617.

864.   The unlawful or unauthorized manufacture, distribution or dispensing of Opioid Drugs constitute predicate acts of racketeering activity. La. R.S. § 15:1352(A)(13) (citing La. R.S. § 40:967(A)).

865.   Manufacturer Defendants violated the Louisiana RICO Act by knowingly, intentionally and unlawfully aiding, abetting and conspiring with each other to commit violations of the Louisiana CDS Law and federal law. La. R.S. § 15:1353.   Manufacturer Defendants committed these actions intentionally and knowingly with specific intent to advance their schemes, or with the knowledge that their actions would result in violations of the Louisiana CDS Law and federal law in the ordinary course of business, or that such violations, promoting their Opioid Drugs for unsafe, unapproved and unnecessary uses, were foreseen as against public health and safety, even if not explicitly intended.

866.   As alleged in greater detail above, the Manufacturer Defendants created false marketing materials, press releases, educational and CME materials, physician handbooks, brochures, newsletters, publications, and other consumer information materials fraudulently promoting their Opioid Drugs.

867.   Manufacturer Defendants worked together and made communications necessary to the effectuation of their collaborative scheme.

868.    Manufacturer Defendants' misrepresentations, omissions, acts of concealment, and failures to disclose were knowing and intentional and made for the purposes of deceiving and defrauding Plaintiff EBRCOC and obtaining Plaintiff's property for Manufacturer Defendant's gain.

869.    Manufacturer Defendants knew or recklessly disregarded that their misrepresentations were material, and Plaintiff and/or its contracted PBM and TPA relied upon the misrepresentations and omissions as described above.

870.    As a direct and foreseeable result of Manufacturer Defendants' fraudulent schemes as alleged herein, Plaintiff has been injured in its businesses and property.

871.    As a result of their misrepresentations and omissions, Manufacturer Defendants obtained money and property belonging to Plaintiff, and Plaintiff has been injured in its business or property by Manufacturer Defendants' acts which violate the Louisiana CDS Law and federal law.

872.    The EBRCOC's injuries, were proximately caused by the Manufacturer Defendants' racketeering activity.  But for the misstatements by Manufacturer Defendants, Front Groups, and KOLs, as well as the scheme employed by the Opioid Marketing Enterprise, the EBRCOC would not have paid for Opioid Drug prescriptions for chronic pain or related treatments, including associated payments for addiction treatment and prescriptions, nor incurred additional costs related to the opioid epidemic caused by Manufacturer Defendants' unauthorized manufacture, distribution and/or dispensing of Opioid Drugs in violation of the Louisiana CDS Law, federal law, and against the public interest of health and safety.

873.    By virtue of these violations, Manufacturer Defendants are jointly and severally liable to the EBRCOC for three times the damages Plaintiff has sustained, plus the cost of this suit, including reasonable attorney fees.

874.    Plaintiff brings this claim against Manufacturer Defendants seeking all legal and equitable relief as allowed by law, including *inter alia* actual damages, treble damages, equitable relief, forfeiture as deemed proper by the Court, attorneys' fees and all costs and expenses of suit and pre- and post-judgment interest. La. R.S. § 15:1356(E).

**Count VI**
**VIOLATIONS OF THE LOUISIANA RACKETEERING ACT**
**La. R.S. §§ 15:1351 *et seq.***
**(Opioid Diversion Concealment Enterprise)**
**Against All Defendants**

875.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

876.    Defendants formed an association-in-fact enterprise referred to herein as the "Opioids Diversion Concealment Enterprise."  The Opioid Diversion Concealment Enterprise consists of (a) Manufacturer Defendants, including their employees and agents; (b) Distributor Defendants, including their employees and agents; and (c) retail pharmacies.

877.    This association-in-fact enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity.

878.    The Opioids Diversion Concealment Enterprise is an ongoing and continuing business organization that created and maintained systematic links for a common purpose: to expand the market for Opioid Drugs by intentionally and unlawfully increasing sales, revenues and profits by violating their legal and statutory requirements to identify, detect, monitor,

investigate, halt and report suspicious orders and any evidence of Opioid Drug diversion into the illicit market to unlawfully increase quotas set by the DEA, and collectively earn profits therefrom.

879.    Defendants have controlled and operated the Enterprise: (a) through their membership in various industry and Front Groups, including the PCF and the HDA; (b) through their own contractual relationships; (c) through interpersonal relationships and network communications; (d) without regard to their obligations under state and federal law, including the obligation to report suspicious orders; and (e) without regard to whether prescriptions presented by purchasers are for legitimate purposes; among other things.

880.    Alternatively, the Defendants were members of a legal entity enterprise within the meaning of La. R.S. § 15:1352, through which Defendants conducted their pattern of racketeering activity in the State of Louisiana, including within East Baton Rouge Parish and this judicial district. Specifically, the HDA, which is a distinct legal entity that satisfies the definition of a Louisiana RICO enterprise. The HDA is a non-profit corporation formed under the laws of the District of Columbia and doing business in Virginia. As a non-profit corporation, the HDA qualifies as an "enterprise," because it is a corporation and a legal entity.

881.    Upon information and belief, each Defendant is a member, participant and/or sponsor of the HDA and utilized the HDA to conduct the Opioid Diversion Concealment Enterprise and to engage in the pattern of racketeering activity alleged herein.

882.    Each Defendant is a legal entity separate and distinct from the HDA, and the HDA serves the interests of the distributors and manufacturers beyond Defendants. Therefore, the HDA exists separately from the Opioid Diversion Concealment Enterprise, and each Defendant exists separately from the HDA.  Therefore, the HDA may serve as a Louisiana RICO enterprise.

883.    The Louisiana RICO Act prohibits: "committing, attempting to commit, or soliciting, coercing, or intimidating another person to commit any crime that is punishable under . . . the Uniform Controlled Dangerous Substances Law," among other enumerated acts. La. R.S. § 15:1352(A).

884.    Opioid Drugs are categorized as "controlled dangerous substances" under federal law and Louisiana law and are further considered "Schedule II" drugs as they have a "high potential for abuse." *See* La. R.S. §§ 40:961(8), (29.1); 40:963(B); 40:964. Louisiana CDS Law explicitly provides that "[p]hysical dependence is an expected result of opioid use." La. R.S. § 40:961(29.1).

885.    Under Louisiana CDS Law, the manufacture and distribution of controlled dangerous substances should be consistent with the public interest. La. R.S. § 40:974(A). In determining the public interest, the following factors are considered: "(1) Maintenance of effective controls against diversion of particular controlled dangerous substances and any Schedule I or II substance compounded therefrom into other than legitimate medical, scientific, or industrial channels. (2) Compliance with applicable state and local law. (3) Prior conviction record of applicant under federal or state laws relating to the manufacture, distribution, or dispensing of such substances. (4) Past experience in the manufacture of controlled dangerous substances, and the existence in the establishment of effective controls against diversion. (5) Such other factors as are relevant to and consistent with the public health and safety." La. R.S. § 40:974.

886.    The unlawful or unauthorized manufacture, distribution or dispensing of Opioid Drugs constitute predicate acts of racketeering activity. La. R.S. § 15:1352(A)(13) (citing La. R.S. § 40:967(A)).

887.    Defendants violated the Louisiana RICO Act by knowingly, intentionally and unlawfully aiding, abetting and conspiring with each other to commit violations of the Louisiana CDS Law, La. R.S. § 15:1353, filing or maintaining false public records in violation of La. R.S. § 14:133, and federal law.  Defendants committed these actions intentionally: and knowingly with specific intent to advance their schemes, or with the knowledge that their actions would result in violations of the Louisiana CDS Law and federal law in the ordinary course of business, or that such violations were foreseen as against the public interest, even if not explicitly intended.

888.    As alleged in greater detail herein, Defendants violated the Louisiana CDS Law, as well as the Louisiana DDD Act, the Louisiana Prescription Monitoring System and federal law governing controlled dangerous substances by: (a) providing false information to state and federal enforcement, (b) transmitting false acquisition and distribution transaction reports, (c) transmitting orders of Opioid Drugs that Defendants knew would promote the Opioid Diversion Concealment Enterprise, (d) failing to maintain complete and accurate records of Opioid Drug manufacturing, distribution, and/or dispensing, (e) failing to maintain effective controls against diversion of Opioid Drugs into other than legitimate medical, scientific, or industrial channels, (f) failing to comply with federal, state and local laws, (g) failing to report suspicious orders of Opioid Drugs to appropriate enforcement, and (h) manufacturing, distributing or dispensing Opioid Drugs in a manner inconsistent with public health and safety.

889.    Defendants' misrepresentations, omissions, acts of concealment, and failure to report suspicious orders and maintain effective controls against diversion were done knowingly and intentionally, made for the purposes of expanding the Opioid Drug market and deceiving and defrauding Plaintiff EBRCOC in order to obtain Plaintiff's property for Defendants' gain.

890.    Defendants knew or recklessly disregarded that their violations of Louisiana CDS Law regulations and federal law were material, and Plaintiff relied upon the misrepresentations and omissions regarding Defendants' compliance with the Louisiana and federal law as described herein.

891.    As a direct and foreseeable result of Defendants' fraudulent schemes as alleged herein, Plaintiff has been injured in its businesses and property.

892.    As a result of their misrepresentations and omissions, Defendants obtained money and property belonging to Plaintiff, and Plaintiff has been injured in its business or property by Defendants' acts which violate the Louisiana CDS Law, federal law, and are inconsistent with public health and safety.

893.    The EBRCOC's injuries, were proximately caused by Defendants' racketeering activity.  But for the Defendants' and retail pharmacies, as well as the scheme employed by the Opioid Diversion Concealment Enterprise, the EBRCOC would not have paid for Opioid Drug prescriptions for chronic pain or related treatments, including payments for addiction related prescriptions and services, nor incurred additional costs related to the opioid epidemic and diversion caused by Defendants' unauthorized manufacture, distribution and/or dispensing of Opioid Drugs in violation of the Louisiana CDS Law and federal law.

894.    By virtue of these violations, Defendants are jointly and severally liable to the EBRCOC for three times the damages Plaintiff has sustained, plus the cost of this suit, including reasonable attorney fees.

895.    Plaintiff brings this claim against Manufacturer Defendants seeking all legal and equitable relief as allowed by law, including *inter alia* actual damages, treble damages, equitable

relief, forfeiture as deemed proper by the Court, attorney fees and all costs and expenses of suit and pre- and post-judgment interest. La. R.S. § 15:1356(E).

**Count VII**
**VIOLATIONS OF THE LOUISIANA RACKETEERING ACT,**
**La. R.S. §§ 15:1351 *et seq*.**
**(Civil Conspiracy to Violate La. R.S. § 15:1353)**
**Against All Defendants**

896.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

897.    La. R.S. § 15:1353(c) provides that it "is unlawful for any person employed by, or associated with, any enterprise knowingly to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity."

898.    All Defendants have violated La. R.S. § 15:1353(d) by conspiring to violate La. R.S. § 15:1353(c) through the fraudulent promotion and unauthorized manufacture, distribution and/or dispensing of Opioid Drugs in violation of the Louisiana Prescription Drug Monitoring Program, federal law, Louisiana CDS Law and Louisiana DDD Act regulations, inconsistent with public health and safety in order to obtain money or property belonging to the Plaintiff. The object of this conspiracy has been and is to conduct and participate in, directly or indirectly, the affairs of the Enterprises through a pattern of racketeering activity that directly caused injuries to the Plaintiff's business or property.

899.    Each Defendant committed or aided and abetted in the commission of at least two acts of racketeering activity within the past five years. Defendants have committed multiple acts of racketeering activity (as alleged herein) that were not isolated, but shared a similar purpose, participants, and methods that victimized the same or similar victims, including Plaintiff EBRCOC.

900.    Each Defendant knowingly, willfully, and unlawfully agreed and combined to conduct or participate, directly or indirectly, in the conduct of the affairs and activities of the Enterprises through a pattern of racketeering activity.  Defendants manifested their agreement to the commission of the substantive violations of the Louisiana Racketeering Act by at least one member of the conspiracy by words or acts, as alleged herein.

901.    Each Defendant committed at least one overt act of racketeering activity or other wrongful activity, as alleged herein, in furtherance of such conspiracy.

902.    Even if some of the Defendants did not agree specifically to harm the Plaintiff, the purpose of the acts that caused the Plaintiff's injuries was to advance the overall object of the conspiracy – unlawfully expand the market for Opioid Drugs and earn profits therefrom- and the harm to the Plaintiff was a reasonably foreseeable consequence of the Defendants' scheme.

903.    As a direct and proximate result, Plaintiff has been and continues to be injured in its business or property by the predicate acts that make up the Defendants' pattern of racketeering activity through the Enterprises as set forth more fully herein.

904.    By virtue of these violations, Defendants are jointly and severally liable to the EBRCOC for three times the damages Plaintiff has sustained, plus the cost of this suit, including reasonable attorney fees.

**Count VIII**
**PUBLIC NUISANCE**
**Against All Defendants**

905.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

906.    Defendants' unlawful actions and conduct, as alleged herein, have created a public nuisance under Louisiana law, and Plaintiff EBRCOC brings an action for abatement of that

nuisance. *See* La. R.S. § 13:4712 (granting Plaintiff the right to petition for injunction or order of abatement to suppress nuisances).

907.    A prohibited activity under Louisiana public nuisance statutes includes the illegal manufacture, sale or distribution of, or possession with intent to manufacture, sell or distribute a controlled dangerous substance, including opiates. La. R.S. §§ 13:4711(4)(b); 40:961(26), (27).

908.    Defendants have created a public nuisance with their violations of the Louisiana CDS Law, Louisiana DDD Act regulations, federal law and in their unlawful manufacture, sale and distribution of Opioid Drugs in Louisiana in a manner inconsistent with public health and safety.

909.    Each Defendant is liable for public nuisance because its conduct at issue, as alleged herein, has caused an unreasonable and substantial interference with a right common to the general public, which is the proximate cause of and/or substantial factor leading to Plaintiff's injury. *See* Restatement Second, Torts § 821B.

910.    Through the actions described herein, Defendants have created a public nuisance by unreasonably interfering with the right common to the public to public health, safety, peace, comfort, and convenience.

911.    The public has a common right to be free from the substantial injury to public health, safety, peace, comfort, and convenience that has resulted from Defendants' actions described herein.

912.    Defendants' conduct as described herein has unreasonably interfered with a right common to the general public of East Baton Rouge Parish and the EBRCOC by: (a) significantly interfering with the public health, the public safety, the public peace, the public comfort or the public convenience; (b) engaging in conduct that is proscribed by the Louisiana CDS Law,

Louisiana DDD Act regulations and other state and federal laws; and (c) engaging in conduct that is of a continuing nature or has produced a permanent or long-lasting effect, and, as Defendants knew or had reason to know, has a significant effect upon the public right.

913.    Each of the Manufacturer Defendants unreasonably interfered with rights common to the general public of East Baton Rouge Parish, including the EBRCOC, by intentionally, unlawfully, recklessly, and/or negligently manufacturing, marketing, distributing, and selling their Opioid Drugs through materially false and misleading statements to physicians, pharmacists, insurers, and members of the general public that misrepresented the characteristics and safety of Opioid Drugs and that resulted in widespread inappropriate and ineffective use of these highly addictive and dangerous pharmaceuticals.  Manufacturer Defendants further misled regulators as to the addictive nature of their drugs, promoting and marketing the use of Opioid Drugs for uses not approved, circulating false and misleading information concerning Opioid Drugs' safety and efficacy, and downplaying or failing to disclose the risk of addiction arising from their use.  In so doing, the Manufacturer Defendants acted unreasonably, recklessly, and with actual malice.

914.    Each of the Defendants unreasonably interfered with rights common to the general public of East Baton Rouge Parish, including the EBRCOC, by failing to design and operate a system that would disclose the existence of suspicious orders of controlled substances and/or by concealing and failing to report suspicious orders of Opioid Drugs as required by Louisiana CDS Law, Louisiana DDD Act regulations, Louisiana Prescription Monitoring Program, and other state and federal laws.  Defendants intentionally, unlawfully, recklessly, and/or negligently manufactured, marketed, distributed and/or sold Opioid Drugs that Defendants knew or, or should have reasonably known, would be diverted, causing widespread distribution of prescription opioids in and/or to Plaintiff EBRCOC, resulting in addiction and abuse, an elevated level of crime, death

and injuries to the residents of East Baton Rouge Parish, a higher level of fear, discomfort, and inconvenience to the resident of East Baton Rouge, and with direct costs to Plaintiff EBRCOC.  In doing so, Defendants acted unreasonably, recklessly, and with actual malice.

915.    Distributor Defendants violated Louisiana's public nuisance statutes by conducting, carrying on and knowingly permitting prohibited activities at distribution centers located in Louisiana. *See* La. R.S. § 13:4711.

916.    Defendants' conduct has interfered with the right common to the public in causing injuries including, but not limited to, (a) widespread dissemination of false and misleading information regarding the risks and benefits of long-term use of Opioid Drugs to treat chronic pain; (b) a distortion of the medical standard of care for treating chronic pain, resulting in pervasive and excessive overprescribing of Opioid Drugs and the failure to provide more appropriate pain treatments; (c) high rates of opioid abuse, addiction, injury, overdose, and death, and their impact on East Baton Rouge Parish families and communities; (d) increased health care costs and addiction and overdose related services; (e) lost employee productivity resulting from the cumulative effects of long-term Opioid Drug use, addiction, and death; (g) the creation and maintenance of a secondary, criminal market for Opioid Drugs; and (h) escalating crime rates and need for children and family welfare services leading to increased law enforcement and judicial costs, including costs to Plaintiff EBRCOC.

917.    As detailed herein, Defendants' conduct has interfered with and continues to interfere with rights common to the general public of East Baton Rouge Parish, and has caused the EBRCOC to sustain damages special and particular in kind.

918.    Defendants' conduct created this public nuisance and Defendants' actions were a direct and legal cause of the public nuisance.

919.    Defendants' actions were a substantial factor in creating the public nuisance by deceiving prescribers and patients about the risks and benefits of Opioid Drugs and distorting the medical standard of care for treating chronic pain.  Without Defendants' actions, Opioid Drug use would not have become dangerously widespread and the opioid epidemic that now exists in East Baton Rouge Parish, the State of Louisiana, and the United States would have been averted or would be much less severe.

920.    Defendants' actions, alleged herein, were a substantial factor in creating the public nuisance.

921.    The public nuisance was foreseeable result of Defendants' actions. Defendants' conduct in marketing, distributing and selling Opioid Drugs, which the Defendants knew or should have reasonably known, would be diverted for non-legitimate, non-medical uses, created a strong likelihood that these illegal distributions of opioids would cause injuries and death to residents in East Baton Rouge Parish and otherwise significantly and unreasonably interfere with public health, safety and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

922.    In light of Defendants' failures to disclose suspicious orders of Opioid Drugs, and in light of Manufacturer Defendants' aggressive misinformation campaign regarding Opioid Drugs, the EBRCOC was unaware of, and could not reasonably know or have learned through reasonable diligence, that it had been exposed to the risks alleged herein.  Information pertaining to the suspicious orders of Opioid Drugs the Defendants were required to disclose, but did not disclose, was nonpublic information over which the Defendants had and continue to have exclusive control, and which Defendants knew was unavailable to the EBRCOC.

923.    At all times relevant to this Complaint, Defendants were in complete control over the instrumentalities constituting the public nuisance.

924.    The EBRCOC had neither knowledge nor reason to suspect that the Defendants were engaged in the wrongdoing alleged herein.  Because of the Defendants' fraudulent acts of concealment of wrongdoing, the EBRCOC could not have reasonably discovered the wrongdoing in time to stop the opioid epidemic in East Baton Rouge Parish.

925.    Defendants' conduct was unlawful, intentional or reckless and has resulted in significant and unreasonable interference with the public health, safety, peace, and welfare of the residents of East Baton Rouge Parish, which constitutes a public nuisance that, if unabated, will continue to threaten the health, safety, and welfare of the Parish, with direct costs to Plaintiff EBRCOC.

926.    The public nuisance can be abated, in part, through health care provider and consumer education on appropriate prescribing, honest marketing of the risks and benefits of long-term Opioid Drug use, addiction treatment, disposal of unused Opioid Drugs, adequate monitoring programs to detect and deter suspicious orders of Opioid Drugs, and other such means.

927.    Stemming the flow of illegally-distributed Opioid Drugs, and abating the nuisance caused by the illegal flow of Opioid Drugs, will help to alleviate opioid diversion and the ensuing associated plague of prescription opioid and illicit drug abuse and addiction, saving lives, preventing injuries, and making East Baton Rouge Parish a safer place to live.

928.    The EBRCOC has a clearly ascertainable right to abate conduct that perpetuates this public nuisance.

929.     Defendants received a material benefit from Plaintiff's expenditure of funds to purchase Opioid Drug prescriptions for its insured employees and retirees under the Plaintiff's medical benefits, and prescription drug plans.

930.     It would be unjust for Defendants to retain these benefits.  It would be inequitable to Plaintiff to continue to bear the entire cost of the expenditures it has been and is continuing to make to support the health and safety of its members and residents of East Baton Rouge Parish in the face of the opioid crisis created by the Defendants. As a direct result of Defendants' conduct, Plaintiff EBRCOC has suffered actual injury and damages, including, but not limited to, significant expenses for unnecessary and inappropriate Opioid Drug prescriptions, associated health care costs for addiction related services and prescriptions, increased judicial and court costs, associated in part with an increase in crime rates and the need for children and family welfare services caused by the opioid epidemic. The full amount of these expenditures should be shifted to the Defendants.

931.     The EBRCOC seeks actual and compensatory damages; restitution; punitive or exemplary damages; costs incurred herein; the costs of abating the public nuisance; an order enjoining Defendants from further conduct contributing to the nuisance; and any such other relief as this Court deems just and proper.

**Count IV**
**FRAUD**
**La. C.C. 1953**
**Against All Defendants**

932.     Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

933.     Pursuant to La. C.C. 2315, "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."

934.    Under Louisiana law, "Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction." La. C.C. 1953.

935.    Manufacturer Defendants have committed fraud by violating their duty not to actively deceive by intentionally and unlawfully making known false statements, and by intentionally and unlawfully omitting and/or concealing information through their repeated material misrepresentation of presently existing or past facts, including but not limited to falsely representing that prescription Opioid Drugs are relatively safe for the management of chronic pain, intending that physicians (in prescribing), insurers and third-party payors, including the EBRCOC (in paying for them), and patients (in taking them) would and did, reasonably rely on Defendants' materially false representations.

936.    Manufacturer Defendants knew that Opioid Drugs were highly addictive and pose a significant risk of overdose, death, and long-term brain damage for those prescribed Opioid Drugs for non-indicated or approved uses or for an inappropriate duration or dosage.

937.    As alleged herein, all Defendants have committed fraud by violating their duty not to actively deceive by intentionally and unlawfully making known false statements, and by intentionally and unlawfully omitting and/or concealing information through their repeated material misrepresentation of presently existing or past facts, including but not limited to falsely representing their compliance with the Louisiana CDS Law and Louisiana DDD Act regulations, state and federal laws regarding their duties to prevent diversion and to monitor, investigate, report and halt suspicious orders of Opioid Drugs and/or concealing their noncompliance with these requirements, intending that the public, patients, physicians, insurers and third-party payors,

including the EBRCOC, would and did, reasonably rely on Defendants' materially false representations.

938.    Defendants had knowledge or belief of the falsity of these representations at the time they were made that was unknown or not knowable to the EBRCOC, healthcare providers, patients and the public.

939.    Defendants intended that others rely on these misrepresentations, and others, including prescribers, patients and insurers such as the EBRCOC, did reasonably rely on these representations.

940.    Defendants' illegal marketing, promoting, pricing, selling and distributing acts and practices have given an unjust advantage to Defendants and have caused losses to the public, patients and insurers like the EBRCOC.

941.    As a direct and foreseeable consequence of the Defendants' fraudulent acts, the EBRCOC has been damaged as alleged herein.

942.    The EBRCOC seeks compensatory damages, equitable relief, and such other relief as this Court deems just and proper.

**Count X**
**NEGLIGENT MISREPRESENTATION**
**La. C.C. 2315 and 2316**
**Against All Defendants**

943.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

944.    Pursuant to La. C.C. 2315, "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."

945.    Further under Louisiana law, "Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill." La. C.C. 2316.

946.    As alleged herein, Defendants made negligent misrepresentations to Plaintiff and others pursuant to La. C.C. 2315 and 2316.

947.    Defendants have failed to exercise reasonable care in the marketing and distribution of Opioid Drugs.

948.    Physicians prescribed Opioid Drugs for chronic pain, insurers and payors, including the EBRCOC, paid for them, and patients took them in reasonable and foreseeable reliance on Defendants' false and misleading statements as to the safety, efficacy and diversion of opioid drugs.

949.    Plaintiff has been damaged as alleged herein as a direct and foreseeable consequence of the Defendants' negligent misrepresentations and Plaintiff's reasonable reliance thereof.

950.    The EBRCOC seeks restitution, attorney's fees and costs for the losses incurred as a direct and proximate cause of Defendants' misrepresentations, and any and all equitable relief and such other relief as this Court deems just and proper.

## Count XI
## REDHIBITION
## La. C.C. 2520 *et seq.*
## Against All Defendants

951.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

952.    Pursuant to La. C.C. 2520 *et seq.,* through the manufacture, marketing, distribution, offer to sell and sale of Opioid Drugs, Defendants warranted to Plaintiff, patients, physicians,

insurers and the public that Opioid Drugs were of merchantable quality, safe and fit for their intended use.

953.    By virtue of the acts alleged herein, Defendants had reasons to know of the particular purpose for which the Plaintiff, patients, physicians, insurers and the public were purchasing and using Opioid Drugs. Therefore, pursuant to La. C.C. 2520 *et seq.*, Defendants warranted to the Plaintiff, patients, physicians, insurers and the public that Opioid Drugs were fit for that particular purpose.

954.    By virtue of the acts alleged herein, Defendants breached the statutory warranty of merchantability and of fitness for a particular purpose in that Opioid Drugs are not of merchantable quality, not safe for its intended use, and not safe for its particular purpose. This is because Opioid Drugs have dangerous and undisclosed propensities of abuse and addiction, resulting in serious and severe illness and injury to many of its users. Furthermore, the distribution of Opioid Drugs have a dangerous and undisclosed propensity to be diverted from legitimate distribution channels and entering into the black market.

955.    By virtue of the acts alleged herein, Defendants engaged in deceptive trade practices and represented that Opioid Drugs have characteristics, benefits, and/or qualities that they do not have and/or by representing that Opioid Drugs were of a particular standard, quality or grade, when in fact, the drugs were not of that standard, quality or grade.

956.    By virtue of the acts alleged herein, Defendants willfully and intentionally withheld information from the Plaintiff, patients, physicians, insurers and the public regarding the risks associated with Opioid Drugs use. Defendants knew that Opioid Drugs have defects but omitted to declare them. Further, Defendants declared that Opioid Drugs had qualities that Defendants knew it did not have.

957.     As a direct result of this breach of warranty, the Plaintiff has suffered and will continue to suffer damages.

958.     Pursuant to La C.C. 2545, Defendants is liable to the Plaintiff for the return of the price with interest from the time it was paid, for reimbursement of reasonable expenses occasioned by the sale, and for damages, including any consequential damages related to the undisclosed adverse effects of Opioid Drugs and their diversion, along with reasonable attorney fees.

**Count XII**
**UNJUST ENRICHMENT**
**Against All Defendants**

959.     Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

960.     By virtue of the acts alleged herein, Defendants knowingly, willfully, and intentionally marketed, promoted, sold and distributed Opioid Drugs in a false and deceptive manner.

961.     By virtue of the acts alleged herein, Defendants knowingly, willfully, and intentionally withheld crucial information from the public, patients, health care providers and insurers, including the EBRCOC, regarding the risks associated with Opioid Drugs and the high propensity for diversion of Opioid Drugs into the black market causing the current epidemic.

962.     By virtue of the acts alleged above, the EBRCOC has been harmed, and continues to be harmed by Defendants' actions.

963.     The EBRCOC has paid, reimbursed or otherwise conferred a benefit of over one hundred thousand dollars on Defendants that directly resulted from Defendants' fraudulent and misleading marketing and distributing practices and material misrepresentations.

964.    By virtue of the acts alleged herein, Defendants have been unjustly enriched as a result of their fraudulent and misleading marketing and distributing practices and material misrepresentations.

965.    Pursuant to La. C.C. 2298, Defendants are liable to the EBRCOC for compensation to the extent that Defendants have been enriched from the distribution and sale of Opioid Drug that were reimbursed by the ERBCOC and which resulted from Defendants' deceptive and illegal marketing and distribution and fraud on the EBRCOC.

## PRAYER FOR RELIEF

Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

WHEREFORE, the Plaintiff EBRCOC, demands judgement against each Defendant, jointly and severally, awarding the Plaintiff:

1.  A finding that by the acts alleged herein, Defendants violated the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c) and (d);

2.  A finding that by their acts alleged herein, Defendants violated the Louisiana Racketeering Act, La. R.S. § 15:15, *et seq.*;

3.  Actual and compensatory damages;

4.  An award three times the Plaintiff's damages pursuant to the federal Racketeer Influenced and Corrupt Organizations Act and/or the Louisiana Racketeering Act;

5.  A finding that by the acts alleged herein, Defendants violated the Louisiana Unfair Trade Practices and Consumer Protection Law,  La. R.S. §§ 51:401, *et seq.*;

6.  An award three times the Plaintiff's damages pursuant to the Louisiana Unfair Trade Practices and Consumer Protection Law;

7.  A finding that by the acts alleged herein the Defendants have created a public nuisance;

8.  All appropriate injunctive relief, costs and means necessary to fully abate the public nuisance created by Defendants;

9.  A finding that Defendants' actions, as alleged herein, constitute fraud, negligent misrepresentation, unjust enrichment and redhibition.

10. Disgorgement of the unjust enrichment gained by Defendants as a result of their unlawful conduct;

11. Attorneys' fees, pre-judgment interest, post-judgment interest, and costs incurred in this suit; and

12. any additional amount that this Court deems just and proper.

Dated: November 27, 2019                   Respectfully submitted,

                                            _/s/ Allan Kanner_
                                            **KANNER & WHITELEY, L.L.C.**
                                            Allan Kanner, Esq. (La. Bar #20580)
                                            a.kanner@kanner-law.com
                                            Conlee S. Whiteley, Esq. (La. Bar #22678)
                                            c.whiteley@kanner-law.com
                                            Annemieke M. Tennis, Esq. (La. Bar #37893)
                                            a.tennis@kanner-law.com
                                            701 Camp Street
                                            New Orleans, Louisiana 70130
                                            Tel.: (504) 524-5777
                                            Fax: (504) 524-5763


                                            **SHOWS, CALI & WALSH, LLP**
                                            John C. Walsh
                                            john@scwllp.com
                                            628 St. Louis Street
                                            Baton Rouge, Louisiana 70802
                                            (225) 346-1461


                                            **BEYCHOK LAW FIRM**
                                            Benjamin D. Beychok

{Cases; 00029402.DOCX}                          234

Bchok@aol.com
301 St. Ferdinand Street
Baton Rouge, Louisiana 70802
(225) 906-0050

*Attorneys for the Plaintiff East Baton Rouge Clerk of Court Office*